UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | | |
|---|---|---|
| GRIGSBY & ASSOCIATES, INC. and CALVIN B. GRIGSBY, | ) ) ) | Case No. **06-23035** _CIV-COOKE_ |
| Plaintiffs, | ) ) | |
| v. | ) ) | MAGISTRATE JUDGE BROWN |
| M SECURITIES INVESTMENT, HOWARD GARY & COMPANY , HOWARD V. GARY and the NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. | ) ) ) ) ) | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Defendants. | ) ) | |
| _____ | ) ) | |

Grigsby & Associates, Inc and Calvin Grigsby ("Grigsby"), for their Complaint against

Defendants M Securities Investment, Howard Gary & Company, Howard Gary (hereinafter

collectively referred to as "Howard Gary") and NASD state:

## I.  BACKGROUND

1.     On August 27, 1996, Grigsby & Associates, Inc. entered into an Agreement Among

Underwriters as Representative of Smith Barney, Howard Gary & Company and AIBC Investment to

purchase certain Resource Recovery Bonds (the "Bonds") from Metropolitan Dade County as Issuer.

2.     This Agreement Among Underwriters provided for a release of claims by Howard

Gary of all prior and future claims, agreements related to, derived from or associated with the Bonds

and stated it was the "entire agreement" between plaintiffs and Howard Gary.

3.     The Agreement Among Underwriters specifically provided:

"Each Underwriter and the Representative hereby release each Underwriter and the Representative and each Underwriter's and the Representative's successors, assigns and former and current parents and affiliates from all actions, causes of action, suits debts, sums of money, accounts reckonings, bonds bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever in law or equity, which each Underwriter and the Representative and each Underwriter's and Representative's successors, assigns and former and current parents and affiliates, ever had, now or hereafter can, shall or may have for, upon , or by reason of any matter related to or derived from the obligations hereunder or associated herewith (other than any action or claim relating to the performance of any obligation of any Underwriter or the Representative explicitly contained herein) from the beginning of the world through the date of delivery of the Bonds.  This Agreement constitutes the entire agreement between each Underwriter and the Representative. (See, page 3 of Exhibit 3 to Exhibit A hereto).

4.     On September 15, 2006, Defendants Howard Gary filed a statement of claim for arbitration under NASD rules stating that "[t]he case arises out  of a municipal bond transaction where Grigsby Associates failed to pay the Claimant fees and profits that it is entitled to receive by contract as co-underwriter."  (See, Exhibit A)

5.     On November 6, 2006, Defendants Howard Gary filed a Response to plaintiffs' motion to dismiss the arbitration stating that "Claimant was a third party beneficiary whose claim to funds arose when and if Grigsby received money from Rice, and that did not occur until August of 2005 at the earliest.  Grigsby's obligation continues even as of this date.  Therefore, the claim or

event did not begin to arise until August of 2005 and this matter has been timely filed." (See, Exhibit B, page 9).

6.     On or about December 7, 2006, defendant NASD ruled there was a factual issue as to whether the statute of limitations barred the arbitration and required the plaintiffs to submit an answer to the statement of claim under NASD rules.

## II.    NATURE OF THE ACTION

7.     This is an action to enjoin a NASD arbitration, a proceeding wrongfully initiated by Defendants Howard Gary and implemented by NASD based upon knowingly false representations by defendants Howard Gary that (a) their claim arose in 2005, (b) that they have a contract to receive a payment from a lawsuit between plaintiffs and their partner in a swap business, and (c) that there are numerous agreements between defendants and plaintiffs other than the Agreement Among Underwriters, and further based upon defendants Howard Gary intentionally and willfully failing to disclose to the NASD that the Agreement Among Underwriters expressly releases any and all of the baseless claims in their complaint and the Agreement Among Underwriters and is the entire agreement between Howard Gary and plaintiffs.

8.     The arbitration is wrongful for at least six reasons. First, none of the claims were brought under the Agreement between the parties; second, arbitration under NASD rules is only allowed for claims arising out of business between the parties and the Agreement Among Underwriters is the only business transaction between the parties1 and , to be sure, a third party

---

1 Under NASD rules the agreement to arbitrate in this context must relate to the Agreement Among Underwriters since this is the only business transaction between Howard Gary and plaintiffs:
**10201. Required Submission**
     (a) Except as provided in paragraph (b) or Rule 10216, a dispute, claim, or controversy eligible for submission under the Rule 10100 Series between or among members and/or associated persons, and/or certain others, arising in connection with the business of such member(s) or in connection with the activities of such associated person(s), or arising out of the employment or termination of employment of such associated person(s) with such member, shall be arbitrated under this Code, at the instance of:

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

lawsuit was not and cannot be the business between the parties; third, the Agreement Among Underwriters bars any claim except "any action or claim relating to the performance of any obligation of any Underwriter or the Representative explicitly contained herein" ; fourth, the claim is barred by the Florida 5 year statute of limitation on contract actions; fifth the defendant's determination that there is a factual dispute over when the "event or occurrence" underlying the action occurred given the express date of the agreement of August 27, 1996, is a clear violation of plaintiffs adhesion requirement to arbitrate if the statement of claim is filed within 6 years under the NASD rules; and sixth, based on written contract, the parties Agreement Among Underwriters does not contain an agreement to arbitrate, and in fact, it bars any claim for non performance of arbitration unless the right is explicitly required by the contract—arbitration is clearly not required.

### III.    JURISDICTION AND VENUE

9.      Federal jurisdiction lies under 15 U.S.C.S. @ 78aa and 9 U.S.C.S. @ 2,4.[2] Jurisdiction of the federal causes of action is conferred by 28 U.S.C. §1331.  Jurisdiction of the

---

(1) a member against another member

2 The defendants reliance on the Howsam and each of the other cases included in claimant's Response to show the Court has no jurisdiction to rule on "questions of arbitrability" attached as Exhibit B, present a different set of facts from the present case. Defendant's reliance on the Supreme Court's Howsam case is misplaced. In Howsam v. Dean Witter Reynolds, 537 U.S. 79, 123 S.Ct. 588 (2002), the Court was asked to rule whether the judiciary or the arbitrators should interpret an internal NASD rule requiring commencement of arbitration within 6 years. Howsam did not turn on the question of the application of the defense of statute of limitations. The Howsam decision is very clearly limited to the application by the NASD of its own internal time limit rule. The Supreme Court clearly recognized this distinction. Justice Breyer stated: "[w]e find that the applicability of the NASD time limit rule is a matter presumptively for the arbitrator, not the judge the NASD arbitrators, comparatively more expert about the meaning of their own rule, are comparatively better able to interpret and apply it." 537 U.S. 79, 85. The Howsam does not stand for the proposition that the Court should not decide the State of Florida law stature of limitations defense, especially where, as here, the parties clearly intended for the Court to apply Florida law. Justice Breyer stressed the reasoning behind Howsam-- that the NASD is better equipped to interpret and apply its own internal rule. That is not the case here. Plaintiffs are not asking this Court to interpret or apply the internal NASD time limit but the 5 year Florida time limit  We requests that the Court apply Florida law, as was the intent of the parties. Howsam, which involved a written agreement by a customer to arbitrate, rather than the written Agreement Among Underwriters, which bars all except explicit claims, is simply not on point. As Judge Breyer states:  We consequently conclude that the NASD's time limit rule falls within the class of gateway procedural disputes that do not present what out cases have called "questions of arbitrability."[i.e. questions of arbitrability are to be determined by the court] (at, 85-86) As the concurring opinion of Justice Thomas states:

causes of action under Florida law is conferred by 28 U.S.C. §1367. Venue is proper in the Southern District of Florida under 28 U.S.C. §1391(b).

## IV.   PARTIES

10.     Grigsby & Associates, Inc. is a private, for-profit corporation incorporated and domiciled in the State of California, and a member of the NASD.

11.     Grigsby is an individual residing and domiciled in the State of California. Grigsby is the CEO and President of Grigsby & Associates.

12.     M Securities is a corporation domiciled in Florida and appears to be a member of the NASD.

13.     Howard Gary & Company is, on information and belief, a Florida Corporation and predecessor of M Securities.

14.     Howard Gary is, on information and belief, a principal owner and control person of M Securities and Howard Gary & Company.

15.     The NASD is a voluntary association registered under the Securities Act of 1934 and engaged in regulation and enforcement of rules governing the business of member firms.

## V.   COUNT   1—INJUNCTION   AGAINST   FURTHER ARBITRATION BY HOWARD GARY DEFENDANTS

(To Enjoin the NASD Arbitration Pursuant to the Florida Arbitration Act)

---

"[a]rbitration is a matter of contract [citations]. In Volt v Stanford, 489 U.S. 468 (1989) we held that under the Federal Arbitration Act courts must enforce private agreements to arbitrate just as they would ordinary contracts: in accordance with their terms. Under <u>Volt when an arbitration agreement contains a choice of law provision, that provision must be honored, and a court interpreting the agreement must follow the law of the jurisdiction selected by the parties.</u>

16.     Plaintiffs repeat, reallege and incorporate each and every allegation contained in paragraphs 1 through 15 of this Complaint with the same force and effect as though fully set forth herein.

17.     Under Section 682.03(1) of the Florida Arbitration Code, Florida Statutes @ 682.01-682-22, a party cannot be required to submit to arbitration absent an agreement or provision to do so.

18.     Under Section 682.03(3), (4) of the Florida Arbitration Code an arbitration provision may be stayed unless the there is agreement to arbitrate the subject matter of the proposed arbitration.

19.     Defendants have asked to arbitrate claims for 25% of underwriting fees and 50% of net profits from a  swap transaction which are not included in the parties written Agreement Among Underwriters or any other written agreement between the parties and are directly contrary to the parties written Agreement.

20.     The parties Agreement Among Underwriters releases plaintiffs from any obligation not explicitly stated in the agreement.

21.     No arbitration provision is included in the Agreement Among Underwriters.

22.     Moreover, the defendants Howard Gary did not alleged in their statement of claim with the NASD any violation of any explicit provision of the Agreement.

23.     Plaintiffs' proceeds from a lawsuit settled in 2005 are not the subject of any business between the plaintiffs and Howard Gary defendants. Defendants have alleged no agreement to participate in any litigation settlements received by plaintiffs.

24.     No basis for arbitration of the spurious claims not connected to the Agreement Among Underwriters, which is "the entire agreement" between the parties, exists here.

25.     There is no express contractual provision for arbitration because neither the Agreement Among Underwriters nor any documents Grigsby & Associates or Defendant executed in connection with the purchase of the Bonds contain an arbitration clause.

26.     Accordingly, the NASD Arbitration should be enjoined as the statement of claim of defendants relates solely to the conduct released or barred by the Agreement of the parties.

27.     Moreover, the NASD Arbitration should be enjoined because it is barred by the State of Florida 5 year statute of limitations.

28.     Finally the NASD arbitration should be enjoined because the parties have not agreed to arbitrate and have released any obligation in any prior or future agreement to arbitrate which includes a release of the NASD requirement to arbitrate.

## VI.     INJUNCTIVE RELIEF AGAINST NASD

(Injunctive Relief)

29.     Plaintiffs repeat, reallege and incorporate each and every allegation contained in paragraphs 1 through 28 of this Complaint with the same force and effect as though fully set forth herein.

30.     Defendant's course of conduct, as alleged above, including attempting to arbitrate claims which have been released by the parties Agreement and which the parties have not contracted or otherwise agreed to arbitrate threatens Plaintiffs with irreparable harm. Plaintiffs litigation proceeds are not a part of the parties Agreement and can never be a subject matter of the litigation.

31.     The Arbitration directly implicates Grigsby & Associates conduct as Representative of the Underwriters. Neither Plaintiff has agreed to arbitrate any claims involving their conduct as Representative. Any decision reached during the pendency of the Arbitration irrevocably affects Plaintiffs' substantive rights, rights Plaintiffs are entitled to protect in an appropriate forum. Because

the Arbitration alleges breaches and/or violations by the Representative in a Bond Trust Agreement governed by Florida Law, this Court has a direct interest in adjudicating these issues and provides the appropriate forum for such adjudication.

32.     In order to force Defendants to identify a contract provision which was breached within 5 years of the date of the arbitration as described herein, an order should issue enjoining Defendant from further pursuing the Arbitration.

33.     Plaintiffs have no adequate remedy at law and cannot be adequately compensated by an award of money damages.

34.     The NASD Arbitration is not an appropriate forum for adjudication of questions of whether or not there are claims to be arbitrated or whether or not the Florida 5 year statute of limitation applies, plaintiffs should not be forced to participate in such arbitration.

35.     Any] award granted by the NASD arbitration panel is final and non-appealable. As a result, both plaintiffs would be irreparably harmed by any decision reached by the NASD arbitration panel with respect defendants baseless claims which have no basis in the Agreement Among Underwriters which by its explicit provisions is the exclusive, plain and unambiguous agreement among the parties.

## VII.  ORDER REQUESTED

Plaintiffs respectfully request that the Court enter an Order:

(a) enjoining the Arbitration, on the basis that no valid agreement supporting any of the claims asserted in the Statement of Claim (Exhibit A) exist; or

(b) enjoining the Arbitration, on the basis that the parties Agreement Among Underwriters expressly released and bars any agreement to arbitrate not explicitly stated therein; or

(c) enjoining the Arbitration, on the basis that the parties have no agreement to arbitrate the spurious subject matter in the defendant Howard Gary Statement of Claim; or

(d) enjoining the Arbitration, on the basis that the claim is based on a 1996 Agreement and has long been barred by the Florida Statute of limitations; or

(e) enjoining the Arbitration, under the doctrine of judicial estoppel because the defendants have intentionally misrepresented to the NASD the terms of the Agreement Among Underwriters and failed to disclose the release and bar provisions of the agreement and have attempted to dupe the arbitration panel that the contract right underlying their claims started in 2005 in order to subvert the statute of limitations ban; and

(f) sanction defendants and their counsel for willfully concealing the August 27, 1996 contract date in their pleadings in order to create a false fact issue on the statute of limitations; and

(b) awarding reasonable costs and attorneys' fees; and

(c) awarding such other and further relief as the Court may deem just and proper.

Calvin B. Grigsby
In Pro Per
Pro Hac Vice Application Pending
311 California Street
Suite 320
San Francisco, Ca 94104-2605
TEL:   415 392-4800
FAX:   415 676-2445
CA. BAR NO.:  53655

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by U.S. Mail

on the following counsel of record for Howard Gary Defendants, and the following representatives

of the NASD on the 13[h] day of December 2006.

Curtis Carlson
1200 Suntrust International Center
One Southeast Third Avenue
Miami, FL 33131

JoAnne Sorrentino
Lisa Lasher
NASD
5200 Town Center Circle
Suite 400
Boca Raton Florida  33486

CALVIN B. GRIGSBY

NASD DISPUTE RESOLUTION, INC.

CASE NO. 06 ˜04209

*In the matter of arbitration between:*

M SECURITIES INVESTMENT, INC.

Claimant,

vs.

GRIGSBY & ASSOCIATES, INC.
and CALVIN B. GRIGSBY,

Respondents.

_____/

## STATEMENT OF CLAIM

Claimant, M Securities Investment, Inc, which does business as Howard Gary &

Company, hereby files this statement of claim against Grigsby & Associates, Inc. ("Grigsby

Associates") and Calvin B. Grigsby ("Grigsby"), and alleges the following:

## INTRODUCTION

Claimant requests that this arbitration be held in Boca Raton, Florida. The events

that relate to the claims asserted herein all occurred in Miami-Dade County, Florida.

Grigsby Associates is a member of the National Association of Securities Dealers.

Grigsby is an associated person of a member. In addition, Grigsby Associates is registered with

the Municipal Securities Rule Making Board ("MSRB"), having been issued Registrant No.

A1706.

This case arises out of a municipal bond transaction where Grigsby Associates

failed to pay the Claimant fees and profits that it is entitled to receive by contract as co-

underwriter.

1

## FACTUAL BACKGROUND

Claimant was an active underwriter of municipal bonds in Miami-Dade County, Florida and in other locations in the United States. Claimant had been selected as the co-underwriter with Grigsby Associates on the bond offering and swap transaction involving approximately $183 million in industrial revenue bonds issued by Metropolitan Dade County on behalf of Montenay Power Corp. ("Montenay"). *See*, Letter of Juan Portunado, President of Montenay, attached as Exhibit 1; Bond Purchase Agreement, attached as Exhibit 2; and Agreement Among Underwriters, attached as Exhibit 3. The bonds were secured by revenues generated from the Miami-Dade County, Florida Resource Recovery Facility, which was a waste-to-energy facility operated by Montenay.

Claimant and Grigsby Associates and Grigsby had a binding agreement that Claimant would receive as its compensation for the underwriting and swap transaction an amount equal to the sum of (a) 25% of the underwriting fees and (b) 50% of the net profits, after deducting expenses of approximately $500,000, from the swap transaction. *See* Letter of Dade County Commissioner James Burke, attached as Exhibit 4. Grigsby Associates lined up a company owned by J. Donald Rice to perform the swap transaction. Both the issuance of the bonds and the swap transactions were successfully completed. *See* Article, The Bond Buyer, attached as Exhibit 5. As a result of the issuance of the bonds and the swap transaction, Grigsby Associates owed Claimant approximately (a) underwriting fees of $250,000 and (b) somewhere between $1 million and $2 million of Claimant's share of the net profits from the swap transaction.

For some unknown reason, the companies owned by J. Donald Rice failed to deliver to Grigsby the profits from the swap transaction. Accordingly, Grigsby Associates and

CARLSON & LEWITTES, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

Grigsby filed a lawsuit in the federal district court in Manhattan against J. Donald Rice and his companies. Grigsby Associates and Grigsby alleged that they were owed monies from the municipal bond swap transaction. On August 22, 2005, Grigsby Associates and Grigsby entered into a settlement agreement with the companies owned by J. Donald Rice. Pursuant to the settlement agreement, the companies owned by J. Donald Rice agreed to pay $1,750,000 to Grigsby Associates. The settlement agreement states that $182,966 would be payable every three months from December 15, 2005 through September 15, 2007, along with interest accruing at the rate of 4%.

Claimant recently discovered the fact that Grigsby Associates and Grigsby had settled with the companies owned by J. Donald Rice, when the Claimant obtained a copy of the Grigsby Associates' Form X-17A-5 directly from the Securities and Exchange Commission. A copy of the Form X-17A-5 is attached hereto as Exhibit 6. On pages 9-10 of this Form, there is a discussion of the lawsuit against J. Donald Rice and his companies and the settlement. Accordingly, this arbitration proceeding is timely brought.

CARLSON & LEWITTES, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

## RELIEF REQUESTED

Claimant seeks relief against Grigsby Associates and Grigsby in the form of (a) payment of underwriting fees that are due in the amount of $250,000 and (b) its 50% share of the net profit from the swap transaction. At a minimum, that amount is $1,750,000. Accordingly, the total request for relief is the sum of $2 million, plus prejudgment interest, costs and any other relief that the panel deems is appropriate and just, including an order requiring J. Donald Rice to pay the money directly to Claimant.

DATED this _15_ day of ~~July~~ sep au, 2006.

*Attorneys for Claimant*:

CARLSON & LEWITTES, P.A.

By: _Curtis Carlson_
Curtis Carlson, Fla.Bar. No. 236640
1200 Suntrust International Center
One Southeast Third Avenue
Miami, Florida 33131
Telephone: 305.372.9700
Facsimile:    305.372.8265
E-mail: carlson@carlson-law.net

4

# EXHIBIT 1



Via Telefax

July 11, 1996

Mr. Howard Gary
Howard Gary & Company
3050 Biscayne Boulevard
Miami, FL 33137

Dear Howard:

This is to confirm your participation as a co-manager in the underwriting team and the accompanying swap or other derivative products for the Dade County Resources Recovery refinancing subject to your final agreement(s) with Grigsby Brandford & Co., Inc.

We look forward to working with you again.

Sincerely,

Juan M. Portuondo
President

JMP/mt
31071896.jmp

cc:    Calvin B. Grisby
       Gerard Mozian
       Lourdes Reyes

# EXHIBIT 2

$182,695,000
# DADE COUNTY, FLORIDA
## RESOURCE RECOVERY FACILITY
## REFUNDING REVENUE BONDS,
## SERIES 1996

## BOND PURCHASE CONTRACT

August 29, 1996

Board of County Commissioners of
 Dade County, Florida
111 Northwest First Street
Miami, Florida 33128-1996

Ladies and Gentlemen:

Grigsby Brandford & Company (the "Senior Manager"), acting on behalf of itself and Smith Barney, Inc., Howard Gary & Company, and AIBC Investment Services Corporation (collectively, with the Senior Manager, the "Underwriters") offers to enter into this Bond Purchase Contract (the "Purchase Contract") with Metropolitan Dade County, Florida (the "County"), which, upon acceptance of this offer by the County, will be binding upon the County and the Underwriters. This offer is made subject to acceptance by the County  by execution of this Purchase Contract prior to 5:00 p.m., Eastern Daylight Time, on the date of this Purchase Contract, and, if not so accepted, will be subject to withdrawal by the Senior Manager upon written notice to the County at any time prior to its acceptance by the County.

The Senior Manager represents that it is authorized on behalf of itself and the other Underwriters to enter into and execute this Purchase Contract and to take any other actions which may be required on behalf of the other Underwriters.

All capitalized terms not otherwise defined in this Purchase Contract shall have the same meanings as set forth in the Ordinance, the Trust Indenture, and in the Official Statement.

1

1.  Purchase and Sale of Bonds.

    (a)    Subject to the terms and conditions and the basis of the representations, warranties and covenants set forth in this Purchase Contract, the Underwriters, jointly and severally, hereby agree to purchase from the County, and the County agrees to sell to the Underwriters on the Closing Date, all, but not less than all, of the $182,695,000 aggregate principal amount of Dade County, Florida Resource Recovery Facility Refunding Revenue Bonds, Series 1996, (the "Series 1996 Bonds"), at the aggregate purchase price of $179,712,639.95 (representing the principal amount of $182,695,000 less net original issue discount of $1,528,107.85 and an Underwriters' discount of  $1,454,252.20), plus accrued interest of $236,327.31 from September 1 , 1996, to the Closing Date. The Series 1996 Bonds shall bear interest at the rates, be sold to the public at the prices and mature on the dates all as set forth on Schedule I to this Purchase Contract. The Official Statement of the County relating to the Series 1996 Bonds, dated August 29, 1996, including the cover page and Appendices, with such additional changes and amendments as shall be approved by the Senior Manager and the County Manager or his designee, is referred to as the "Official Statement", in substantially the form attached as Exhibit "A" and incorporated by reference. The Underwriters agree to make a bona fide public offering of the Series 1996 Bonds, solely pursuant to the Official Statement, at the initial offering prices set forth in the Official Statement, reserving, however, the right to change such initial offering prices as the Senior Manager shall deem necessary in connection with the marketing of the Series 1996 Bonds and to offer and sell the Series 1996 Bonds to certain dealers (including dealers depositing the Series 1996 Bonds into investment trusts) at concessions to be determined by the Senior Manager. The Underwriters also reserve the right to over allot or effect transactions that stabilize or maintain the market prices of the Series 1996 Bonds at levels above that which might otherwise prevail in the open market and to discontinue such stabilizing, if commenced, at any time.

    (b)    The Series 1996 Bonds shall be substantially in the form described in, and secured pursuant to, the Trust Indenture dated as of September 1, 1996 by and between the County and SunTrust Bank, Central Florida, National Association, Orlando, Florida as Trustee (the "Trustee"), Ordinance No. 96-120 (the "Ordinance") enacted by the Board of County Commissioners of Dade County, Florida (the "Board") on July 18, 1996, as supplemented by Resolution No. R-919-96, adopted by the Board on July 18, 1996, (the "Series 1996 Resolution" and, together with the Ordinance, the "Ordinance"). The Board is authorized to issue the Series 1996 Bonds pursuant to the Constitution and the laws of the State of Florida, more particularly described as Chapter 125, Florida Statutes, as amended, the Metropolitan Dade County Home Rule Amendment and Charter (the "Charter"), the Trust Indenture and the Ordinance. Between the date of this Purchase Contract and the Closing Date, no changes in the Ordinance shall be made unless mutually agreed upon between the

County and the Senior Manager. The Underwriters have delivered to the County a disclosure letter containing the information required by Section 218.385, Florida Statutes, which letter is in the form attached to this Purchase Contract as Schedule II.

(c)     The Series 1996 Bonds are being issued for the purpose of providing funds together with other available funds, if any, (i) to refund all of the $55,000,000 Dade County, Florida Adjustable Tender Solid Waste Industrial Revenue Bonds, Series 1988, dated as of February 22, 1988, presently outstanding in the aggregate principal amount of $49,115,000 (the "Series 1988 Bonds"), the $18,000,000 Dade County, Florida Adjustable Tender Solid Waste Industrial Revenue Bonds, Series 1989 dated as of May 23, 1989, presently outstanding in the aggregate principal amount of $8,555,000 (the "Series 1989 Bonds") and the $190,000,000 Dade County, Florida Adjustable Tender Solid Waste Industrial Revenue Bonds, Series 1990A dated as of December 27, 1990, presently outstanding in the aggregate principal amount of $129,955,000 (the "Series 1990A Bonds" and, collectively with the Series 1988 Bonds and the Series 1989 Bonds, the "Prior Bonds"), and (ii) to pay the costs of issuance relating to the Series 1996 Bonds, including the premium for the municipal bond insurance policy and the Reserve Fund Surety Bond.

(d)     The proceeds of the Series 1996 Bonds, along with certain other funds of the County, if any, will be deposited into an account created pursuant to an Escrow Deposit Agreement (the "Escrow Deposit Agreement"), dated as of September 10, 1996, between the County and the Trustee. The monies deposited pursuant to the Escrow Deposit Agreement will be applied to the purchase of noncallable direct obligations of the United States of America or held as uninvested cash so as to produce sufficient funds to pay when due, upon redemption, the principal of, redemption premium, if any, and interest on the Prior Bonds. The proceeds of the Series 1996 Bonds will be used to refund and pay all the Prior Bonds and to pay all amounts due to Banque Paribas for certain letters of credit as more particularly described in the Escrow Deposit Agreement.

(e)     The County authorizes the Underwriters to use and distribute copies of the Official Statement and copies of the Ordinance in connection with the public offering and sale of the Series 1996 Bonds and agrees not to supplement or amend or cause to be supplemented or amended the Ordinance, the Trust Indenture or the Official Statement, at any time prior to the Closing, without the consent of the Senior Manager.

(f)     The County consents to the use by the Underwriters of the Preliminary Official Statement dated August 20, 1996, relating to the Series 1996 Bonds (the "Preliminary Official Statement") in connection with the original public offer, sale and distribution of the Series 1996 Bonds by the Underwriters. As of its date, the

Preliminary Official Statement was "deemed final" (except for permitted omissions) by the County for purposes of Rule 15c2-12 of the Securities and Exchange Act of 1934, as amended ("Rule 15c2-12").

(g)     On the Closing Date, the County shall deliver, or cause to be delivered, to the Underwriters copies of the final Official Statement dated the date of this Purchase Contract as shall have been accepted expressly by the Underwriters (which acceptance will not be unreasonably withheld) relating to the Series 1996 Bonds, and shall cause copies of the Official Statement, in sufficient quantity for the Underwriters to comply with the rules of the Municipal Securities Rulemaking Board, including Rule G-32 and Securities and Exchange Commission Rule 15c2-12(b)(4), to be available to the Underwriters within seven (7) business days of the execution of this Purchase Contract and in sufficient time to accompany any confirmation that requests payment from any customer of the Underwriters. Delivery of such copies of the Official Statement within such seven (7) business day period shall constitute the County's representation that such Official Statement is complete as of the date of its delivery. The County agrees to deliver to the Underwriters such reasonable quantities of the Preliminary Official Statement and the Official Statement and such reasonable quantities of the Ordinance as the Underwriters may request for use in connection with the offering and sale of the Series 1996 Bonds.

2.      Events Requiring Disclosure. If at any time prior to Closing and within the Disclosure Period any event known to the County relating to or affecting the Ordinance, the Trust Indenture or the Series 1996 Bonds shall occur which might affect the correctness or completeness of any statement of a material fact contained in the Official Statement (an "Event Requiring Notification"), the County will promptly notify the Senior Manager in writing of the circumstances and details of such event. If, as a result of such event or any other event, it is necessary, in the opinion of the County Attorney, the County Manager, the Finance Director, Co-Bond Counsel, the Senior Manager or Co-Counsel to the Underwriters to amend or supplement the Official Statement in order to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading and any such counsel shall have so advised the County, the County will, at its expense, take all actions necessary to carry out the full purpose and intent and to fully comply with Section 5(w).

3.      Good Faith Check.    The County acknowledges receipt from the Senior Manager of a corporate check in the aggregate amount of $1,826,950 (the "Good Faith Check"), which is being delivered to the County as security for the performance by the Underwriters of their obligation to accept and pay for the Series 1996 Bonds. The County agrees not to cash the Good Faith Check unless the Underwriters default on their obligations under this Purchase Contract. Upon compliance by the Underwriters with their obligations under this Purchase Contract, the Good Faith Check shall be returned to the Underwriters at the Closing. If the County does not accept this offer, the Good Faith Check shall be immediately returned to the

4

Senior Manager. In the event of the County's failure to deliver the Series 1996 Bonds at the Closing, or if the County shall be unable at or prior to the Closing to satisfy the conditions to the obligations of the Underwriters, or if the obligations of the Underwriters shall be terminated for any reason permitted by this Purchase Contract, the Good Faith Check shall be immediately returned to the Senior Manager and such return of the Good Faith Check shall constitute a full release and discharge of all damages for such failure and termination since it is understood by both the County and the Underwriters that actual damages in such circumstances may be difficult or impossible to compute. If the Underwriters fail other than for a reason permitted under this Purchase Contract to accept and pay for the Series 1996 Bonds upon their tender by the County at the Closing, the County may cash the Good Faith Check and retain the funds represented by such Good Faith Check as full liquidated damages, and not as a penalty, for such failure and for any and all defaults on the part of the Underwriters, and the retention of such funds shall constitute a full release and discharge of all claims, rights and damages for such failure and for any and all such defaults.

4.   Closing.       The Closing will occur before 1:00 p.m., Eastern Daylight Time, on September 10, 1996, or at such other time or on such earlier or later date as shall have been mutually agreed upon by the County and the Senior Manager. Prior to the Closing, the County will deposit with The Depository Trust Company ("DTC") a Bond Certificate for each maturity of the Series 1996 Bonds registered in the name of DTC's nominee, Cede & Co. representing in the aggregate, 100% of the principal amount of such Series 1996 Bonds. The County has provided DTC with its blanket letter of representations. The Senior Manager, on behalf of the Underwriters, will accept such delivery and pay the purchase price of the Series 1996 Bonds by delivering to the County a wire transfer credited to the order of the County in immediately available federal funds. Payment for and delivery of the Series 1996 Bonds shall be made at such place as shall be agreed upon between the County and the Senior Manager. Such payment and delivery is called the "Closing" and the date of the Closing is called the "Closing Date."

5.   Representations, Warranties, and Covenants of the County. The County, by its acceptance of this Purchase Contract, represents, warrants and covenants to each of the Underwriters as of the date of this Purchase Contract that:

(a)   the County is, and will be on the Closing Date, a political subdivision of the State of Florida duly created and validly existing under the Constitution and laws of the State of Florida;

(b)   the Board had, has and will have, as the case may be, full legal right, power and authority (i) to enact or adopt the Ordinance, to execute and deliver, as the case may be, this Purchase Contract, the Escrow Deposit Agreement, the Trust Indenture, the Loan Agreement, the Management Agreement, the Swap Agreement, the 1996 Note, the Preliminary Official Statement and the Official Statement; (ii) to issue, sell, execute and deliver the Series 1996 Bonds to the Underwriters as provided in this

5

Purchase Contract; (iii) to secure the Series 1996 Bonds in the manner contemplated by the Trust Indenture and the Ordinance; and (iv) to carry out and consummate all other transactions contemplated by the preceding documents and instruments;

(c)    the Board has duly enacted and adopted the Ordinance and has duly authorized or ratified (i) the execution, delivery and performance of this Purchase Contract, the Escrow Deposit Agreement, the Trust Indenture, the Management Agreement, the Swap Agreement, the 1996 Note, and the issuance, sale, execution and delivery of the Series 1996 Bonds; (ii) the delivery and the distribution of the Preliminary Official Statement and delivery and distribution of the Final Official Statement; and (iii) the taking of any and all such action as may be required on the part of the County to carry out, give effect to and consummate the transactions contemplated by the preceding documents and instruments; provided, however, that no representation is made concerning compliance with the federal securities laws or securities or Blue Sky laws of the various states;

(d)    this Purchase Contract, the Escrow Deposit Agreement, the Trust Indenture, the Loan Agreement, the Management Agreement, the Swap Agreement, and the 1996 Note, when executed and delivered by the parties, will, and the Ordinance does, constitute the legal, valid and binding obligations of the County enforceable in accordance with their terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium or other laws affecting creditors' rights generally or subject to the exercise of the state's police power and to judicial discretion in appropriate cases;

(e)    the County has complied, and will at the Closing be in compliance, in all material respects, with the Ordinance and the Trust Indenture;

(f)    when paid for by the Underwriters at the Closing in accordance with the provisions of this Purchase Contract, and when authenticated by the Bond Registrar, the Series 1996 Bonds will be duly authorized, executed, issued and delivered and will constitute legal, valid and binding obligations of the County enforceable in accordance with their terms and the terms of the Ordinance, except as enforcement may be limited by bankruptcy, insolvency, moratorium or other laws affecting creditors' rights generally or subject to the exercise of the state's police power and to judicial discretion in appropriate cases;

(g)    the Ordinance creates a valid pledge of, and lien and charge upon, the proceeds of the Trust Estate to the extent set forth in the Ordinance and the Trust Indenture;

(h)    at Closing, all approvals, consents and orders of and filings with any governmental authority or agency, if any, which would constitute a condition precedent to the issuance of the Series 1996 Bonds or the execution and delivery of or the performance by the County of its obligations under this Purchase Contract, the Trust

6

Indenture, the Series 1996 Bonds, the Ordinance, the Loan Agreement, the Management Agreement, the Swap Agreement, or the 1996 Note will have been obtained or made and any consents, approvals and orders so received or filings so made will be in full force and effect; provided, however, that no representation is made concerning compliance with the federal securities laws or the securities or Blue Sky laws of the various states or the legality of the Series 1996 Bonds for investment under the laws of the various states;

(i)    other than as disclosed in the Official Statement, the execution and adoption by the Board and performance by the County of the Ordinance and the authorization, execution, delivery and performance of this Purchase Contract, the Escrow Deposit Agreement, the Management Agreement, the Loan Agreement, the Swap Agreement, the 1996 Note, the Series 1996 Bonds, and any other agreement or instrument to which the County is a party, used or contemplated for use in consummation of the transactions contemplated by this Purchase Contract or by the Official Statement, and, to the best of the County's knowledge, compliance with the provisions of each such instrument, do not and will not conflict with, or constitute or result in (i) a violation of the Constitution of the State of Florida, or any existing law, administrative regulation, rule, decree or order, state or federal, or the Charter or the Code of Metropolitan Dade County; or (ii) a breach of or default under a material provision of any agreement, indenture, lease, note or other instrument to which the County, or its properties or any of the officers of the County as such is subject; or (iii) the creation or imposition of any prohibited lien, charge or encumbrance of any nature upon any of the revenues, credit, property or assets of the County under the terms of the Constitution of the State of Florida or any law, instrument or agreement;

(j)    the Preliminary Official Statement and the Official Statement and any amendment or supplement to each (including any financial and statistical data included in each) will at all times prior to and including the Closing Date be true, correct and complete in all material respects and will not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading;

(k)    at Closing, the financial statements and other historical financial and statistical information contained in the Official Statement will fairly represent the financial position and results of operations of the Dade County Department of Solid Waste (the "Department") as of the dates and for the periods of time set forth in accordance with generally accepted accounting principles applicable to governmental units (including any applicable State of Florida requirements) as in effect from time to time and applied consistently;

(l)    except as otherwise described in the Official Statement, there shall not have been any material adverse change since September 30, 1995 in the results of operations or

7

financial condition of the Department other than changes in the ordinary course of business or in the normal operations of the Department;

(m)   between the time of execution of this Purchase Contract by the County and the Closing, the County will not execute or issue any bonds or notes on a parity with the Series 1996 Bonds without the written consent of the Senior Manager, or incur any other obligations or borrow money secured by the Trust Estate;

(n)   the County will furnish such information, execute such instruments and take such other action in cooperation with the Underwriters as the Underwriters may reasonably request to qualify the Series 1996 Bonds for offer and sale and to determine the eligibility of the Series 1996 Bonds for investment under the Blue Sky or other securities laws and regulations of such states and other jurisdictions of the United States of America as the Senior Manager may designate, provided that the County shall not be required to file a general consent to service of process or qualify to do business in any jurisdiction or become subject to service of process in any jurisdiction in which the County is not now subject to such service;

(o)   to the best of the County's knowledge and belief, other than as described in the Official Statement, there is no claim, action, suit, proceeding, inquiry or investigation, at law or in equity, or before or by any court, public board or body pending, or, to the best knowledge of the County, threatened against or affecting the County: (i) to restrain or enjoin the issuance or delivery of any of the Series 1996 Bonds or the collection of the revenues pledged under the Ordinance or the Trust Indenture; (ii) in any way contesting or affecting: (1) the authority for the issuance of the Series 1996 Bonds; (2) the validity or enforceability of the Series 1996 Bonds, the Ordinance, the Trust Indenture, this Purchase Contract, the Loan Agreement, the 1996 Note, the Management Agreement, the Swap Agreement, or the Escrow Deposit Agreement; or (3) the power of the Board to duly enact and adopt the Ordinance and to execute and deliver the Series 1996 Bonds, this Purchase Contract, the Trust Indenture, the Loan Agreement, the 1996 Note, the Management Agreement, the Swap Agreement, and the Escrow Deposit Agreement, or to consummate the transactions relating to the County contemplated by the Ordinance, the Trust Indenture, the Loan Agreement, the 1996 Note, the Management Agreement, the Swap Agreement, the Escrow Deposit Agreement and this Purchase Contract; (iii) in any way contesting the existence or powers of the County or the Board or the title to office of any member of the Board; or (iv) contesting in any way the completeness, accuracy or fairness of the Official Statement;

(p)   the County will not knowingly take or omit to take any action, which action or omission would adversely affect the exclusion from gross income for federal income tax purposes of the interest on the Series 1996 Bonds under the Internal Revenue Code of 1986, as amended;

8

(q)     to the best of the County's knowledge, since December 31, 1975, the County has not been in default in the payment of principal of, redemption premium, if any, or interest on, any direct County indebtedness or other obligations in the nature of direct County indebtedness which it has issued, assumed or guaranteed as to payment of principal, redemption premium, if any, or interest;

(r)     any certificate signed by any official of the County and delivered to the Underwriters in connection with the issuance, sale and delivery of the Series 1996 Bonds shall be deemed to be a representation and warranty by the County to each of the Underwriters as to the statements made in the certificate;

(s)     the Series 1996 Bonds as issued will conform in all material respects to the description of the Series 1996 Bonds in the Official Statement;

(t)  .  the County will apply the proceeds of the Series 1996 Bonds in accordance with the Ordinance, the Escrow Deposit Agreement and the Trust Indenture, and as contemplated by the Official Statement;

(u)     neither the County nor anyone authorized to act on its behalf, directly or indirectly, has offered the Series 1996 Bonds for sale to, or solicited any offer to buy, the Series 1996 Bonds from anyone other than the Underwriters;

(v)     all proceedings of the Board relating to the enactment and adoption of the Ordinance, the approval and authorization of the execution and delivery of the Trust Indenture, the Loan Agreement, the 1996 Note, the Management Agreement, the Swap Agreement, this Purchase Contract and the Official Statement, and the approval and authorization of the issuance and sale of the Series 1996 Bonds were conducted at duly convened meetings of the Board with respect to which all required notices were duly given to the public and at which quorums were or will be at all material times present, and no authority or proceeding for the issuance of the Series 1996 Bonds has been repealed, rescinded, or revoked;

(w)    during the Disclosure Period as defined in this Purchase Contract, (i) the County will not adopt any amendment of or supplement to the Official Statement to which, after having been furnished with a copy, the Underwriters shall reasonably object in writing, unless the County has obtained the opinion of Co-Bond Counsel, stating that such amendment or supplement is necessary in order to make the Official Statement not misleading in light of the circumstances existing at the time that it is delivered to a purchaser, and (ii) if any event relating to or affecting the County shall occur which would or might cause the information contained in the Official Statement, as then supplemented or amended, to contain any untrue statement of a material fact or to omit to state a material fact required to be stated therein or necessary to make the

statements therein, in light of the circumstances under which they were made, not misleading, the County shall notify the Underwriters, and if as a result of which it is necessary, in the opinion of Co-Counsel to the Underwriters, to amend or to supplement the Official Statement in order to make the Official Statement not misleading in light of the circumstances existing at the time it is delivered to a purchaser, the County shall immediately prepare and furnish to the Underwriters (at the expense of the County) a reasonable number of copies of an amendment of or supplement to the Official Statement (in form and substance satisfactory to the Underwriters and the County) which will amend or supplement the Official Statement so that such Official Statement, as amended or supplemented, will not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances existing at the time the Official Statement is delivered to a purchaser, not misleading in any material respect. Unless otherwise notified in writing by the Underwriters on or prior to the Closing Date, the End of the Underwriting Period for the Series 1996 Bonds for all purposes of Rule 15c2-12 is the Closing Date. In the event such notice is given in writing by the Underwriters, the Underwriters agree to notify the County in writing following the occurrence of the End of the Underwriting Period for the Series 1996 Bonds;

(x)   For the purposes of this Purchase Contract, the term "Disclosure Period" shall mean the earlier of (1) ninety (90) days from the End of the Underwriting Period, or (2) the time when the Official Statement is available to any person from a nationally recognized municipal securities information repository, but in no case less than twenty-five (25) days following the End of the Underwriting Period.

(y)   the County has agreed, in the Trust Indenture, to comply with the continuing disclosure requirements of Rule 15c2-12 promulgated by the Securities and Exchange Commission and in particular will provide the following information: (i) certain annual financial information and operating data (the "Annual Information") for the preceding fiscal year together with the County's most recent audited financial statements that are normally available to the general public; (ii) timely notice of the occurrence of certain material events with respect to the Series 1996 Bonds; and (iii) timely notice of the County's inability to provide the Annual Information on or before the date specified in the Trust Indenture.

6.   Conditions of Closing.   The Underwriters have entered into this Purchase Contract in reliance on the representations and agreements of the County. The obligations of the Underwriters shall be subject to the performance by the County of its obligations to be performed at or prior to the Closing, to the accuracy of and compliance with the representations, warranties and covenants of the County, in each such case as of the time of delivery of this Purchase Contract and as of the Closing, and are also subject, in the

10

discretion of the Senior Manager, to the following further conditions:

(a)     at Closing, (i) the Ordinance, the Trust Indenture, the Loan Agreement, the 1996 Note, the Management Agreement, the Swap Agreement, the Escrow Deposit Agreement, and this Purchase Contract shall be in full force and effect and shall not have been repealed, amended, modified or supplemented, except as may have been agreed to in writing by the Senior Manager, and the County shall have executed each of them and there shall have been taken in connection with each of them and in connection with the issuance of the Series 1996 Bonds, all such action as shall, in the opinions of Bryant, Miller & Olive, P.A. and Manuel Alonso-Poch, P.A. ("Co-Bond Counsel") or Thomas J. Korge, P.A., and Harold Long, Jr., Esquire ("Co-Counsel to the Underwriters"), be necessary in connection with the transactions contemplated by this Purchase Contract, (ii) the Series 1996 Bonds shall have been duly authorized, executed and delivered, (iii) the Official Statement shall not have been amended, modified or supplemented, except as may have been agreed to in writing by the Senior Manager, and (iv) the County shall perform or have performed all of its obligations under or specified in this Purchase Contract, the Escrow Deposit Agreement, the Trust Indenture, the Loan Agreement, the 1996 Note, the Management Agreement, the Swap Agreement, the Official Statement, and the Ordinance;

(b)     at or prior to the Closing Date, the Underwriters shall have received the following:

(i)      the opinion of the County Attorney, dated the Closing Date, in a form acceptable to the Senior Manager and the County;

(ii)     the final approving opinions of Co- Bond Counsel, dated the Closing Date in substantially the form attached to the Official Statement as Appendix "E ";

(iii)    the opinions of Co-Counsel to the Underwriters dated the Closing Date, to the effect that the Series 1996 Bonds are not subject to the registration requirements of the Securities Act of 1933, as amended, and the Trust Indenture and the Ordinance are exempt from qualification under the Trust Indenture Act of 1939, as amended. Such opinions shall also state that, based upon their participation in the preparation of the Official Statement as Co-Counsel to the Underwriters and without having undertaken to determine independently the accuracy or completeness of the contents of the Official Statement, nothing has come to the attention of such co- counsel which has caused them to believe that the Official Statement (except for the financial and statistical data to which no view need be expressed) as of its date contained, or as of the Closing Date contains, any untrue statement of a material fact or omits to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were

11

made, not misleading; and

(iv)    the supplemental opinions of Co-Bond Counsel, dated the Closing Date, in a form acceptable to the Senior Manager and the County;

(v)    an executed copy of this Purchase Contract, the Trust Indenture, the Loan Agreement, the 1996 Note, the Management Agreement, the Swap Agreement, and the Escrow Deposit Agreement;

(c)    at Closing, the Underwriters shall receive a certificate, dated the Closing Date, signed by the County Manager or Assistant County Manager to the effect that, to the best of their knowledge, information and belief: (i) the representations and warranties of the County contained in this Purchase Contract are true and correct in all material respects as of the Closing Date as if made on the date of this Purchase Contract; and (ii) the County has performed all obligations to be performed under this Purchase Contract as of the Closing Date;

(d)    at Closing, the Underwriters shall receive a copy of the Ordinance certified by the Ex-Officio Clerk or Deputy Clerk of the County as a true and correct copy of the original, as currently in full force and effect and as not having been otherwise amended since its adoption, except as provided in this Purchase Contract;

(e)    at Closing, the Underwriters shall receive letters from Moody's Investors Service Inc. ("Moody's"), and Standard & Poor's Ratings Services, a division of McGraw-Hill Corporation ("S&P"), confirming that they have rated the Series 1996 Bonds "Aaa" and "AAA", respectively, and that such ratings are in effect on the Closing Date;

(f)    at Closing, the Underwriters shall receive a certificate from the Trustee, dated the Closing Date and addressed to the Underwriters, Co-Bond Counsel and the County to the effect that (i) the Trustee is a national bank association, duly organized and validly existing under the laws of the United States of America and authorized to do business in the State of Florida, (ii) the Trustee has duly accepted its duties under the Ordinance and the Trust Indenture, and (iii) the Trustee has taken all necessary corporate action required to act in its role as trustee, bond registrar, authentication agent, and paying agent under the Ordinance and the Trust Indenture and to perform its duties under each;

(g)    at Closing, the Underwriters shall receive a letter from Deloitte & Touche LLP, addressed to the County, dated the date of the Closing, to the effect that they consent to the inclusion of the audited financial statement for Fiscal Year 1994-95, or their most recent financial statement, as the case may be, of the Department in the Preliminary Official Statement and the Official Statement and to the references made to them in the Preliminary Official Statement and the Official Statement;

12

(h)     at Closing, the Underwriters shall receive evidence satisfactory to the Underwriters that AMBAC Indemnity Corporation (the "Bond Insurer") has issued a policy of insurance guaranteeing the timely payment of principal of and interest on the Series 1996 Bonds (the "Bond Policy");

(i)     at Closing, the Underwriters shall receive an opinion of Bond Insurer's counsel, addressed to the Underwriters, in a form and substance satisfactory to the Underwriters;

(j)     at Closing, the Underwriters shall receive a certificate of the Escrow Agent dated the Closing Date and addressed to the Underwriters, Co-Bond Counsel and the County to the effect that (i) the Escrow Agent is a national bank association, duly organized and validly existing under the laws of the United States of America and authorized to do business in the State of Florida, (ii) the Escrow Agent has duly accepted its duties under the Escrow Deposit Agreement, has full legal right and procedural authority to act in such role as Escrow Agent under the Escrow Deposit Agreement and to perform its duties under the Escrow Deposit Agreement;

(k)     at Closing, the Underwriters shall receive the Termination Agreement executed by the authorized representatives of Banque Paribas and the other syndicate banks dated the Closing Date.

(l)     at Closing, the Underwriters shall receive such additional legal opinions, certificates (including such certificates as may be required by regulations of the Internal Revenue Service in order to establish the exclusion from income, for federal income tax purposes, of the interest on the Series 1996 Bonds, which certificates shall be satisfactory in form and substance to Co-Bond Counsel) and other evidence as the Senior Manager, Co-Bond Counsel, or Co-Counsel to the Underwriters may reasonably deem necessary, provided such additional legal opinions, certificates and other evidence is requested by the Senior Manager at least two business days before the Closing;

The foregoing opinions, certificates and other evidence shall be in form and substance satisfactory to the Senior Manager.

If the County shall be unable to satisfy the conditions to the obligations of the Underwriters contained in this Purchase Contract, or if the obligations of the Underwriters shall be terminated for any reason permitted by this Purchase Contract, this Purchase Contract shall terminate and neither the Underwriters nor the County shall be under any further obligation or liability to the other, except as provided in Section 9 and except that the Good Faith Check shall be returned to the Senior Manager by the County.

13

7.   Termination of Purchase Contract.   The Senior Manager may terminate this Purchase Contract, without liability therefor, by written notification to the County, if at any time subsequent to the date of this Purchase Contract and at or prior to the Closing:

(a)   the marketability of the Series 1996 Bonds or the market price, in the opinion of the Senior Manager, has been materially adversely affected by an amendment to the Constitution of the United States of America or by any legislation (other than any actions taken by either House of Congress on or prior to the date of this Purchase Contract, (i) enacted or adopted by the United States of America, (ii) recommended to the Congress or otherwise endorsed for passage, by press release, other form of notice or otherwise, by the President of the United States of America, the Chairman or ranking minority member of the Committee on Finance of the United States Senate or the Committee on Ways and Means of the United States House of Representatives, the Treasury Department of the United States of America or the Internal Revenue Service, or (iii) favorably reported out of the appropriate Committee for passage to either House of the Congress by any full Committee of such House to which such legislation has been referred for consideration, or by any decision of any court of the United States of America or by any order, rule or regulation (final, temporary or proposed) on behalf of the Treasury Department of the United States of America, the Internal Revenue Service or any other authority or regulatory body of the United States of America, or by a release or announcement or communication issued or sent by the Treasury Department of the United States of America or the Internal Revenue Service, or any comparable legislative, judicial or administrative development affecting the federal tax status of the County, its property or income, obligations of the general character of the Series 1996 Bonds, as contemplated hereby, or any tax exemption of the Series 1996 Bonds; or

(b)   any legislation, rule, or regulation shall be introduced in, or be enacted or adopted by any department or agency in the State of Florida, or a decision by any court of competent jurisdiction within the State of Florida shall be rendered which, in the reasonable opinion of the Senior Manager, materially and adversely affects the market for the Series 1996 Bonds or the sale, at the contemplated offering prices by the Underwriters of the Series 1996 Bonds to be purchased by them; or

(c)   any amendment to the Official Statement is proposed by the County or deemed necessary by Co-Bond Counsel or the Senior Manager which, in the reasonable opinion of the Senior Manager, materially and adversely affects the market for the Series 1996 Bonds or the sale, at the contemplated offering prices, by the Underwriters of the Series 1996 Bonds to be purchased by them; or

(d)   a national or international calamity or crisis shall have occurred or escalated which, in the sole opinion of the Senior Manager with the concurrence of the County

14

adversely affects the market for the Series 1996 Bonds or the sale, at the contemplated offering prices, by the Underwriters of the Series 1996 Bonds to be purchased by them; or

(e)    legislation shall be introduced by amendment or otherwise in or be enacted by, the House of Representatives or the Senate of the Congress of the United States of America, or a decision by a Court of the United States of America shall be rendered, or a stop order, ruling, release, regulation, official statement or no-action letter by or on behalf of the Securities and Exchange Commission or any other governmental agency having jurisdiction of the subject matter of the Series 1996 Bonds shall have been proposed, issued or made (which is beyond the control of the Senior Manager or the County to prevent or avoid) to the effect that the issuance, offering or sale of the Series 1996 Bonds, including all the underlying obligations as contemplated by this Purchase Contract or by the Official Statement, or any document relating to the issuance, offering or sale of the Series 1996 Bonds is or would be in violation of any of the federal securities laws at Closing, including the Securities Act of 1933, as amended and then in effect, the Securities Exchange Act of 1934, as amended and then in effect, or the Trust Indenture Act of 1939, as amended and then in effect, or with the purpose or effect of otherwise prohibiting the offering and sale of obligations of the general character of the Series 1996 Bonds, or the Series 1996 Bonds, as contemplated by this Purchase Contract; or

(f)    there shall have occurred, after the signing of this Purchase Contract, either a financial crisis or a default with respect to the debt obligations of the County, or proceedings under the federal bankruptcy laws shall have been instituted by the County, in either case the effect of which, in the reasonable judgment of the Senior Manager, is such as to affect (i) the market price or the marketability of the Series 1996 Bonds, or (ii) the ability of the Underwriters to enforce contracts for the sale of the Series 1996 Bonds; or

(g)    a general banking moratorium shall have been declared by the United States of America, New York or Florida authorities, which in the reasonable opinion of the Senior Manager, materially and adversely affects the market for the Series 1996 Bonds or the sale, at the contemplated offering prices, by the Underwriters of the Series 1996 Bonds to be purchased by them; or

(h)    any national securities exchange, or any governmental authority, shall impose, as to the Series 1996 Bonds or obligations of the general character of the Series 1996 Bonds, any material restrictions not now in force, or increase materially those now in force, with respect to the extension of credit by, or the charge to the net capital requirements of the Underwriters, or the establishment of material restrictions upon trading of securities, including limited or minimum prices, by any governmental authority or by any national securities exchange; or

15

(i)    legal action shall have been filed against the County from which an adverse ruling would adversely affect the transactions contemplated hereby or by the Official Statement or the validity of the Series 1996 Bonds, the Ordinance, this Purchase Contract, or the Escrow Deposit Agreement; provided, however, that as to any such litigation, the County may request and the Senior Manager may accept an opinion by Co-Bond Counsel, or of other counsel acceptable to the Senior Manager, that in such counsel's opinion the issues raised by any such litigation or proceeding are without substance or that the contentions of any plaintiff are without merit; or

(j)    the rating of any of the Series 1996 Bonds shall have been downgraded below "AAA" by S&P, or "Aaa" by Moody's, after the date of this Purchase Contract, the effect of which, in the opinion of the Senior Manager, is to affect materially and adversely the market prices of the Series 1996 Bonds or trading in any securities of the County shall have been suspended on any national securities exchange; or any proceeding shall be pending or threatened by the Securities and Exchange Commission against the County; or a general suspension of trading on the New York Stock Exchange or the American Stock exchange or other national securities exchange; or

(k)    any information shall have become known which, in the Senior Manager's reasonable opinion, makes untrue, incorrect or misleading in any material respect any statement or information contained in the Official Statement, as that information has been supplemented or amended by other information, as of the date furnished or supplied to the Underwriters and until the end of the Disclosure Period, or causes the Official Statement, as so supplemented or amended, to contain an untrue, incorrect or misleading statement of a material fact or to omit to state a material fact required or necessary to be stated therein in order to make the statements made therein, in light of the circumstances under which they were made, not misleading and upon the receipt of notice of same by the County, the County fails to promptly amend or supplement the Official Statement in a manner which is reasonably acceptable in form and content to the Senior Manager.

8.    Termination of Purchase Contract by County.

(a)    The County may terminate this Purchase Contract, without liability therefore, by written notification to the Senior Manager should Banque Paribas and/or any of its syndicate banks fail for any reason to execute the Termination Agreement for the Prior Bonds to be dated as of September 10, 1996, among Montenay-Dade, Ltd., Montenay Power Corporation, Banque Paribas, and any of its syndicate banks.

9.    Expenses.

(a)    The County agrees to pay all expenses incident to the performance of its obligations, including, but not limited to, (i) the cost of the preparation, printing or other reproduction (for distribution prior to, on, or after the date of acceptance of this Purchase Contract) of copies of the Official Statement and Preliminary Official Statement, (ii) charges made by rating agencies for the rating of the Series 1996 Bonds, (iii) the fees and charges of the Escrow Agent and the Trustee, (iv) the fees and expenses of Co-Bond Counsel, the Financial Advisor, and of any other experts or consultants retained by the County, (v) the cost of any insurance commitment or other credit enhancements, (vi) the cost of any consent letters delivered by the County's accountants or consultants, and (vii) any other cost incidental to the issuance of the Series 1996 Bonds.

(b)    The Underwriters shall pay all expenses incident to their obligation to purchase the Series 1996 Bonds, including, but not limited to, (i) the cost of delivering the Series 1996 Bonds from New York, New York, to their purchasers, (ii) the fees and disbursements of Co-Counsel to the Underwriters, and (iii) all other expenses incurred by them or any of them in connection with their offering and distribution of the Series 1996 Bonds including the preparation, printing and separate distribution, if any, of the Blue Sky memoranda and legal investment surveys.

(c)    In the event either the County or the Underwriters shall have paid obligations of the other as set forth in this Section, appropriate reimbursements and adjustments shall be made.

10.    Truth in Bonding Statement.

The County is proposing to issue not more than $182,695,000 of the Dade County, Florida Resource Recovery Facility Refunding Revenue Bonds, Series 1996, (the "Series 1996 Bonds") for the purpose of providing funds together with other available funds, if any, (i) to refund all of the $55,000,000 Dade County, Florida Adjustable Tender Solid Waste Industrial Revenue Bonds, Series 1988, dated as of February 22, 1988, presently outstanding in the aggregate principal amount of $49,115,000 (the "Series 1988 Bonds"), the $18,000,000 Dade County, Florida Adjustable Tender Solid Waste Industrial Revenue Bonds, Series 1989 dated as of May 23, 1989 , presently outstanding in the aggregate principal amount of  $8,555,000 (the "Series 1989 Bonds") and the $190,000,000 Dade County, Florida Adjustable Tender Solid Waste Industrial Revenue Bonds, Series 1990A dated as of December 27, 1990, presently outstanding in the aggregate principal amount of $129,955,000 (the "Series 1990A Bonds" and, collectively with the Series 1988 Bonds and the Series 1989 Bonds, the "Prior Bonds"), and (ii) to pay the costs of issuance relating to the Series 1996 Bonds, including the premium for the municipal bond insurance policy and the Reserve Fund Surety Bond.

17

The debt or obligation created by the Series 1996 Bonds is expected to be repaid over a period of seventeen (17) years from October 1, 1996. At a true interest cost (TIC) of 5.5755%, the total interest paid over the life of the debt or obligation will be $89,156,807.71.

The source of repayment or security for this proposal to issue the Series 1996 Bonds is exclusively limited to certain funds known as the Trust Estate. Because (a) such Trust Estate funds may not be used by the County for any purpose other than the stated purposes in the Ordinance and the Trust Indenture, (b) the ad valorem taxing power of the County is not pledged or involved in these Series 1996 Bonds, (c) the Series 1996 Bonds including interest do not constitute a debt of the County within the meaning of any constitutional or statutory provision, and (d) the faith and credit of the County are not pledged to the payment of the principal of or the interest on the Series 1996 Bonds, authorizing this debt or obligation will result in no diminution of any moneys being available to the County to finance other services of the County each year for the 17 year period for the Series 1996 Bonds.

11.     <u>Public Entity Crimes</u>  The Underwriters represent that each of them, including its employees, officers, directors, executives, partners, shareholders, or agents have not been charged with or indicted for a public entity crime pursuant to Section 287.133, Florida Statutes.

12.     <u>Miscellaneous</u>.

(a)     All notices, demands and formal actions hereunder shall be in writing and mailed, telegraphed, or delivered to:

The Underwriters:

        Grigsby Brandford & Co., Inc.
        101 California Street, Suite 2000
        San Francisco, California 94111
        Attention: Lorraine

The County:

        Metropolitan Dade County
        Stephen P. Clark Center
        111 N.W. First Street, Suite 2550
        Miami, Florida 33128-1996
        Attention: Finance Director

(or such other addresses as may be designed in writing to the other party).

(b)     This Purchase Contract will inure to the benefit of and be binding upon the parties

and their successors and assigns, and will not confer any rights upon any other person. The terms "successors" and "assigns" shall not include any purchaser of any of the Series 1996 Bonds from the Underwriters merely because of such purchase.

(c)     All the representations, warranties, covenants and agreements of the County in this Purchase Contract shall remain operative and in full force and effect as if made on the date of this Purchase Contract and the Closing Date, regardless of (i) any investigation made by or on behalf of any of the Underwriters, or (ii) delivery of and any payment for the Series 1996 Bonds.

(d)     The agreements contained in Sections 3 and 9 hereof shall survive any termination of this Purchase Contract.

(e)     Section headings have been inserted in this Purchase Contract as a matter of convenience for reference only, and it is agreed that such section headings are not a part of this Purchase Contract and will not be used in the interpretation of any provisions of this Purchase Contract.

(f)     If any provision of this Purchase Contract shall be held or deemed to be, or shall in fact be, invalid, inoperative or unenforceable as applied in any particular case in any jurisdiction or jurisdictions, or in all jurisdictions because it conflicts with any provisions of any constitution, statute, or rule of public policy, or for any other reasons, such circumstances shall not have the effect of rendering the provision in question invalid, inoperative or unenforceable in any other case or circumstances, or of rendering any other provision or provisions of this Purchase Contract invalid, inoperative or unenforceable to any extent whatever.

(g)     This Purchase Contract may be executed in several counterparts, each of which shall be regarded as an original and all of which shall constitute one and the same document.

(h)     This Purchase Contract shall be governed by and construed in accordance with the laws of the State of Florida.

(i)     This Purchase Contract shall become effective upon the execution by the appropriate County officials and shall be valid and enforceable at the time of such acceptance.

19

GRIGSBY BRANDFORD & CO., INC.

By: _____

Accepted as of the date
first above written:

METROPOLITAN DADE COUNTY, FLORIDA

By: _____
     County Manager

Approved as to form:

By: _____
     Assistant County Attorney

20

<u>SCHEDULE I</u>

BOND TERMS

$182,695,000
Dade County, Florida
Resource Recovery Facility Refunding Revenue Bonds,
Series 1996

| Maturity (October 1) | Principal Amount | Interest Rate | Yield |
|---|---|---|---|
| 1997 | $10,300,000 | 4.00% | 4.00% |
| 1998 | 10,735,000 | 4.30 | 4.30 |
| 1999 | 10,740,000 | 6.00 | 4.55 |
| 2000 | 10,745,000 | 4.60 | 4.70 |
| 2001 | 10,745,000 | 4.70 | 4.85 |
| 2002 | 10,750,000 | 4.85 | 4.95 |
| 2003 | 10,755,000 | 5.00 | 5.10 |
| 2004 | 10,760,000 | 5.10 | 5.20 |
| 2005 | 10,765,000 | 5.20 | 5.30 |
| 2006 | 10,775,000 | 6.00 | 5.40 |
| 2007 | 10,780,000 | 5.30 | 5.50 |
| 2008 | 10,785,000 | 5.35 | 5.60 |
| 2009 | 10,795,000 | 5.50 | 5.70 |
| 2010 | 10,800,000 | 5.50 | 5.75 |

$32,465,000 5.50% Term Bond maturing October 1, 2013 - 5.85% Yield

(plus accrued interest from September 1, 1996)

**Redemption**

*Optional Redemption.* The Series 1996 Bonds maturing on or before October 1, 2006, are not subject to redemption prior to maturity. The Series 1996 Bonds maturing on or after October 1, 2007, are subject to redemption prior to maturity, at the option of the County, on or after October 1, 2006, as a whole or in part at any time by lot, at the following redemption prices (expressed as a percentage of the principal amount to be redeemed), plus accrued interest to the date fixed for redemption:

| Redemption Period (Both Dates Inclusive) | Redemption Price |
|---|---|
| October 1, 2006 thru September 30, 2007 | 102% |
| October 1, 2007 thru September 30, 2008 | 101% |
| October 1, 2008 and thereafter | 100% |

*Extraordinary Optional Redemption.* At any time upon the exercise by the Company of its option to prepay payments due under the Loan Agreement, the Series 1996 Bonds will be redeemed in whole or in

21

part at the principal amount plus accrued interest to the redemption date (but without premium) in the event that the Company certifies to the Trustee that:

(A) Any federal, state, or local body exercising governmental or judicial authority has taken any action which results in the imposition of unreasonable burdens or excessive liabilities with respect to the Facility rendering impracticable or uneconomical the operation of the Facility by the Company; or

(B) Any portion of the Facility has been taken by any governmental authority pursuant to the power of eminent domain or condemnation, or an encumbrance on the Facility or site cannot be cleared, in each case, which has a material adverse effect on the fair market value, usefulness, or operating efficiency of the Facility; or

(C) Any portion of the Facility has been damaged or destroyed to such an extent that it is not practicable or desirable to rebuild, repair, or restore the Facility.

*Mandatory Redemption.* The Series 1996 Bonds maturing on October 1, 2013 are subject to mandatory redemption prior to maturity in part by lot in such manner as may be designated by the Trustee at the principal amount of such Series 1996 Bonds to be redeemed plus accrued interest to the date of redemptiopn, without premium, on each October 1 set forth below for mandatory sinking fund installments in the following years and in the following amounts:

| Year | Principal Amount |
|------|------------------|
| 2011 | $10,815,000 |
| 2012 | 10,820,000 |
| 2013* | 10,830,000 |

---

* Final Maturity

## SCHEDULE II

## DISCLOSURE LETTER

Board of County Commissioners of
 Dade County, Florida
111 Northwest First Street
 Miami, Florida  33128-1995

$182,695,000
Dade County, Florida
Resource Recovery Facility Refunding Revenue Bonds,
Series 1996

Ladies and Gentlemen:

Pursuant to Section 218.385, Florida Statutes, and in reference to the issuance of the Dade County, Florida Resource Recovery Facility Refunding Revenue Bonds, Series 1996 (the "Series 1996 Bonds"), Grigsby Brandford & Co., Inc. (the "Senior Manager"), acting on behalf of itself and Smith Barney, Inc., Howard Gary & Company, and AIBC Investment Services Corporation, (collectively with the Senior Manager, the "Underwriters") as named in the Bond Purchase Contract (the " Purchase Contract"), dated August 29, 1996, by and among the Underwriters and Dade County, Florida (the "County"), hereby makes the following disclosures to the County.

The Underwriters are acting as investment bankers to the County for the public offering of the Series 1996 Bonds, executed and delivered in the aggregate principal amount of $182,695,000.  The total fee to be paid to the Underwriters pursuant to the Bond Purchase Contract is $1,454,252.20.

13.    Expenses estimated to be incurred by the Underwriters in connection with the issuance of the Series 1996 Bonds:

| | |
|---|---|
| Underwriters Counsel Fees and Expenses | $133,367.00 |
| Courier and Delivery | 5,481.00 |
| | |
| Day Loan | 29,231.00 |
| PSA Fees | 5,481.00 |
| DTC | 500.00 |
| CUSIP/Dalcomp | 3,654.00 |
| Travel | 56,636.00 |

23

Communications/Misc.                                      14,283.00

TOTAL                                                    $248,633.00

14.    Names, addresses and estimated amounts of compensation of any person who is not regularly employed by, or not a partner or officer of, an underwriter, bank, banker or financial consultant or advisor and who enters into an understanding with either the County or the Underwriters, directly, expressly or impliedly, to act solely as an intermediary between the County and the Underwriters for the purpose of influencing any transaction in the purchase of the Series 1996 Bonds:

NONE

15.    The amount of underwriting spread expected to be realized:

Risk                   $ 0.00/1000
Average Takedown         5.60/1000
Expenses                 1.36/1000
Management fee           1.00/1000

Total                  $7.96/1000

16.    Any other fee, bonus and other compensation estimated to be paid by the underwriters in connection with the Series 1996 Bonds to any person not regularly employed or retained by the Underwriters:

NONE

17.    The name and address of the Underwriters connected with the Series 1996 Bonds:

See attached list

Very truly yours,

Grigsby Brandford & Co., Inc.

As Managing Underwriter acting on behalf of the Underwriters, including itself.

24

$182,695,000
DADE COUNTY, FLORIDA
RESOURCE RECOVERY FACILITY
REFUNDING REVENUE BONDS
SERIES 1996

UNDERWRITERS

**Grigsby Brandford & Co., Inc.**
101 California Street
Suite 2000
San Francisco, California 94111

**Howard Gary & Company**
3050 Biscayne Boulevard
Suite 603
Miami, Florida 33137

**Smith Barney, Inc.**
390 Greenwich Street
New York, New York 10013

**AIBC Investment Services Corporation**
World Trade Center
80 S.W. 8th Street, Suite 2120
Miami, Florida 33130

25

EXHIBIT A

OFFICIAL STATEMENT

# EXHIBIT 3

Issuer:              Metropolitan Dade County, Florida

Securities           Dade County, Florida Resource Recovery Facility Refunding Revenue Bonds, Series 1996

Estimated Principal Amount:      $187,625,000

Name of Purchaser:               HOWARD GARY & COMPANY

Your Original Participation:     $28,143,750

Representative for the Managers:    Grigsby Brandford & Co., Inc.

# AGREEMENT AMONG UNDERWRITERS
## INSTRUCTIONS, TERMS AND ACCEPTANCE

August 27, 1996

We, as Representative for the Managers, are forming a Group of Underwriters, including ourselves and the other Managers, to submit a proposal for the purchase of the Securities described above and to distribute the Securities by a public offering pursuant to the Agreement Among Underwriters. The Agreement Among Underwriters will consist of these Instructions, Terms and Acceptance and the Standard Terms and Conditions (PSA Standard 6/15/91), incorporated by reference herein, as the Standard Terms and Conditions may be modified or supplemented in Exhibit A hereto.

The Group will consist of those Underwriters listed in Exhibit B attached hereto who accept participation pursuant to Section 10 hereof and who do not withdraw pursuant to Section 5 hereof. Capitalized terms not defined herein are used as defined in the Standard Terms and Conditions.

You are invited to participate in the Group with the Original Participation specified above, which will be subject to adjustment as provided in the Agreement Among Underwriters.

Enclosed are: the Preliminary Official Statement, the proposed form of Purchase Contract, the Preliminary Blue Sky Survey and a Letter of Representation

## 1. Offering Information.

The following information applies to the proposed offering.

Expected Offering Date: August 28, 1996

Expected Purchase Contract Execution Date: August 29, 1996

Expected Closing Date: September 5, 1996

Payment of Funds at Closing: Federal funds

Representative's Syndicate Address: 101 California Street, Suite 2600, San Francisco, California 94111, Att. Steven Nielsen

Telephone: (415) 392-4800  telecopy (415) 398-5548)

Official Statement Availability Address:   Packard Press
                                           One Penn Center at Suburban Station
                                           1617 JFK Boulevard, Suite 430
                                           Philadelphia, PA 19103
                                           Tel (215) 563-9000  Fax (215) 563-3810

## 2. Operative Terms.

As used in the Agreement Among Underwriters:

"Notification to the Representative" means written, telephonic or telecopy notification to the Representative at the Representative's Syndicate Address

"Official Statement" means the Final Official Statement, as it may be amended or supplemented, relating to the Securities, to be delivered to the Underwriters by the Issuer pursuant to the Purchase Contract.

"Payment (Delivery) Address" means  Grigsby Brandford & Co., Inc.
101 California Street, Suite 2000
San Francisco, California 94111

"Preliminary Official Statement" means the Preliminary Official Statement, dated August 20 , 1996, relating to the Securities

"Prevailing Time" means California Time

"Wire Notice" means the transmission of information to the Group by the Representative by Dalcomp/DalNet, Minifacts or as otherwise specified by the Representative. If an Underwriter is not a subscriber to that wire service, that Underwriter must advise the Representative, by a Notification to the Representative, of an alternative means of notification, satisfactory to the Representative  Thereafter, notice by that means shall constitute Wire Notice to that Underwriter.

## 3. Preliminary Official Statement.

You may obtain a reasonable number of additional copies of the Preliminary Official Statement by placing your order at the Official Statement Availability Address. We call your attention to SEC Rule 15c2-12 requiring that the Preliminary Official Statement be sent to potential customers in certain circumstances

The Issuer has advised us that the Preliminary Official Statement is "deemed final" for purposes of Rule 15c2-12 Unless you immediately notify us to the contrary, we will rely upon your representation in the Agreement Among Underwriters that you have no knowledge of any false or misleading statement in or material omission from the Preliminary Official Statement

## 4. Official Statement.

Your order for Official Statements should be placed with the Official Statement Availability Address not later than 12:00 noon, Prevailing Time, on the business day following the date of execution of the Purchase Contract

We call your attention to the requirements of SEC Rule 15c2-12 and Municipal Securities Rulemaking Board Rule G-32 requiring that the Official Statement and certain other information be sent to potential customers and customers

## 5. Notification of Proposed Terms of Purchase and Withdrawal.

The Representative will advise each Underwriter by Wire Notice of the initial offering prices and other proposed terms of purchase for the Securities  Priority of orders will be as set forth in Section 6 of the Agreement Among Underwriters Standard Terms and Conditions, unless otherwise specified by the Representative by Wire Notice. Underwriters who do not wish to participate in the offering must notify the Representative by a Notification to the Representative not later than 4:00 p.m., Prevailing Time, on the business day preceding the date of execution of the Purchase Contract  Any telephonic notice must be promptly confirmed in writing by telecopy or delivery of the Withdrawal from Agreement Among Underwriters attached as Exhibit D.

2

## 6. Advertising.

The Representative reserves the right to advertise the Securities in such publications and over the names of such Underwriters as the Representative may determine.  Any Underwriter who chooses to be omitted from any such advertisement must give a Notification to the Representative on or prior to the date of the execution of the Purchase Contract Advertising will be an expense of the Group.  No Underwriter is authorized to advertise the Securities in any publication without the express approval of the Representative until the day following publication of the official advertisement, or if no official advertisement is published, until the Representative advises the members of the Group that syndicate restrictions on trading the Securities have been removed.

## 7. Compliance with MSRB Rules.

We call your attention to the rules of the Municipal Securities Rulemaking Board applicable to the offer and sale of the Securities, and in particular to Rule G-11 establishing certain requirements for sales during the underwriting period and Rule G-21 relating to advertisements.  We will file or cause to be filed, pursuant to Rule G-36, copies of the Official Statement with the Municipal Securities Rulemaking Board

## 8. Release

Each Underwriter and the Representative hereby release each Underwriter and the Representative and each Underwriter's and the Representative's successors, assigns and former and current parents and affiliates from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, in law or equity which each Underwriter and the Representative and each Underwriter's and the Representative's successors, assigns and former and current parents and affiliates, ever had, now or hereafter can, shall or may have, for, upon, or by reason of any matter related to or derived from the obligations hereunder or associated herewith (other than any action or claim relating to the performance of any obligation of any Underwriter or the Representative explicitly contained herein) from the beginning of the world through the date of delivery of the Bonds. This Agreement constitutes the entire agreement between each Underwriter and the Representative

## 9. Acceptance.

You must advise the Representative of your participation in the Group by a Notification to the Representative received not later than 4:00 p.m., Prevailing Time, on the business day preceding the Expected Offering Date.  Any telephonic notice must be promptly confirmed in writing by telecopy or delivery of the Acceptance of Agreement Among Underwriters attached as Exhibit C

Very truly yours,

_____

GRIGSBY BRANDFORD & CO., INC

By /S/ _____
Steven Nielsen, Sr  Vice President

3

EXHIBIT B
TO
AGREEMENT AMONG UNDERWRITERS
(INSTRUCTIONS, TERMS AND ACCEPTANCE)

METROPOLITAN DADE COUNTY, FLORIDA

$187,625,000*

DADE COUNTY, FLORIDA
RESOURCE RECOVERY FACILITY REFUNDING REVENUE BONDS
SERIES 1996

The Group of Underwriters formed to purchase and distribute the above-referenced Securities shall consist of the following, upon acceptance of their respective participation

| Representative | Original Participation In the Securities (in dollars or percent) |
|---|---|
| Grigsby Brandford & Co., Inc. | 55% |

Managers

| | |
|---|---|
| AIBC Investment Services Corporation | 15% |
| Howard Gary & Company | 15% |
| Smith Barney, Inc. | 15% |

Other Underwriters

None

100%

If a Selling Group is formed the Representative will notify the Underwriters by Wire Notice.

---

*Preliminary, subject to change

# EXHIBIT 4



**JAMES C. BURKE**
COMMISSIONER

*Board of County Commissioners*
METROPOLITAN DADE COUNTY-FLORIDA
DISTRICT 2
STEPHEN P. CLARK CENTER
111 N. W. FIRST STREET
MIAMI, FLORIDA 33128-1963
(305) 375-4833

August 5, 1996

Mr. Howard Gary
President & CEO
Howard Gary & Company
3050 Biscayne Boulevard
Suite 603
Miami, FL 33137

Dear Mr. Gary:

In response to our discussion regarding your participation in the Montenay $225,000,000, Series 1996 bond issue, please be informed that as Chairman of the Metropolitan Dade County Finance Committee, it is my understanding from Mr. Juan Portuondo of Montenay and Mr. Grigsby of Grigsby Brandford & Company that your firm's participation includes the underwriting and the accompanying swap.

Our meeting with Mr. Calvin Grigsby, President and Chairman of Grigsby Brandford & Company, who is senior managing this transaction, to discuss this matter verified your participation as previously mentioned. Specifically, Mr. Grigsby agreed that your participation in the underwriting would be 25% and should generate your firm $160,00. With regard to the accompanying swap, Mr. Grigsby agreed that your firm and his firm would split equally the revenues from the swap after the deduction of $500,00 for expenses.

As a locally headquartered minority owned firm, your participation is in compliance with the county commission's policy and is important to the development of local business .

If you have any further questions, please feel free to contact me.

Sincerely,

James Burke
Commissioner, District 2

# EXHIBIT 5

Case 1:06-cv-23035-MGC   Document 1   Entered on FLSD Docket 12/18/2006   Page 52 of 100

# THE BOND BUYER

### THE DAILY NEWSPAPER OF MUNICIPAL FINANCE

Vol. 317 No. 29978     Tuesday, September 10, 1996     New York, NY

## DERIVATIVES NEWS AND TRENDS

## Dade County, Fla., Enters Into a Fixed-to-Floating Interest Rate Swap

*By Joanne Morrison*

Washington – **Dade County, Fla.,** entered into a fixed-to-floating interest rate swap with **GBR Financial Products** in conjunction with the county's $182.695 million of resource recovery facility refunding bonds priced last month.

GBR Financial Product structured and served as counterparty for the swap, which extends through the final maturity of the bonds, 2013. GBR says the swap is possibly one of the largest and longest transactions of its kind ever executed by a municipal issuer.

"The fixed-to-floating interest rate swap was always an integral part of the county's financing plan," said **Don Rice,** president and chief executive officer of GBR Financial, adding that the county saves 100 basis points annually by entering into the transaction rather than issuing traditional variable-rate debt.

"In addition to much lower costs through the removal of letter of credit and remarketing fees, the county also removed several burdensome revenue constraints which should provide added financing flexibility to the county's overall debt portfolio," Rice said.

Rice said synthetic variable-rate debt has "distinct advantages" over conventional floaters because there are no LOC or remarketing fees and no increase fees as a result of credit downgrades.

"We believe more municipal entities will look to replace their old costly variable rate with this cheaper and far more efficient structure," Rice said.

"I think it is a good deal for the county, it saves a lot of money and gives us a lot of flexibility in the future," said Dade County commission, **James Burke,** in a statement released by GBR.

"GBR's innovative structure allowed us to do what we needed and at a much lower cost than a conventional financing," Burke said.



The interest rate swap is structured so that the county will receive fixed-rate payments from GBR that offset the fixed rate it is paying out on its bonds.

In exchange, the county will then pay GBR a floating rate based on the Public Securities Association Municipal Swap Index. The structure produces interest costs more than 100 basis points lower than the county's current cost of funds.

"In all, the swap should generate about $15 million in present value savings, which is more than 8% of par," Rice said.

A unique feature of the swap was the firm's development of its so-called actual annual effective interest cost swap, which takes into account the increase in the average coupon over the life of the bonds. The fixed rate that the county receives will be equal to the fixed rate on the outstanding bonds and will change annually as that rate changes.

"By increasing the fixed swap coupon as the lower coupon bonds are amortized, we were able to achieve a structure that more closely resembles conventional variable-rate debt," said **Michael Murray,** vice president and senior trader at GBR.

Under a traditional fixed-to-floating swap, the fixed rate an issuer receives remains the same over the life of the swap. But in the actual annual effective interest cost swap, the fixed-swap rate rises so that it always equals the average coupon of the outstanding bonds.

Under this structure, the issuer can gauge in advance what the rate will be.

**'We believe more municipal entities will look to replace their old costly variable rate with this cheaper and far more efficient structure,' says Don Rice of GBR Financial.**

Rice cited a$35 million deal for the **Texas Veterans Land Board,** closed in May 1994, as another example of a successful fixed-to- floating rate swap transaction. It was the state's first such deal, he said.

The purpose of Dade County's bonds issue and underlying interest rate swap transaction last month was to refinance the county's Series 1988, 1989, and 1990A variable-rate bonds that originally funded the county's waste-to-energy resources recovery facility.

That facility is operated by **Montenay-Dade Ltd.,** a joint venture between the county and **Montenay Power Corp.**

**Grigsby Brandford & Co.,** which is a part owner of GBR Financial, ran the books and headed a syndicate for the negotiated bond offering that includes **Smith Barney Inc.** as co-senior manager. **Howard Gary & Co.** and **AIBC Investment Services Corp.** are also aboard.

The bonds, with yields ranging from 4% in 1997 to 5.75% in 2010, are insured by AMBAC and have triple-A ratings from Standard & Poor's and Moody's.

A few weeks ago, GBR implemented a similar conversion to variable-rate debt for the city of **Fort Worth, Tex.,** against a portion of the city's already outstanding fixed-rate water and sewer revenue bonds.

Fort Worth officials said the program would allow the city to continue to benefit from the lower interest rates available in the short-term debt market that have been attained through the Water and Sewer Commercial Paper Program, without incurring additional principal obligations.

Reprinted with permission from *The Bond Buyer*

# EXHIBIT 6



SEC............MISSION
05044174

| OMB APPROVAL | |
| --- | --- |
| OMB Number: | 3235-0123 |
| Expires: | October 31, 2004 |
| Estimated average burden hours per response...... | 12.00 |

# ANNUAL AUDITED REPORT
## FORM X-17A-5
## PART III

SEC FILE NUMBER

8- 29236

### FACING PAGE
**Information Required of Brokers and Dealers Pursuant to Section 17 of the Securities Exchange Act of 1934 and Rule 17a-5 Thereunder**

REPORT FOR THE PERIOD BEGINNING ___October 1, 2004___ AND ENDING ___September 30, 2005___
MM/DD/YY — MM/DD/YY

## A. REGISTRANT IDENTIFICATION

NAME OF BROKER-DEALER:
Grigsby & Associates, Inc.

OFFICIAL USE ONLY

FIRM I.D. NO.

ADDRESS OF PRINCIPAL PLACE OF BUSINESS: (Do not use P.O. Box No.)

311 California Street          Suite 320
(No. and Street)

San Francisco          California          94104
(City)          (State)          (Zip Code)

NAME AND TELEPHONE NUMBER OF PERSON TO CONTACT IN REGARD TO THIS REPORT
William Chin          (415) 392-4800
(Area Code – Telephone Number)

## B. ACCOUNTANT IDENTIFICATION

INDEPENDENT PUBLIC ACCOUNTANT whose opinion is contained in this Report*

Breard & Associates Inc., Certified Public Accountants
(Name – if individual, state last, first, middle name)

9010 Corbin Avenue  Suite 7          Northridge          CA          91324
(Address)          (City)          (State)

CHECK ONE:

☒ Certified Public Accountant
☐ Public Accountant
☐ Accountant not resident in United States or any of its possessions.

PROCESSED
JAN 2 5 2006
THOMSON
FINANCIAL

| FOR OFFICIAL USE ONLY |
| --- |
| |

*Claims for exemption from the requirement that the annual report be covered by the opinion of an independent public accountant must be supported by a statement of facts and circumstances relied on as the basis for the exemption. See Section 240.17a-5(e)(2)*

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

## OATH OR AFFIRMATION

I, Calvin B. Grigsby _____, swear (or affirm) that, to the best of

my knowledge and belief the accompanying financial statement and supporting schedules pertaining to the firm of
Grigsby & Associates, Inc. _____, as

of September 30 , 20 05 , are true and correct. I further swear (or affirm) that
neither the company nor any partner, proprietor, principal officer or director has any proprietary interest in any account
classified solely as that of a customer, except as follows:

_____

_____

State of Cali fornia

County of San Francisco

Subscribed and sworn (or affirmed) to
before me this 4th day of Nov , 2005

_Darnella Broaden_
Notary Public

Signature _Cal B Grigsby_

Title _PRESIDENT_

DARNELLA BROADEN
Commission # 1375539
Notary Public - California
San Francisco County
My Comm. Expires Oct 13, 2006

This report ** contains (check all applicable boxes):
- ☒ (a) Facing Page.
- ☒ (b) Statement of Financial Condition.
- ☒ (c) Statement of Income (Loss)
- ☒ (d) Statement of Changes in Cash Flows
- ☒ (e) Statement of Changes in Stockholders' Equity or Partners' or Sole Proprietors' Capital.
- ☒ (f) Statement of Changes in Liabilities Subordinated to Claims of Creditors.
- ☒ (g) Computation of Net Capital.
- ☒ (h) Computation for Determination of Reserve Requirements Pursuant to Rule 15c3-3.
- ☒ (i) Information Relating to the Possession or Control Requirements Under Rule 15c3-3.
- ☐ (j) A Reconciliation, including appropriate explanation of the Computation of Net Capital Under Rule 15c3-3 and the Computation for Determination of the Reserve Requirements Under Exhibit A of Rule 15c3-3.
- ☐ (k) A Reconciliation between the audited and unaudited Statements of Financial Condition with respect to methods of consolidation.
- ☒ (l) An Oath or Affirmation.
- ☐ (m) A copy of the SIPC Supplemental Report.
- ☐ (n) A report describing any material inadequacies found to exist or found to have existed since the date of the previous audit.

**For conditions of confidential treatment of certain portions of this filing, see section 240.17a-5(e)(3).*

# BREARD & ASSOCIATES, INC.

### Certified Public Accountants

## Independent Auditor's Report

Board of Directors
Grigsby & Associates, Inc.

We have audited the accompanying statement of financial condition of Grigsby & Associates, Inc. as of September 30, 2005, and the related statements of operations, changes in stockholder's equity, and cash flows for the year then ended that you are filing pursuant to rule 17a-5 under the Securities Exchange Act of 1934. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatements. An audit includes examining on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Pension Dynamics Securities Corporation as of September 30, 2005, and the results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

Our examination was made for the purpose of forming an opinion on the basic financial statements taken as a whole. The information contained on Schedules I-III are presented for purposes of additional analysis and is not required as part of the basic financial statements, but as supplementary information required by rule 17a-5 of the Securities and Exchange Commission. Such information has been subject to the auditing procedures applied in the examination of the basic financial statements and, in my opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole and in conformity with the rules of the Securities and Exchange Commission.

*Breard & Associates, Inc.*
Breard & Associates, Inc.
Certified Public Accountants

Northridge, California
October 27, 2005

*We Focus & Care* SM

9010 Corbin Avenue, Suite 7
Northridge, California 91324
(818) 886-0940 • Fax (818) 886-1924
www.baicpa.com

) )

## Grigsby & Associates, Inc. and Subsidiary
## Consolidated Statement of Financial Condition
### September 30, 2005

### Assets

| | |
|---|---:|
| Cash and cash equivalents | $  445,037 |
| Deposits with clearing organization | 200,000 |
| Marketable securities, at market | 144,898 |
| Securities, not readily marketable | 4,200 |
| Receivable from related party | 857,654 |
| Receivable-other | 1,400,000 |
| Equipment & furniture, net | 12,472 |
| Deposits | 19,572 |
| Other assets | 7,890 |
| Investments in unconsolidated affiliates | — |
| **Total assets** | **$ 3,091,723** |

### Liabilities & Stockholder's Equity

**Liabilities**

| | |
|---|---:|
| Accounts payable and accrued expenses | $   23,761 |
| Income tax payable | 82,043 |
| **Total liabilities** | 105,804 |

**Stockholder's equity**

| | |
|---|---:|
| Common stock, no par value, 100,000 shares authorized, 1,000 shares issued and outstanding | 30,000 |
| Additional paid-in capital | 3,838,522 |
| Accumulated deficit | (882,603) |
| **Total stockholder's equity** | 2,985,919 |
| **Total liabilities & stockholder's equity** | **$ 3,091,723** |

*The accompanying notes are an integral part of these financial statements.*

-1-

**Grigsby & Associates, Inc. and Subsidiary**
**Consolidated Statement of Income**
**For the Year Ended September 30, 2005**

**Revenues**

| | | |
|---|---|---:|
| Commissions | $ | 236,821 |
| Underwriting fees | | 22,445 |
| Interest income and dividends | | 17,953 |
| Interest income, non-taxable | | 450 |
| Unrealized gains (losses) | | 97,457 |
| Realized gains (losses) | | (34,614) |
| Other income | | 1,757,268 |
| **Total revenues** | | 2,097,780 |

**Expenses**

| | |
|---|---:|
| Employee compensation and benefits | 242,608 |
| Underwriting | 96,509 |
| Communications | 32,171 |
| Interest | 8,417 |
| Occupancy and equipment rental | 114,612 |
| Taxes, licenses, & fees, other than income taxes | 20,447 |
| Other operating expenses | 461,776 |
| **Total expenses** | 976,540 |
| Net income (loss) before income taxes | 1,121,240 |
| **Total income tax provision** | 90,543 |
| **Net income (loss)** | $  1,030,697 |

*The accompanying notes are an integral part of these financial statements.*

-2-

**Grigsby & Associates, Inc. and Subsidiary**
**Consolidated Statement of Changes in Stockholder's Equity**
**For the Year Ended September 30, 2005**

| | Common Stock | Additional Paid-in Capital | Accumulated Deficit | Total |
|---|---|---|---|---|
| Balance, September 30, 2004 | $ 30,000 | $ 3,638,522 | $(1,913,300) | $1,755,222 |
| Additional paid-in capital | - | 200,000 | - | 200,000 |
| Net income (loss) | - | - | 1,030,697 | 1,030,697 |
| Balance, September 30, 2005 | $ 30,000 | $3,838,522 | $ (882,603) | $2,985,919 |

*The accompanying notes are an integral part of these financial statements.*

-3-

)                                    )

**Grigsby & Associates, Inc. and Subsidiary**
**Consolidated Statement of Changes in Cash Flows**
**For the year ended September 30, 2005**

**Cash flows from operating activities:**

| | | |
|---|--:|--:|
| Net income (loss) | | $ 1,030,697 |
| Adjustments to reconcile net income (loss) to net cash | | |
| provided by (used in) operating activities: | | |
| | | |
| Depreciation | $     2,779 | |
| Valuation of marketable securities to market | (97,785) | |
| (Gain) loss on sale of marketable securities | 8,809 | |
| (Increase) decrease in: | | |
|     Receivable from clearing firm | (200,000) | |
|     Receivable, other than trade | (1,359,802) | |
|     Deposits | (13,912) | |
|     Other assets | 30,125 | |
| (Decrease) increase in: | | |
|     Accounts payable and accrued expenses | (19,267) | |
|     Income taxes payable | 74,367 | |
|     Total adjustments | | (1,574,686) |
| Net cash and cash equivalents provided by (used in) operating activities | | (543,989) |
| | | |
| **Cash flows from investing activities:** | | |
| Proceeds from sale of marketable securities | 300,000 | |
| Purchase of equipment | (15,251) | |
| Net cash and cash equivalents provided by (used in) investing activities | | 284,749 |
| | | |
| **Cash flows from financing activities:** | | |
| Collection of related party loan | 321,081 | |
| Proceeds from issuance of additional paid-in capital | 200,000 | |
| Net cash and cash equivalents provided by (used in) financing activities | | 521,081 |
| | | |
| Net decrease in cash and cash equivalents | | 261,841 |
| | | |
| Cash and cash equivalents at beginning of year | | 183,196 |
| | | |
| Cash and cash equivalents at end of year | | $   445,037 |

**Supplemental disclosure of cash flow information:**
Cash paid during the year for the period ended September 30, 2005

| | | |
|---|--:|--:|
|     Interest | $     — | |
|     Income taxes | $   8,500 | |

*The accompanying notes are an integral part of these financial statements.*

-4-

)                                              )

**Grigsby & Associates, Inc. and Subsidiary**
**Consolidated Notes to Financial Statements**
**September 30, 2005**

### Note 1:   GENERAL AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Basis of Consolidation*

The consolidated financial statements include the accounts of Grigsby Brandford Capital Partners (the Subsidiary), a wholly-owned subsidiary.  All significant inter-company accounts and transactions have been eliminated in consolidation.

*General*

Grigsby & Associates, Inc. and Subsidiary (formerly Grigsby Brandford & Co., Inc.) was incorporated in 1981, and registered as a broker-dealer under the Securities and Exchange Act of 1934 in April, 1983.  Grigsby & Associates, Inc. and Subsidiary (the "Company") is a fully disclosed broker/dealer whereby it does not hold customer funds or securities.  The Company is a member of the National Association of Securities Dealers, Inc. ("NASD"), the Municipal Rule Making Board ("MSRB"), and the Securities Investor Protection Corporation ("SIPC").

*Summary of Significant Accounting Principles*

The presentation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period.  Actual results could differ from those estimates.

*Income Taxes*

Income taxes are provided for the tax effects of transactions reported on the financial statements and consist of taxes currently due or refundable plus deferred taxes.  Deferred taxes are recognized for differences between the basis of assets and liabilities for financial statement and income tax purposes.  The differences relate primarily to investments in partnerships and closely held corporations (use of different methods of accounting for financial statement and income tax purposes), depreciable assets (use of different depreciation methods and lives for financial statement and income tax purposes), and contributions (limitations on amount of deduction based upon income for income tax purposes and for financial statement purposes).

*Statement of Cash Flows*

For purposes of the statements of cash flows, the Company considers all highly liquid debt instruments purchased with a maturity of three months or less to be cash equivalents.

-5-

)                                                    )

Grigsby & Associates, Inc. and Subsidiary
Consolidated Notes to Financial Statements
September 30, 2005

Note 1:   GENERAL AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES
(Continued)

*Related Party Transactions*

The receivable from related party is unsecured and non-interest bearing.  If interest would have
been charged at the current U.S. bank rates, approximately 4%, the interest income not included
in these financial statements of $40,728 is material to the financial statements when taken as a
whole.

The sole shareholder and president of the Company is also the sole stockholder and president of
Fiscal Funding Co., Inc..  The Company shares office space with Fiscal Funding.  Fiscal Funding
has paid half of the lease expenses associated with the Company's office rent.  These statements
do not reflect any adjustment for these amounts.

*Securities Owned*

Investments in marketable securities at market value transactions are shown at market value.  The
change in unrealized gains and losses on investments in marketable securities at market value  is
reflected in the statements of operations.  Securities transactions are recorded on a trade date
basis.

Mutual funds and annuities income are recognized when earned.

*Investments in Unconsolidated Affiliates*

The investment in unconsolidated affiliates in which the Company maintains a 50% interest, is
accounted for under the equity method.  The Company's interest is carried at cost adjusted for its
proportionate share of distributed and undistributed earnings or losses.

Rent expense for the year ended September 30, 2005, was $104,687, and is included in
occupancy and equipment rental in the statement of income.

Note 2:   INVESTMENTS IN UNCONSOLIDATED AFFILIATES

The Company owns a 50% interest in two closely-held corporations (G.B.  Derivative Products
Corporation  and GBDP Corporation).  These two corporations own general partnership interests
in three partnerships (1% - GB Derivative Products., L.P., 1% - GBDP Holdings, L.P., and 1% -
GBDP, L.P.).  The Company also owns a limited partnership interest in two of these partnerships
(49.5% - GB Derivative Products Co., L.P. and 49.5% - GBDP Holdings, L.P.).  GBDP

Grigsby & Associates, Inc. and Subsidiary
Consolidated Notes to Financial Statements
September 30, 2005

## Note 2:   INVESTMENTS IN UNCONSOLIDATED AFFILIATES (Continued)

Holdings, L.P. in addition, owns a 99% limited partnership interest in GBDP, L.P.. The unconsolidated affiliates are collectively referred to as GBR Financial Products Companies (GBR).

The affiliated companies were formed to engage in interest and currency swap transactions through GBDP, L.P.. These transactions involve obligating itself to pay a stream of payments at a given rate while simultaneously entering into a hedging transaction to receive a stream of payments at a rate in excess of that of the payment stream. Revenues are recorded as the net payment stream. Because of the degree of uncertainty involving these transactions, the Company accounts for its equity investment in these entities on the cash receipts and disbursements method of accounting.

In accordance with the limited partnership agreement, the Company made a capital contribution of $545,000 to GBDP Holdings, L.P.. In accordance with the agreement, the Company is liable only to the extent of its capital contribution. The allocation of the partnership loss is allocated first to the Company, equal to the excess of its aggregate capital contributions of the other limited partner. At September 30, 2005, the Company was the sole contributor to the partnership.

The Company's share of partners' (deficit) and equity earnings of approximately ($25,000), at September 30, 2005 has not been recorded.

Subsequent to September 30, 1996, the Company has been unsuccessful in obtaining any information from GBR, regarding its 50% financial interest. The Company was seeking legal demand for access to the books and records of GBR. (See Note 8)

The Company's investment in GBR is carried at zero value. There has been no income or expenses on its investment in GBR on the statement of operations for the year ended September 30, 2005, nor has the Company received any distributions from GBR during the year ended September 30, 2005.

## Note 3:   DEPOSITS WITH CLEARING ORGANIZATION

The Company has deposited $200,000 with Huntleigh Securities Corporation as security for its transactions with them. Interest is paid monthly on the deposit at the average overnight repurchase agreement rate.

Grigsby & Associates, Inc. and Subsidiary
Consolidated Notes to Financial Statements
September 30, 2005

### Note 4:   MARKETABLE SECURITIES

The Company's securities investments are held principally for the purpose of selling in the near term and are classified as trading securities.  Trading securities are recorded at fair value on the balance sheet in current assets, with the change in fair value during the period in earnings. The market value of these investments at September 30, 2005 was $144,898.

### Note 5: SECURITIES, NOT READILY MARKETABLE

Securities, not readily marketable consist of 1,200 warrants in the NASDAQ Stock Market, Inc., these securities were offered primarily to NASD members and purchased through a Private Placement Memorandum.  The warrants were exercisable in four tranches over four years.  The third tranche became exercisable on June 28, 2004 at $14 and expired on June 27, 2005.  The Company has the remaining options to exercise in the following tranches;

| | | Exercisable on | Expires on | Exercise Price |
|---|---|---|---|---|
| Tranche 4 | 1,200 shares | June 28, 2005 | June 27, 2006 | $ 16.00 |

The Company is carrying these warrants at their amortized cost of $4,200.

### Note 6: EQUIPMENT AND FURNITURE, NET

The equipment and furniture are recorded at cost as follows:

| | |
|---|---|
| Equipment and furniture | $   209,251 |
| Accumulated depreciation and amortization | (196,779) |
| Equipment and furniture, net | $    12,472 |

Depreciation expense for the year ended September 30, 2005, was $2,779.

### Note 7:   PENSION PLAN

The Company maintains a defined contribution pension plan covering substantially all of the Company's employees.  The Company contributes an amount equal to 10% of participant's compensation subject to a maximum contribution of $15,000, per employee. For the year ended September 30, 2005, the Company contributed $29,033 to the plan, which is included in employee compensation and benefits in the statement of operations.

Grigsby & Associates, Inc. and Subsidiary
Consolidated Notes to Financial Statements
September 30, 2005

Note 8:   INCOME TAXES

The current provision of $90,543 for income taxes consists of the California Franchise tax for
Grigsby & Associates, Inc.

The Company has available at September 30, 2005 unused operating loss carry-forwards, which
may be applied against future taxable income, resulting in a deferred tax asset of approximately
$417,347, that expire as follows:

| Amount of unused operating loss carry-forwards | Expiration during year ended September 30, |
|---|---|
| $ 486,752 | 2018 |
| 920,226 | 2019 |
| 317,975 | 2020 |
| 516,527 | 2021 |
| 141,443 | 2022 |
| 399,388 | 2023 |
| $ 2,782,311 | |

A 100% valuation allowance has been established against this asset since management cannot
determine if it is more likely than not that the asset will be realized.

Note 9:   COMMITMENTS AND CONTINGENCIES

*Underwriting Commitments*

In the normal course of business, the Company enters into underwriting commitments.
Transactions relating to such underwriting commitments that were open at September 30, 2005
were subsequently settled and had no material effect on the financial statements as of that date.

*Litigation*

The Company and Calvin Grigsby filed a lawsuit in the federal district court in Manhattan
against J. Donald Rice Jr., Rice Derivative Holdings, L.P., Rice Derivative Holdings
Corporation, GBR Derivative Products Company, L.P., GBR Derivative Products Corporation
GBDP, L.P., GBDP Holdings, L.P., GBDP Corporation, GB Derivative Products Company, L.P.,
and GB Derivative Products Corporation (Collectively "Defendants").  The Company alleged
that they were owed monies by the defendants from the operation of a series of limited
partnerships involving the parties (see Note 2), which partnerships engaged in interest rate swap
transactions in connection with municipal bond financing.

)                                                    )

**Grigsby & Associates, Inc. and Subsidiary**
**Consolidated Notes to Financial Statements**
**September 30, 2005**

### Note 9:   COMMITMENTS AND CONTINGENCIES
(Continued)

The complaint set forth the following claims:(1) to compel inspection of the defendants' books and records; (2) an accounting;(3) breach of fiduciary duty, (4) unjust enrichment and (5) constructive trust. The complaint sought both equitable remedies and damages for breach of fiduciary duty in an unspecified amount.

The Company entered into a settlement on August 22, 2005. The Company was awarded $1,750,000 and has collected $350,268. The settlement agreement states that $182,966 will be payable every three months from December 15, 2005 through September 15, 2007 at four percent interest.

The settlement agreement also states that if an agreement terminating a Phase I swap can be reached, the Company will effect a dissolution of GBDP Holdings, L.P., GB Derivative Products Company, L.P., GBDP Corporation, and GB Derivative Products Corporation.

*Concentrations of Credit Risk*

The Company invests in marketable securities, the value of which is subject to market conditions at any given time.

The Company's receivables are predominately from other broker/dealers.

The Company maintains cash balances at financial institutions. Accounts at each institution are insured by the Federal Deposit Insurance Corporation up to $100,000. At September 30, 2005, the Company's uninsured cash balances totaled $227,083.

*Operating Lease*

In February 2002, the Company entered into a five (5) year lease for its San Francisco office space.

In January 2005, the Company entered into a three (3) year lease for its New York office space. The New York office is a new branch.

Under these agreements total rent expense for the year ended September 30, 2005 was $100,545.

)                                    )

Grigsby & Associates, Inc. and Subsidiary
Consolidated Notes to Financial Statements
September 30, 2005

Note 9:   COMMITMENTS AND CONTINGENCIES
(Continued)

The future minimum lease expenses in the aggregate and for each of the five succeeding years
are:

|  | September 30, |
|---|---|
| 2006 | $ 61,459 |
| 2007 | 45,813 |
| 2008 | 11,537 |
| 2009 | – |
| 2010 and thereafter | – |
| Total | $ 118,809 |

Note 10:   RECENTLY ISSUED ACCOUNTING STANDARDS

In January 2003, The Financial Accounting Standards Board ("FASB") issued FASB
Interpretation No. 46, *"Consolidation of Variable Interest Entities"* ("FIN 46"). This
interpretation of Accounting Research Bulletin No. 51, requires companies to consolidate the
operations of all variable interest entities ("VIE's") for which they are the primary beneficiary.
The term "primary beneficiary" is defined as the entity that will absorb a majority of expected
losses, receive a majority of the expected residual returns, or both. This interpretation was later
revised by the issuance of Interpretation No. 46R ("FIN 46R"). The revision was issued to
address certain implementation issues that had arisen since the issuance of the original
interpretation and to provide companies with the ability to defer the adoption of FIN 46 to
periods after March 15, 2004. The implementation of FIN No. 46 and FIN 46R, had no material
impact on the Company's financial statements.

On July 16, 2004, the FASB ratified the Emerging Issues Task Force ("EITF") consensus on
Issue 02-14, *"Whether the Equity Method of Accounting Applies When an Investor Does Not
Have an Investment in Voting Stock of an Investee but Exercises Significant Influence through
Other Means"* ("EITF 02-14"). The consensus concludes that an investor should apply the equity
method of accounting when it can exercise significant influence over an entity through a means
other than holding voting rights. The consensus is effective for reporting periods beginning after
September 15, 2004. The adoption of EITF 02-14 did not have a material impact on the
Company's financial statements.

On December 16, 2004, FASB issued Statement of Financial Accounting Standards No. 123
(revised 2004), *"Share-Based Payment"* ("FASB 123R"), which addresses the accounting for
employee stock options. FASB 123R requires that the cost of all employee stock options, as well

-11-

)                                    )

Grigsby & Associates, Inc. and Subsidiary
Consolidated Notes to Financial Statements
September 30, 2005

**Note 10:   RECENTLY ISSUED ACCOUNTING STANDARDS
(Continued)**

as other equity-based compensation arrangements, be reflected in the financial statements based
on the estimated fair value of the awards.  Stock options are a valuable and important tool that
have been used by many companies as a means to motivate employees and to promote business
growth. The statement requires that the value of these arrangements be measured and recognized
in the financial statements.  FASB 123R becomes effective for reports filed after June 15, 2005.
Early adoption of FASB 123R had no material effect on the Company's financial statements.

**Note 11:  NET CAPITAL**

The Company is subject to the Securities and Exchange Commission Uniform Net Capital Rule
(SEC rule 15c3-1), which requires the maintenance of minimum net capital and requires that the
ratio of aggregate indebtedness to net capital, both as defined, shall not exceed 15 to 1.  Net
capital and aggregate indebtedness change day to day, but on September 30, 2005, the Company's
net capital of $623,522 exceeded the minimum net capital requirement by $523,522; and the
Company's ratio of aggregate indebtedness ($105,804) to net capital was 0.2:1, which is less than
the 15 to 1 maximum ratio allowed of a Broker/Dealer.

**Note 12:   RECONCILIATION OF AUDITED NET CAPITAL TO UNAUDITED FOCUS**

There is a $109,435 difference between the computation of net capital under net capital Sec. Rule
15c3-1 and the corresponding unaudited focus part IIA.

| | | |
|---|---|---|
| Net capital per unaudited schedule | | $   732,957 |
| Adjustments: | | |
| Accumulated deficit | $   1,216,429 | |
| Non-allowable assets | (1,327,673) | |
| Haircuts and undue concentration | 1,809 | |
| Total adjustments | | (109,435) |
| Net capital per audited statements | | $    623,522 |

-12-

Grigsby & Associates, Inc. and Subsidiary
Schedule I - Computation of Net Capital Requirements
Pursuant to Rule 15c3-1
As of September 30, 2005

**Computation of net capital**

| | | | |
|---|---|---:|---:|
| Common stock | | $    30,000 | |
| Additional paid-in capital | | 3,838,522 | |
| Accumulated deficit | | (882,603) | |
| Total stockholder's equity | | | $  2,985,919 |
| Less: Non-allowable assets | | | |
| Securities, not readily marketable | | (4,200) | |
| Receivable from related parties | | (857,654) | |
| Receivable-other | | (1,400,000) | |
| Deposits | | (19,572) | |
| Furniture & equipment, net | | (12,472) | |
| Other assets | | (15,590) | |
| Total adjustments | | | (2,309,488) |
| Net capital before haircuts | | | 676,431 |
| **Haircuts on securities** | | | |
| Money market | | (6,542) | |
| Municipal bonds | | (613) | |
| Corporate stocks | | (20,153) | |
| Other - Fidelity Bond deductible | | (13,000) | |
| Total haircuts on securities | | | (40,308) |
| | | | |
| **Undue concentration** | | | (12,601) |
| | | | |
| Total haircuts and undue concentration | | | (52,909) |
| | | | |
| Net capital | | | 623,522 |

**Computation of net capital requirements**

| | | | |
|---|---|---:|---:|
| Minimum net capital requirements | | | |
| 6 2/3 percent of net aggregate indebtedness | | $    7,054 | |
| Minimum dollar net capital required | | $  100,000 | |
| Net capital required (greater of above) | | | (100,000) |
| | | | |
| Excess net capital | | | $   5,23,522 |
| | | | |
| Ratio of aggregate indebtedness to net capital | | 0.2: 1 | |

There is a $109,435 difference in net capital computed above and that which was reported by the
Company in Part II of Form X-17A-5. See Note 12.

---

*See independent auditor's report.*
-13-

)                                    )

**Grigsby & Associates, Inc. and Subsidiary**
**Schedule II - Computation for Determination of Reserve**
**Requirements Pursuant to Rule 15c3-3**
**As of September 30, 2005**

A computation of reserve requirement is not applicable to Grigsby & Associates, Inc. and Subsidiary as the Company qualifies for exemption under Rule 15c3-3 (k)(2)(ii).

*See independent auditor's report.*
-14-

)                                    )

**Grigsby & Associates, Inc. and Subsidiary**
**Schedule III - Information Relating to Possession or Control**
**Requirements Under Rule 15c3-3**
**As of September 30, 2005**

Information relating to possession or control requirements is not applicable to Grigsby & Associates, Inc. and Subsidiary as the Company qualifies for exemption under Rule 15c3-3 (k)(2)(ii).

Grigsby & Associates, Inc. and Subsidiary

Supplementary Accountant's Report

on Internal Accounting Control

Report Pursuant to 17a-5

for the Year Ended September 30, 2005

)                                                    )

# BREARD & ASSOCIATES, INC.
### Certified Public Accountants

Board of Directors
Grigsby & Associates, Inc.

In planning and performing our audit of the financial statements and supplemental schedules of Pension Dynamics Securities Corporation ("the Company"), for the year ended September 30, 2005, We considered its internal control structure, for the purpose for safeguarding securities, in order to determine our auditing procedures for the purpose of expressing our opinion on the financial statements and not to provide assurance on the internal control structure.

Also, as required by rule 17a-5(g)(1) of the Securities and Exchange Commission ("SEC"), we have made a study of the practices and procedures followed by Pension Dynamics Securities Corporation including tests of such practices and procedures that we considered relevant to objectives stated in rule 17a-5(g), in making the periodic computations of aggregate indebtedness (or aggregate debits) and net capital under rule 17a-3(a)(11) and for determining compliance with the exemptive provisions of rule 15c3-3. Because the Company does not carry security accounts for customers or perform custodial functions relating to customer securities, we did not review the practices and procedures followed by the Company in any of the following:

1.  Making the quarterly securities examinations, counts, verifications and comparisons

2.  Recordation of differences required by rule 17a-13

3.  Complying with the requirements for prompt payment for securities under Section 8 of Federal Reserve Regulation T of the Board of Governors of the Federal Reserve System

The management of the Company is responsible for establishing and maintaining internal control structure and the practice and procedures referred to in the preceding paragraph in fulfilling this responsibility, estimates and judgements by management are required to assess the expected benefits and related costs of internal control structure policies and procedures and of the practices and procedures referred to in the proceeding paragraph and to assess whether those practices and procedures can be expected to achieve the SEC's above mentioned objectives. Two of the objectives of an internal control structure and the practices and procedures are to provide management with reasonable, but not absolute, assurance that assets for which the Company has responsibility are safeguarded against loss from unauthorized use or disposition and that transactions are executed in accordance with management's authorization and recorded properly to permit preparation of financial statements in conformity with generally accepted accounting principles. Rule 17-5(g) lists additional objectives of the practices and procedures listed in the preceding paragraph.

*We Focus & Care*℠

9010 Corbin Avenue, Suite 7
Northridge, California 91324
(818) 886-0940 • Fax (818) 886-1924
www.baicpa.com

Because of inherent limitations in any internal control structure or the practices and procedures referred to above, errors or irregularities may occur and not be detected. Also, projection of any evaluation of them to future periods is subject to the risk they may become inadequate because of changes in conditions or that the effectiveness of their design and operation may deteriorate.

Our consideration of the internal control structure would not necessarily disclose all matters in the internal control that might be material weaknesses under standards established by the American Institute of Certified Public Accountants. A material weakness is a condition in which design or operation of the specific internal control structure elements does not reduce to a relatively low level the risk that errors or irregularities in amounts that would be material in relation to the financial statements being audited may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions. However, we noted no matters involving the internal control structure, including procedures for safeguarding securities, that we considered to be material weakness as defined above.

We understand that practices and procedures that accomplish the objectives referred to in the second paragraph of this report are considered by the SEC to be adequate for its purpose in accordance with the Securities Exchange Act of 1934 and related regulations, and that practices and procedures that do not accomplish such objectives in all material respects indicate material inadequacy for such purposes. Based on this understanding and on our study, we believe that the Company's practices and procedures were adequate at September 30, 2005 to meet the SEC's objectives.

This report is intended solely for the use of management, the Securities and Exchange Commission, and other regulatory agencies which rely on rule 17a-5(g) under the Securities Exchange Act of 1934 and should not be used for any other purpose.

Breard & Associates, Inc.
Certified Public Accountants

Northridge, California
October 27, 2005

*ii*

NASD DISPUTE RESOLUTION, INC.

CASE NO.  06-04209

*In the matter of arbitration between:*

M SECURITIES INVESTMENT, INC.

       Claimant,

vs.

GRIGSBY & ASSOCIATES, INC.
and CALVIN B. GRIGSBY,

       Respondents.

_____/

## CLAIMANT'S RESPONSE TO RESPONDENTS' MOTION TO DISMISS

Claimant, M Securities Investment, Inc. ("M Securities"), by undersigned counsel, hereby responds to the motion to dismiss filed by Respondents Calvin Grigsby ("Grigsby") and Grigsby and Associates, Inc. ("Grigsby Associates").

## INTRODUCTION

Essentially, the Statement of Claim filed in this matter seeks to recover a portion of monies that were recently recovered by Grigsby and Grigsby Associates against a third party. Respondents contend, however, that this matter should be dismissed because (1) a prior arbitration and prior lawsuits were filed and dismissed with prejudice, (2) M Securities (which does business as Howard Gary & Company) was not really a broker-dealer and, therefore, this is not a proper case for submission under the Rules of the NASD Code of Arbitration, and (3) this matter is barred by the six (6) year eligibility rule.[1]  Each of these points is completely without

_____

[1] Rule 10304 is an eligibility rule, not a statute of limitations.  In other words, claims may not be eligible for submission to arbitration under the Rule.

1

**CARLSON & LEWITTES, P.A.**
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

merit, and this case should proceed to a final hearing on the merits.

## DISCUSSION

### A.    FACTUAL BACKGROUND

Claimant was an active underwriter of municipal bonds in Miami-Dade County, Florida and in other locations in the United States.  Claimant had been selected as the co-underwriter with Grigsby Associates on the bond offering and swap transaction involving approximately $183 million in industrial revenue bonds issued by Metropolitan Dade County on behalf of Montenay Power Corp. ("Montenay").  *See*, Letter of Juan Portunado, President of Montenay, attached as Exhibit 1; Bond Purchase Agreement, attached as Exhibit 2; and Agreement Among Underwriters, attached as Exhibit 3.  The bonds were secured by revenues generated from the Miami-Dade County, Florida Resource Recovery Facility, which was a waste-to-energy facility operated by Montenay.

Claimant and Grigsby Associates and Grigsby had a binding agreement that Claimant would receive as its compensation for the underwriting and swap transaction an amount equal to the sum of (a) 25% of the underwriting fees and (b) 50% of the net profits, after deducting expenses of approximately $500,000, from the swap transaction.  *See* Letter of Dade County Commissioner James Burke, attached as Exhibit 4.  Grigsby Associates lined up a company owned by J. Donald Rice to perform the swap transaction.  Both the issuance of the bonds and the swap transactions were successfully completed.  *See* Article, The Bond Buyer, attached as Exhibit 5.  As a result of the issuance of the bonds and the swap transaction, Grigsby Associates owed Claimant approximately (a) underwriting fees of $250,000 and (b) somewhere between $1 million and $2 million of Claimant's share of the net profits from the swap transaction.

2

For some unknown reason, the companies owned by J. Donald Rice failed to

deliver to Grigsby the profits from the swap transaction.  Accordingly, Grigsby Associates and

Grigsby filed a lawsuit in the federal district court in Manhattan against J. Donald Rice and his

companies on July 10, 2000.  *See* Docket Sheet for Civil Case No. 1:00-CV-O5-056-RO,

attached hereto as Exhibit 6 ("Docket Sheet").  Grigsby Associates and Grigsby alleged that they

were owed monies from the municipal bond swap transaction.  On August 22, 2005, Grigsby

Associates and Grigsby entered into a settlement agreement with the companies owned by J.

Donald Rice.  Pursuant to the settlement agreement, the companies owned by J. Donald Rice

agreed to pay $1,750,000 to Grigsby Associates.  The settlement agreement states that $182,966

would be payable every three months from December 15, 2005 through September 15, 2007,

along with interest accruing at the rate of 4%.  Thus, the payments are continuing through this

date.

Claimant recently discovered the fact that Grigsby Associates and Grigsby had

sued and settled with the companies owned by J. Donald Rice, when the Claimant obtained a

copy of the Grigsby Associates' Form X-17A-5 directly from the Securities and Exchange

Commission.  *See* Form X-17A-5 attached hereto as Exhibit 7.  On pages 9-10 of this Form,

there is a discussion of the lawsuit against J. Donald Rice and his companies and the settlement,

as follows:

> The Company and Calvin Grigsby filed a lawsuit in the federal
> district court in Manhattan against J. Donald Rice Jr., Rice
> Derivative Holdings, L.P., Rice Derivative Holdings Corporation,
> GBR Derivative Products Company, L.P., GBR Derivative
> Products Corporaiton GBDP, L.P., GBDP Holdings L.P., GBDP
> Corporation, GB Derivative Products Company, L.P., and GB
> Derivative Products Corporation (Collectively "Defendants").  The
> Company alleged that they were owed monies by the defendants
> from the operation of a series of limited partnerships involving the
> parties (see Note 2), which partnerships engaged in interest rate

swap transactions in connection with municipal bond financing.

The complaint set forth the following claims: (1) to compel inspection of the defendants' books and records; (2) an accounting; (3) breach of fiduciary duty; (4) unjust enrichment and (5) constructive trust. The complaint sought both equitable remedies and damages for breach of fiduciary duty in an unspecified amount.

The Company entered into a settlement on August 22, 2005. The Company was awarded $1,750,000 and has collected $350,268. The settlement agreement states that $182,966 will be payable every three months from December 15, 2005 through September 15, 2007 at four percent interest.

The settlement agreement also states that if an agreement terminating a Phase I swap can be reached, the Company will effect a dissolution of GBDP Holdings, L.P., GB Derivative Produces Company, L.P., GBDP Corporation, and GB Derivative Products Corporation.

In their motion to dismiss, Grigsby & Grigsby Associates contend that a prior arbitration proceeding was brought based on these claims. That assertion is not accurate. No prior arbitration proceeding has been brought.

Finally, Grigsby & Grigsby Associates claim in their motion to dismiss that prior federal court cases were brought and were dismissed with prejudice. That statement is partially accurate. Claims were brought and dismissed because M Securities' counsel failed to timely serve Grigsby & Grigsby Associates with the summons and complaint within the time permitted under the Federal Rules of Civil Procedure and, for that reason, the claims were dismissed. However, the claims were not dismissed with prejudice.

### B. THIS MATTER IS APPROPRIATE FOR ARBITRATION UNDER SECTION 10100 SERIES OF THE CODE OF ARBITRATION PROCEDURE

Claimant M Securities does business as "Howard Gary & Company." That entity is a member firm of the NASD. Indeed, when this claim was filed the NASD sent an invoice to

the undersigned counsel requiring the Claimant to pay a surcharge for this arbitration, which surcharge is only charged to member firms. *See* Invoice attached hereto as Exhibit 8.

The Claimant has been continuously a member firm of the NASD since at least 1990. Therefore, the assertion by Grigsby & Grigsby and Associates that the Claimant is not a member firm is simply incorrect.

Section 10101(a) of the NASD Code of Arbitration Procedure provides that any "dispute, claim, or controversy arising out of or in connection with the business of any member of the association" is eligible for arbitration if the dispute is " between or among members". Indeed, under Section 10201, any "dispute, claim, or controversy eligible for submission under the Rule 10100 Series . . . *shall* be arbitrated under this Code at the instance of . . . a member against another member." Therefore, under the applicable Rules of the NASD Code of Arbitration Procedure, this matter is eligible for submission to arbitration because it is a controversy between member firms.

### C.     NONE OF THE PRIOR CASES WERE DISMISSED WITH PREJUDICE

Contrary to the statements made by Grigsby and Grigsby & Associates in their motion to dismiss, none of the prior cases that Claimant filed against Grigsby and Grigsby & Associates were dismissed prejudice.

Claimant's prior counsel filed two separate federal court cases wherein Grigsby and Grigsby Associates were named as defendants along with a host of other Defendants. One complaint, case no. 02-21906, was dismissed without prejudice because "it is virtually identical" to the complaint filed in the other case, case no. 00-3278. A copy of the Order of Dismissal of case no. 02-21906 is attached to Grigsby's motion to dismiss. As the panel can see, the order does not contain the words, "with prejudice."

As to the other case where Grigsby was named as a party, in August of 2001, in case no. 00-3278, the court issued an Order to Show Cause to claimant's prior counsel to show cause why Grigsby and Grigsby Associates had not been served with process (i.e. the summons and complaint). A copy of the Order to Show Cause is attached as Exhibit 9. On September 28, 2001, the court issued an Order of Dismissal as to Grigsby and Grigsby Associates for failure to serve the suit papers on them. A copy of the Order of Dismissal is attached as Exhibit 10. As the panel can see, the Order of Dismissal does not contain the words, "with prejudice."

Also, on September 28, 2001, the court consolidated case no. 00-3278 (which remained pending as to parties after the dismissal of Grigsby and Grigsby Associates) with another case, no. 00-1951, where Grigsby and Grigsby Associates were never parties. A copy of the Amended Complaint filed in case no. 00-1951 is attached as Exhibit 11 and the panel can see that neither Grigsby nor Grigsby Associates was a party. Also, a copy of the Order of Consolidation is attached as Exhibit 12. However, Grigsby and Grigsby Associates were already dismissed at the time of consolidation.

Rule 41(a)(2) of the Federal Rules of Civil Procedure specifically states, "Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice." That means the dismissal is without prejudice to the claimant refiling the action. Therefore, Grigsby and Grigsby & Associates cannot claim that the prior two cases have any impact on this arbitration.

### D.    THE MATTER HAS BEEN FILED WITHIN THE SIX YEAR ELIGIBILITY PERIOD

It is critical to emphasize that Grigsby and Gigsby Associates were required to file a lawsuit in the year 2000 in order to be paid the money that was owed from Donald Rice and his companies. It is further necessary to emphasize that it was apparently not until August 22, 2005,

that Grigsby & Associates and Grigsby entered into a settlement agreement with the companies owned by Donald Rice in order to be paid the money that was owed from the transaction that was done in 1996. Put differently, the evidence shows that Grigsby and Grigsby & Associates were not paid any money from Donald Rice from a transaction that occurred in 1996 until they reached a settlement in the year 2005. Further, the Claimant did not discover this settlement until early in 2006 when it obtained a copy of the Grigsby & Associates' Form X-17A-5 directly from the Securities and Exchange Commission.

Rule 10304 of the NASD Code of Arbitration Procedure provides in subparagraph (a) that:

> No dispute, claim, or controversy shall be eligible for submission to arbitration under this Code where six (6) years have elapsed from the occurrence or event giving rise to the act or dispute, claim or controversy. The panel will resolve any questions regarding the eligibility of a claim under this Rule.

As a preliminary matter, a panel has not been selected in this case, and, therefore, the motion to dismiss cannot be ruled upon at this time or until a panel is selected. When a panel is finally selected, the motion to dismiss on the basis of the six year eligibility rule should be denied.

Before exploring this issue further, some background information is pertinent. Prior to 2002, the courts were split on whether a court or the arbitrators should determine whether claims are eligible under the six year Rule. In 2002, the United States Supreme Court in *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002), ruled that arbitrators–not the courts–should determine whether a claim is still eligible for arbitration. 537 U.S. at 93. *See* Exhibit 13. The Court further ruled that arbitrators have broad powers in determining the eligibility of claims. In January of 2005, the NASD released a Notice to Members which announced the amendment to the eligibility rule to conform with the Supreme Court's decision in

7

*Howsam*, as well as to make clear the impact of that decision on future cases. *See* Exhibit 14.

Prior to *Howsam*, many courts (*i.e.,* those courts that believed it was appropriate for the courts to determine eligibility) interpreted Rule 10304. Those court held that the term "event" as used in this Rule may be a *continuing* event that unfolds over several years. *Prudential Securities, Inc. v. Purello*, 206 A.D.2d 713, 614 N.Y.S.2d 638 (3rd Dept. 1994). *See* Exhibit 15. They have further held that the date of the transaction is, quite simply, irrelevant. *See Goldberg v. Parker*, Fed.Sec.L.Rep. ¶ 98,749,1995 WL 396568 (N.Y. Sup. 1995)(The court noted that the Director of the NASD, in deciding eligibility in other cases, had ruled the "purchase date was not the event or occurrence that gave rise" to the dispute), *see* Exhibit 16; *Corbo v. Les Chateau Assocs.*, 127 A.D.2d 657 (2nd Dept. 1987)(the customer's claims raised issues of fraud that spanned both more than and within six years from the commencement of the proceeding, and the court held that the claims were therefore eligible for arbitration), *see* Exhibit 17.

The *Howsam* case is a perfect example of a case being eligible for arbitration where more than six years elapsed from the date of the transaction. In *Howsam*, the claimant purchased the investments in 1986. In 1994, the claimant received information indicating that the investments had eroded in value. In March 1997, some 11 years after the purchase, Howsam brought an arbitration claim against Dean Witter. Dean Witter then sought to have a court determine that the case was not eligible for arbitration because more than six years had elapsed from the date of purchase. As noted above, the case went to the Supreme Court of the United States, and the Court ruled that the arbitrators must decide eligibility under Rule 10304. The case then went to the arbitrators, and the panel made an award of over $1 million in favor of Howsam and explicitly found that the six-year rule did not make the case ineligible for

arbitration. *See* Arbitration Award, Exhibit 18. Subsequently, a federal district court affirmed the award of the arbitrators. *See* Order affirming arbitration award, Exhibit 19. Thus, the trigger date for the six-year eligibility rule is not the date of the transaction.

In fact, courts and the NASD have routinely found that the six-year eligibility rule is not triggered by the date of the transaction. For example, courts have held that the "occurrence or event" giving rise to the dispute is the *last* occurrence or event necessary to make the claim viable. *Kidder, Peabody & Co., Inc., v. Brandt*,131 F.3d 1001, 1004 (11th Cir. 1997). *See also, FSC Sec. Corp v. Freel*, 811 F.Supp. 439, 444 & fn. 6 (D. Minn. 1993), *aff'd,* 14 F.3d 1310 (8th Cir. 1994) (the triggering event of Rule 10304 is frequently a later event in the investment process, stating that "it could just as plausibly be some other occurrence or event").

In this case, Rice was supposed to do a swap transaction and share the profits with Grisby, and Grigsby was supposed to share the profits with Claimant. Apparently Rice never paid Grigsby until Grisby sued Rice in federal court in New York and the case settled in 2005, with Rice making periodic payments that are continuing to this date. Therefore, Claimant was a third party beneficiary whose claim to funds arose when and if Grigsby received the money from Rice, and that did not occur until August of 2005 at the earliest. Grigsby's obligation continues even as of this date. Therefore, the claim or event did not begin to arise until August of 2005 and this matter has been timely filed.

CARLSON & LEWITTES, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

*Attorneys for Claimant*:

CARLSON & LEWITTES, P.A.

By: *Curtis Carlson*
_____
Curtis Carlson, Fla.Bar. No. 236640
1200 Suntrust International Center
One Southeast Third Avenue
Miami, Florida 33131
Telephone: 305.372.9700
Facsimile:    305.372.8265
E-mail: carlson@carlson-law.net

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by Facsimile (without exhibits) and United States mail (with exhibits) this **16** day of November, 2006 to:

Calvin B. Grigsby
311 California Street
Suite 320
San Francisco, CA 94104-2605
(415) 676-2445 Fax

Original with exhibits and three copies are simultaneously being sent via Federal Express to:

JoAnne Sorrentino
NASD
5200 Town Center Circle
Suite 400
Boca Raton, Florida

By: *Curtis Carlson*
_____

**CARLSON & LEWITTES, P.A.**
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

# EXHIBIT 1



Via Telefax

July 11, 1996

Mr. Howard Gary
Howard Gary & Company
3050 Biscayne Boulevard
Miami, FL 33137

Dear Howard:

This is to confirm your participation as a co-manager in the underwriting team and the accompanying swap or other derivative products for the Dade County Resources Recovery refinancing subject to your final agreement(s) with Grigsby Brandford & Co., Inc.

We look forward to working with you again.

Sincerely,

Juan M. Portuondo
President

JMP/mt
31071896.jmp

cc:     Calvin B. Grisby
        Gerard Mozian
        Lourdes Reyes

_____

**montenay power corp.**

3225 aviation avenue, 4th floor, miami, fl 33133     (305) 854-2229     fax (305) 854-2272

# EXHIBIT 2

$182,695,000
DADE COUNTY, FLORIDA
RESOURCE RECOVERY FACILITY
REFUNDING REVENUE BONDS,
SERIES 1996

BOND PURCHASE CONTRACT

August 29, 1996

Board of County Commissioners of
 Dade County, Florida
111 Northwest First Street
Miami, Florida  33128-1996

Ladies and Gentlemen:

Grigsby Brandford & Company (the "Senior Manager"), acting on behalf of itself and Smith Barney, Inc., Howard Gary & Company, and AIBC Investment Services Corporation (collectively, with the Senior Manager, the "Underwriters") offers to enter into this Bond Purchase Contract (the "Purchase Contract") with Metropolitan Dade County, Florida (the "County"), which, upon acceptance of this offer by the County, will be binding upon the County and the Underwriters. This offer is made subject to acceptance by the County  by execution of this Purchase Contract prior to 5:00 p.m., Eastern Daylight Time, on the date of this Purchase Contract, and, if not so accepted, will be subject to withdrawal by the Senior Manager upon written notice to the County at any time prior to its acceptance by the County.

The Senior Manager represents that it is authorized on behalf of itself and the other Underwriters to enter into and execute this Purchase Contract and to take any other actions which may be required on behalf of the other Underwriters.

All capitalized terms not otherwise defined in this Purchase Contract shall have the same meanings as set forth in the Ordinance, the Trust Indenture, and in the Official Statement.

1

1.   Purchase and Sale of Bonds.

   (a)   Subject to the terms and conditions and the basis of the representations, warranties and covenants set forth in this Purchase Contract, the Underwriters, jointly and severally, hereby agree to purchase from the County, and the County agrees to sell to the Underwriters on the Closing Date, all, but not less than all, of the $182,695,000 aggregate principal amount of Dade County, Florida Resource Recovery Facility Refunding Revenue Bonds, Series 1996, (the "Series 1996 Bonds"), at the aggregate purchase price of $179,712,639.95 (representing the principal amount of $182,695,000 less net original issue discount of $1,528,107.85 and an Underwriters' discount of $1,454,252.20), plus accrued interest of $236,327.31 from September 1 , 1996, to the Closing Date. The Series 1996 Bonds shall bear interest at the rates, be sold to the public at the prices and mature on the dates all as set forth on Schedule I to this Purchase Contract. The Official Statement of the County relating to the Series 1996 Bonds, dated August 29, 1996, including the cover page and Appendices, with such additional changes and amendments as shall be approved by the Senior Manager and the County Manager or his designee, is referred to as the "Official Statement", in substantially the form attached as Exhibit "A" and incorporated by reference. The Underwriters agree to make a bona fide public offering of the Series 1996 Bonds, solely pursuant to the Official Statement, at the initial offering prices set forth in the Official Statement, reserving, however, the right to change such initial offering prices as the Senior Manager shall deem necessary in connection with the marketing of the Series 1996 Bonds and to offer and sell the Series 1996 Bonds to certain dealers (including dealers depositing the Series 1996 Bonds into investment trusts) at concessions to be determined by the Senior Manager. The Underwriters also reserve the right to over allot or effect transactions that stabilize or maintain the market prices of the Series 1996 Bonds at levels above that which might otherwise prevail in the open market and to discontinue such stabilizing, if commenced, at any time.

   (b)   The Series 1996 Bonds shall be substantially in the form described in, and issued and secured pursuant to, the Trust Indenture dated as of September 1, 1996 by and between the County and SunTrust Bank, Central Florida, National Association, Orlando, Florida as Trustee (the "Trustee"), Ordinance No. 96-120 (the "Ordinance") enacted by the Board of County Commissioners of Dade County, Florida (the "Board") on July 18, 1996, as supplemented by Resolution No. R-919-96, adopted by the Board on July 18, 1996, (the "Series 1996 Resolution" and, together with the Ordinance, the "Ordinance"). The Board is authorized to issue the Series 1996 Bonds pursuant to the Constitution and the laws of the State of Florida, more particularly described as Chapter 125, Florida Statutes, as amended, the Metropolitan Dade County Home Rule Amendment and Charter (the "Charter"), the Trust Indenture and the Ordinance. Between the date of this Purchase Contract and the Closing Date, no changes in the Ordinance shall be made unless mutually agreed upon between the

2

County and the Senior Manager. The Underwriters have delivered to the County a disclosure letter containing the information required by Section 218.385, Florida Statutes, which letter is in the form attached to this Purchase Contract as Schedule II.

(c)     The Series 1996 Bonds are being issued for the purpose of providing funds together with other available funds, if any, (i) to refund all of the $55,000,000 Dade County, Florida Adjustable Tender Solid Waste Industrial Revenue Bonds, Series 1988, dated as of February 22, 1988, presently outstanding in the aggregate principal amount of $49,115,000 (the "Series 1988 Bonds"), the $18,000,000 Dade County, Florida Adjustable Tender Solid Waste Industrial Revenue Bonds, Series 1989 dated as of May 23, 1989, presently outstanding in the aggregate principal amount of $8,555,000 (the "Series 1989 Bonds") and the $190,000,000 Dade County, Florida Adjustable Tender Solid Waste Industrial Revenue Bonds, Series 1990A dated as of December 27, 1990, presently outstanding in the aggregate principal amount of $129,955,000 (the "Series 1990A Bonds" and, collectively with the Series 1988 Bonds and the Series 1989 Bonds, the "Prior Bonds"), and (ii) to pay the costs of issuance relating to the Series 1996 Bonds, including the premium for the municipal bond insurance policy and the Reserve Fund Surety Bond.

(d)     The proceeds of the Series 1996 Bonds, along with certain other funds of the County, if any, will be deposited into an account created pursuant to an Escrow Deposit Agreement (the "Escrow Deposit Agreement"), dated as of September 10, 1996, between the County and the Trustee. The monies deposited pursuant to the Escrow Deposit Agreement will be applied to the purchase of noncallable direct obligations of the United States of America or held as uninvested cash so as to produce sufficient funds to pay when due, upon redemption, the principal of, redemption premium, if any, and interest on the Prior Bonds. The proceeds of the Series 1996 Bonds will be used to refund and pay all the Prior Bonds and to pay all amounts due to Banque Paribas for certain letters of credit as more particularly described in the Escrow Deposit Agreement.

(e)     The County authorizes the Underwriters to use and distribute copies of the Official Statement and copies of the Ordinance in connection with the public offering and sale of the Series 1996 Bonds and agrees not to supplement or amend or cause to be supplemented or amended the Ordinance, the Trust Indenture or the Official Statement, at any time prior to the Closing, without the consent of the Senior Manager.

(f)     The County consents to the use by the Underwriters of the Preliminary Official Statement dated August 20, 1996, relating to the Series 1996 Bonds (the "Preliminary Official Statement") in connection with the original public offer, sale and distribution of the Series 1996 Bonds by the Underwriters. As of its date, the

Preliminary Official Statement was "deemed final" (except for permitted omissions) by the County for purposes of Rule 15c2-12 of the Securities and Exchange Act of 1934, as amended ("Rule 15c2-12").

(g)     On the Closing Date, the County shall deliver, or cause to be delivered, to the Underwriters copies of the final Official Statement dated the date of this Purchase Contract as shall have been accepted expressly by the Underwriters (which acceptance will not be unreasonably withheld) relating to the Series 1996 Bonds, and shall cause copies of the Official Statement, in sufficient quantity for the Underwriters to comply with the rules of the Municipal Securities Rulemaking Board, including Rule G-32 and Securities and Exchange Commission Rule 15c2-12(b)(4), to be available to the Underwriters within seven (7) business days of the execution of this Purchase Contract and in sufficient time to accompany any confirmation that requests payment from any customer of the Underwriters. Delivery of such copies of the Official Statement within such seven (7) business day period shall constitute the County's representation that such Official Statement is complete as of the date of its delivery. The County agrees to deliver to the Underwriters such reasonable quantities of the Preliminary Official Statement and the Official Statement and such reasonable quantities of the Ordinance as the Underwriters may request for use in connection with the offering and sale of the Series 1996 Bonds.

2.     Events Requiring Disclosure.  If at any time prior to Closing and within the Disclosure Period any event known to the County relating to or affecting the Ordinance, the Trust Indenture or the Series 1996 Bonds shall occur which might affect the correctness or completeness of any statement of a material fact contained in the Official Statement (an "Event Requiring Notification"), the County will promptly notify the Senior Manager in writing of the circumstances and details of such event. If, as a result of such event or any other event, it is necessary, in the opinion of the County Attorney, the County Manager, the Finance Director, Co-Bond Counsel, the Senior Manager or Co-Counsel to the Underwriters to amend or supplement the Official Statement in order to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading and any such counsel shall have so advised the County, the County will, at its expense, take all actions necessary to carry out the full purpose and intent and to fully comply with Section 5(w).

3.     Good Faith Check.   The County acknowledges receipt from the Senior Manager of a corporate check in the aggregate amount of $1,826,950 (the "Good Faith Check"), which is being delivered to the County as security for the performance by the Underwriters of their obligation to accept and pay for the Series 1996 Bonds. The County agrees not to cash the Good Faith Check unless the Underwriters default on their obligations under this Purchase Contract. Upon compliance by the Underwriters with their obligations under this Purchase Contract, the Good Faith Check shall be returned to the Underwriters at the Closing. If the County does not accept this offer, the Good Faith Check shall be immediately returned to the

4

Senior Manager. In the event of the County's failure to deliver the Series 1996 Bonds at the Closing, or if the County shall be unable at or prior to the Closing to satisfy the conditions to the obligations of the Underwriters, or if the obligations of the Underwriters shall be terminated for any reason permitted by this Purchase Contract, the Good Faith Check shall be immediately returned to the Senior Manager and such return of the Good Faith Check shall constitute a full release and discharge of all damages for such failure and termination since it is understood by both the County and the Underwriters that actual damages in such circumstances may be difficult or impossible to compute. If the Underwriters fail other than for a reason permitted under this Purchase Contract to accept and pay for the Series 1996 Bonds upon their tender by the County at the Closing, the County may cash the Good Faith Check and retain the funds represented by such Good Faith Check as full liquidated damages, and not as a penalty, for such failure and for any and all defaults on the part of the Underwriters, and the retention of such funds shall constitute a full release and discharge of all claims, rights and damages for such failure and for any and all such defaults.

4. <u>Closing</u>.     The Closing will occur before 1:00 p.m., Eastern Daylight Time, on September 10, 1996, or at such other time or on such earlier or later date as shall have been mutually agreed upon by the County and the Senior Manager. Prior to the Closing, the County will deposit with The Depository Trust Company ("DTC") a Bond Certificate for each maturity of the Series 1996 Bonds registered in the name of DTC's nominee, Cede & Co. representing in the aggregate, 100% of the principal amount of such Series 1996 Bonds. The County has provided DTC with its blanket letter of representations. The Senior Manager, on behalf of the Underwriters, will accept such delivery and pay the purchase price of the Series 1996 Bonds by delivering to the County a wire transfer credited to the order of the County in immediately available federal funds. Payment for and delivery of the Series 1996 Bonds shall be made at such place as shall be agreed upon between the County and the Senior Manager. Such payment and delivery is called the "Closing" and the date of the Closing is called the "Closing Date."

5. <u>Representations, Warranties, and Covenants of the County</u>. The County, by its acceptance of this Purchase Contract, represents, warrants and covenants to each of the Underwriters as of the date of this Purchase Contract that:

(a)     the County is, and will be on the Closing Date, a political subdivision of the State of Florida duly created and validly existing under the Constitution and laws of the State of Florida;

(b)     the Board had, has and will have, as the case may be, full legal right, power and authority (i) to enact or adopt the Ordinance, to execute and deliver, as the case may be, this Purchase Contract, the Escrow Deposit Agreement, the Trust Indenture, the Loan Agreement, the Management Agreement, the Swap Agreement, the 1996 Note, the Preliminary Official Statement and the Official Statement; (ii) to issue, sell, execute and deliver the Series 1996 Bonds to the Underwriters as provided in this

5

Purchase Contract; (iii) to secure the Series 1996 Bonds in the manner contemplated by the Trust Indenture and the Ordinance; and (iv) to carry out and consummate all other transactions contemplated by the preceding documents and instruments;

(c)     the Board has duly enacted and adopted the Ordinance and has duly authorized or ratified (i) the execution, delivery and performance of this Purchase Contract, the Escrow Deposit Agreement, the Trust Indenture, the Management Agreement, the Swap Agreement, the 1996 Note, and the issuance, sale, execution and delivery of the Series 1996 Bonds; (ii) the delivery and the distribution of the Preliminary Official Statement and delivery and distribution of the Final Official Statement; and (iii) the taking of any and all such action as may be required on the part of the County to carry out, give effect to and consummate the transactions contemplated by the preceding documents and instruments; provided, however, that no representation is made concerning compliance with the federal securities laws or securities or Blue Sky laws of the various states;

(d)     this Purchase Contract, the Escrow Deposit Agreement, the Trust Indenture, the Loan Agreement, the Management Agreement, the Swap Agreement, and the 1996 Note, when executed and delivered by the parties, will, and the Ordinance does, constitute the legal, valid and binding obligations of the County enforceable in accordance with their terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium or other laws affecting creditors' rights generally or subject to the exercise of the state's police power and to judicial discretion in appropriate cases;

(e)     the County has complied, and will at the Closing be in compliance, in all material respects, with the Ordinance and the Trust Indenture;

(f)     when paid for by the Underwriters at the Closing in accordance with the provisions of this Purchase Contract, and when authenticated by the Bond Registrar, the Series 1996 Bonds will be duly authorized, executed, issued and delivered and will constitute legal, valid and binding obligations of the County enforceable in accordance with their terms and the terms of the Ordinance, except as enforcement may be limited by bankruptcy, insolvency, moratorium or other laws affecting creditors' rights generally or subject to the exercise of the state's police power and to judicial discretion in appropriate cases;

(g)     the Ordinance creates a valid pledge of, and lien and charge upon, the proceeds of the Trust Estate to the extent set forth in the Ordinance and the Trust Indenture;

(h)     at Closing, all approvals, consents and orders of and filings with any governmental authority or agency, if any, which would constitute a condition precedent to the issuance of the Series 1996 Bonds or the execution and delivery of or the performance by the County of its obligations under this Purchase Contract, the Trust

6

Indenture, the Series 1996 Bonds, the Ordinance, the Loan Agreement, the Management Agreement, the Swap Agreement, or the 1996 Note will have been obtained or made and any consents, approvals and orders so received or filings so made will be in full force and effect; provided, however, that no representation is made concerning compliance with the federal securities laws or the securities or Blue Sky laws of the various states or the legality of the Series 1996 Bonds for investment under the laws of the various states;

(i)     other than as disclosed in the Official Statement, the execution and adoption by the Board and performance by the County of the Ordinance and the authorization, execution, delivery and performance of this Purchase Contract, the Escrow Deposit Agreement, the Management Agreement, the Loan Agreement, the Swap Agreement, the 1996 Note, the Series 1996 Bonds, and any other agreement or instrument to which the County is a party, used or contemplated for use in consummation of the transactions contemplated by this Purchase Contract or by the Official Statement, and, to the best of the County's knowledge, compliance with the provisions of each such instrument, do not and will not conflict with, or constitute or result in (i) a violation of the Constitution of the State of Florida, or any existing law, administrative regulation, rule, decree or order, state or federal, or the Charter or the Code of Metropolitan Dade County; or (ii) a breach of or default under a material provision of any agreement, indenture, lease, note or other instrument to which the County, or its properties or any of the officers of the County as such is subject; or (iii) the creation or imposition of any prohibited lien, charge or encumbrance of any nature upon any of the revenues, credit, property or assets of the County under the terms of the Constitution of the State of Florida or any law, instrument or agreement;

(j)     the Preliminary Official Statement and the Official Statement and any amendment or supplement to each (including any financial and statistical data included in each) will at all times prior to and including the Closing Date be true, correct and complete in all material respects and will not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading;

(k)     at Closing, the financial statements and other historical financial and statistical information contained in the Official Statement will fairly represent the financial position and results of operations of the Dade County Department of Solid Waste (the "Department") as of the dates and for the periods of time set forth in accordance with generally accepted accounting principles applicable to governmental units (including any applicable State of Florida requirements) as in effect from time to time and applied consistently;

(l)     except as otherwise described in the Official Statement, there shall not have been any material adverse change since September 30, 1995 in the results of operations or

7

financial condition of the Department other than changes in the ordinary course of business or in the normal operations of the Department;

(m)     between the time of execution of this Purchase Contract by the County and the Closing, the County will not execute or issue any bonds or notes on a parity with the Series 1996 Bonds without the written consent of the Senior Manager, or incur any other obligations or borrow money secured by the Trust Estate;

(n)     the County will furnish such information, execute such instruments and take such other action in cooperation with the Underwriters as the Underwriters may reasonably request to qualify the Series 1996 Bonds for offer and sale and to determine the eligibility of the Series 1996 Bonds for investment under the Blue Sky or other securities laws and regulations of such states and other jurisdictions of the United States of America as the Senior Manager may designate, provided that the County shall not be required to file a general consent to service of process or qualify to do business in any jurisdiction or become subject to service of process in any jurisdiction in which the County is not now subject to such service;

(o)     to the best of the County's knowledge and belief, other than as described in the Official Statement, there is no claim, action, suit, proceeding, inquiry or investigation, at law or in equity, or before or by any court, public board or body pending, or, to the best knowledge of the County, threatened against or affecting the County: (i) to restrain or enjoin the issuance or delivery of any of the Series 1996 Bonds or the collection of the revenues pledged under the Ordinance or the Trust Indenture; (ii) in any way contesting or affecting: (1) the authority for the issuance of the Series 1996 Bonds; (2) the validity or enforceability of the Series 1996 Bonds, the Ordinance, the Trust Indenture, this Purchase Contract, the Loan Agreement, the 1996 Note, the Management Agreement, the Swap Agreement, or the Escrow Deposit Agreement; or (3) the power of the Board to duly enact and adopt the Ordinance and to execute and deliver the Series 1996 Bonds, this Purchase Contract, the Trust Indenture, the Loan Agreement, the 1996 Note, the Management Agreement, the Swap Agreement, and the Escrow Deposit Agreement, or to consummate the transactions relating to the County contemplated by the Ordinance, the Trust Indenture, the Loan Agreement, the 1996 Note, the Management Agreement, the Swap Agreement, the Escrow Deposit Agreement and this Purchase Contract; (iii) in any way contesting the existence or powers of the County or the Board or the title to office of any member of the Board; or (iv) contesting in any way the completeness, accuracy or fairness of the Official Statement;

(p)     the County will not knowingly take or omit to take any action, which action or omission would adversely affect the exclusion from gross income for federal income tax purposes of the interest on the Series 1996 Bonds under the Internal Revenue Code of 1986, as amended;

8

(q)    to the best of the County's knowledge, since December 31, 1975, the County has not been in default in the payment of principal of, redemption premium, if any, or interest on, any direct County indebtedness or other obligations in the nature of direct County indebtedness which it has issued, assumed or guaranteed as to payment of principal, redemption premium, if any, or interest;

(r)    any certificate signed by any official of the County and delivered to the Underwriters in connection with the issuance, sale and delivery of the Series 1996 Bonds shall be deemed to be a representation and warranty by the County to each of the Underwriters as to the statements made in the certificate;

(s)    the Series 1996 Bonds as issued will conform in all material respects to the description of the Series 1996 Bonds in the Official Statement;

(t)    the County will apply the proceeds of the Series 1996 Bonds in accordance with the Ordinance, the Escrow Deposit Agreement and the Trust Indenture, and as contemplated by the Official Statement;

(u)    neither the County nor anyone authorized to act on its behalf, directly or indirectly, has offered the Series 1996 Bonds for sale to, or solicited any offer to buy, the Series 1996 Bonds from anyone other than the Underwriters;

(v)    all proceedings of the Board relating to the enactment and adoption of the Ordinance, the approval and authorization of the execution and delivery of the Trust Indenture, the Loan Agreement, the 1996 Note, the Management Agreement, the Swap Agreement, this Purchase Contract and the Official Statement, and the approval and authorization of the issuance and sale of the Series 1996 Bonds were conducted at duly convened meetings of the Board with respect to which all required notices were duly given to the public and at which quorums were or will be at all material times present, and no authority or proceeding for the issuance of the Series 1996 Bonds has been repealed, rescinded, or revoked;

(w)    during the Disclosure Period as defined in this Purchase Contract, (i) the County will not adopt any amendment of or supplement to the Official Statement to which, after having been furnished with a copy, the Underwriters shall reasonably object in writing, unless the County has obtained the opinion of Co-Bond Counsel, stating that such amendment or supplement is necessary in order to make the Official Statement not misleading in light of the circumstances existing at the time that it is delivered to a purchaser, and (ii) if any event relating to or affecting the County shall occur which would or might cause the information contained in the Official Statement, as then supplemented or amended, to contain any untrue statement of a material fact or to omit to state a material fact required to be stated therein or necessary to make the

9

statements therein, in light of the circumstances under which they were made, not misleading, the County shall notify the Underwriters, and if as a result of which it is necessary, in the opinion of Co-Counsel to the Underwriters, to amend or to supplement the Official Statement in order to make the Official Statement not misleading in light of the circumstances existing at the time it is delivered to a purchaser, the County shall immediately prepare and furnish to the Underwriters (at the expense of the County) a reasonable number of copies of an amendment of or supplement to the Official Statement (in form and substance satisfactory to the Underwriters and the County) which will amend or supplement the Official Statement so that such Official Statement, as amended or supplemented, will not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances existing at the time the Official Statement is delivered to a purchaser, not misleading in any material respect. Unless otherwise notified in writing by the Underwriters on or prior to the Closing Date, the End of the Underwriting Period for the Series 1996 Bonds for all purposes of Rule 15c2-12 is the Closing Date. In the event such notice is given in writing by the Underwriters, the Underwriters agree to notify the County in writing following the occurrence of the End of the Underwriting Period for the Series 1996 Bonds;

(x)     For the purposes of this Purchase Contract, the term "Disclosure Period" shall mean the earlier of (1) ninety (90) days from the End of the Underwriting Period, or (2) the time when the Official Statement is available to any person from a nationally recognized municipal securities information repository, but in no case less than twenty-five (25) days following the End of the Underwriting Period.

(y)     the County has agreed, in the Trust Indenture, to comply with the continuing disclosure requirements of Rule 15c2-12 promulgated by the Securities and Exchange Commission and in particular will provide the following information: (i) certain annual financial information and operating data (the "Annual Information") for the preceding fiscal year together with the County's most recent audited financial statements that are normally available to the general public; (ii) timely notice of the occurrence of certain material events with respect to the Series 1996 Bonds; and (iii) timely notice of the County's inability to provide the Annual Information on or before the date specified in the Trust Indenture.

6.     Conditions of Closing.     The Underwriters have entered into this Purchase Contract in reliance on the representations and agreements of the County. The obligations of the Underwriters shall be subject to the performance by the County of its obligations to be performed at or prior to the Closing, to the accuracy of and compliance with the representations, warranties and covenants of the County, in each such case as of the time of delivery of this Purchase Contract and as of the Closing, and are also subject, in the

discretion of the Senior Manager, to the following further conditions:

(a)     at Closing, (i) the Ordinance, the Trust Indenture, the Loan Agreement, the 1996 Note, the Management Agreement, the Swap Agreement, the Escrow Deposit Agreement, and this Purchase Contract shall be in full force and effect and shall not have been repealed, amended, modified or supplemented, except as may have been agreed to in writing by the Senior Manager, and the County shall have executed each of them and there shall have been taken in connection with each of them and in connection with the issuance of the Series 1996 Bonds, all such action as shall, in the opinions of Bryant, Miller & Olive, P.A. and Manuel Alonso-Poch, P.A. ("Co-Bond Counsel") or Thomas J. Korge, P.A., and Harold Long, Jr., Esquire ("Co-Counsel to the Underwriters"), be necessary in connection with the transactions contemplated by this Purchase Contract, (ii) the Series 1996 Bonds shall have been duly authorized, executed and delivered, (iii) the Official Statement shall not have been amended, modified or supplemented, except as may have been agreed to in writing by the Senior Manager, and (iv) the County shall perform or have performed all of its obligations under or specified in this Purchase Contract, the Escrow Deposit Agreement, the Trust Indenture, the Loan Agreement, the 1996 Note, the Management Agreement, the Swap Agreement, the Official Statement, and the Ordinance;

(b)     at or prior to the Closing Date, the Underwriters shall have received the following:

   (i)     the opinion of the County Attorney, dated the Closing Date, in a form acceptable to the Senior Manager and the County;

   (ii)    the final approving opinions of Co- Bond Counsel, dated the Closing Date in substantially the form attached to the Official Statement as Appendix "E ";

   (iii)   the opinions of Co-Counsel to the Underwriters dated the Closing Date, to the effect that the Series 1996 Bonds are not subject to the registration requirements of the Securities Act of 1933, as amended, and the Trust Indenture and the Ordinance are exempt from qualification under the Trust Indenture Act of 1939, as amended. Such opinions shall also state that, based upon their participation in the preparation of the Official Statement as Co-Counsel to the Underwriters and without having undertaken to determine independently the accuracy or completeness of the contents of the Official Statement, nothing has come to the attention of such co- counsel which has caused them to believe that the Official Statement (except for the financial and statistical data to which no view need be expressed) as of its date contained, or as of the Closing Date contains, any untrue statement of a material fact or omits to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were

11

made, not misleading; and

  (iv) the supplemental opinions of Co-Bond Counsel, dated the Closing Date, in a form acceptable to the Senior Manager and the County;

  (v) an executed copy of this Purchase Contract, the Trust Indenture, the Loan Agreement, the 1996 Note, the Management Agreement, the Swap Agreement, and the Escrow Deposit Agreement;

 (c) at Closing, the Underwriters shall receive a certificate, dated the Closing Date, signed by the County Manager or Assistant County Manager to the effect that, to the best of their knowledge, information and belief: (i) the representations and warranties of the County contained in this Purchase Contract are true and correct in all material respects as of the Closing Date as if made on the date of this Purchase Contract; and (ii) the County has performed all obligations to be performed under this Purchase Contract as of the Closing Date;

 (d) at Closing, the Underwriters shall receive a copy of the Ordinance certified by the Ex-Officio Clerk or Deputy Clerk of the County as a true and correct copy of the original, as currently in full force and effect and as not having been otherwise amended since its adoption, except as provided in this Purchase Contract;

 (e) at Closing, the Underwriters shall receive letters from Moody's Investors Service Inc. ("Moody's"), and Standard & Poor's Ratings Services, a division of McGraw-Hill Corporation ("S&P"), confirming that they have rated the Series 1996 Bonds "Aaa" and "AAA", respectively, and that such ratings are in effect on the Closing Date;

 (f) at Closing, the Underwriters shall receive a certificate from the Trustee, dated the Closing Date and addressed to the Underwriters, Co-Bond Counsel and the County to the effect that (i) the Trustee is a national bank association, duly organized and validly existing under the laws of the United States of America and authorized to do business in the State of Florida, (ii) the Trustee has duly accepted its duties under the Ordinance and the Trust Indenture, and (iii) the Trustee has taken all necessary corporate action required to act in its role as trustee, bond registrar, authentication agent, and paying agent under the Ordinance and the Trust Indenture and to perform its duties under each;

 (g) at Closing, the Underwriters shall receive a letter from Deloitte & Touche LLP, addressed to the County, dated the date of the Closing, to the effect that they consent to the inclusion of the audited financial statement for Fiscal Year 1994-95, or their most recent financial statement, as the case may be, of the Department in the Preliminary Official Statement and the Official Statement and to the references made to them in the Preliminary Official Statement and the Official Statement;

12

(h)   at Closing, the Underwriters shall receive evidence satisfactory to the Underwriters that AMBAC Indemnity Corporation (the "Bond Insurer") has issued a policy of insurance guaranteeing the timely payment of principal of and interest on the Series 1996 Bonds (the "Bond Policy");

(i)   at Closing, the Underwriters shall receive an opinion of Bond Insurer's counsel, addressed to the Underwriters, in a form and substance satisfactory to the Underwriters;

(j)   at Closing, the Underwriters shall receive a certificate of the Escrow Agent dated the Closing Date and addressed to the Underwriters, Co-Bond Counsel and the County to the effect that (i) the Escrow Agent is a national bank association, duly organized and validly existing under the laws of the United States of America and authorized to do business in the State of Florida, (ii) the Escrow Agent has duly accepted its duties under the Escrow Deposit Agreement, has full legal right and procedural authority to act in such role as Escrow Agent under the Escrow Deposit Agreement and to perform its duties under the Escrow Deposit Agreement;

(k)   at Closing, the Underwriters shall receive the Termination Agreement executed by the authorized representatives of Banque Paribas and the other syndicate banks dated the Closing Date.

(l)   at Closing, the Underwriters shall receive such additional legal opinions, certificates (including such certificates as may be required by regulations of the Internal Revenue Service in order to establish the exclusion from income, for federal income tax purposes, of the interest on the Series 1996 Bonds, which certificates shall be satisfactory in form and substance to Co-Bond Counsel) and other evidence as the Senior Manager, Co-Bond Counsel, or Co-Counsel to the Underwriters may reasonably deem necessary, provided such additional legal opinions, certificates and other evidence is requested by the Senior Manager at least two business days before the Closing;

The foregoing opinions, certificates and other evidence shall be in form and substance satisfactory to the Senior Manager.

If the County shall be unable to satisfy the conditions to the obligations of the Underwriters contained in this Purchase Contract, or if the obligations of the Underwriters shall be terminated for any reason permitted by this Purchase Contract, this Purchase Contract shall terminate and neither the Underwriters nor the County shall be under any further obligation or liability to the other, except as provided in Section 9 and except that the Good Faith Check shall be returned to the Senior Manager by the County.

13