7.    Termination of Purchase Contract.    The Senior Manager may terminate this Purchase Contract, without liability therefor, by written notification to the County, if at any time subsequent to the date of this Purchase Contract and at or prior to the Closing:

    (a)   the marketability of the Series 1996 Bonds or the market price, in the opinion of the Senior Manager, has been materially adversely affected by an amendment to the Constitution of the United States of America or by any legislation (other than any actions taken by either House of Congress on or prior to the date of this Purchase Contract, (i) enacted or adopted by the United States of America, (ii) recommended to the Congress or otherwise endorsed for passage, by press release, other form of notice or otherwise, by the President of the United States of America, the Chairman or ranking minority member of the Committee on Finance of the United States Senate or the Committee on Ways and Means of the United States House of Representatives, the Treasury Department of the United States of America or the Internal Revenue Service, or (iii) favorably reported out of the appropriate Committee for passage to either House of the Congress by any full Committee of such House to which such legislation has been referred for consideration, or by any decision of any court of the United States of America or by any order, rule or regulation (final, temporary or proposed) on behalf of the Treasury Department of the United States of America, the Internal Revenue Service or any other authority or regulatory body of the United States of America, or by a release or announcement or communication issued or sent by the Treasury Department of the United States of America or the Internal Revenue Service, or any comparable legislative, judicial or administrative development affecting the federal tax status of the County, its property or income, obligations of the general character of the Series 1996 Bonds, as contemplated hereby, or any tax exemption of the Series 1996 Bonds; or

    (b)   any legislation, rule, or regulation shall be introduced in, or be enacted or adopted by any department or agency in the State of Florida, or a decision by any court of competent jurisdiction within the State of Florida shall be rendered which, in the reasonable opinion of the Senior Manager, materially and adversely affects the market for the Series 1996 Bonds or the sale, at the contemplated offering prices by the Underwriters of the Series 1996 Bonds to be purchased by them; or

    (c)   any amendment to the Official Statement is proposed by the County or deemed necessary by Co-Bond Counsel or the Senior Manager which, in the reasonable opinion of the Senior Manager, materially and adversely affects the market for the Series 1996 Bonds or the sale, at the contemplated offering prices, by the Underwriters of the Series 1996 Bonds to be purchased by them; or

    (d)   a national or international calamity or crisis shall have occurred or escalated which, in the sole opinion of the Senior Manager with the concurrence of the County

14

adversely affects the market for the Series 1996 Bonds or the sale, at the contemplated offering prices, by the Underwriters of the Series 1996 Bonds to be purchased by them; or

(e)    legislation shall be introduced by amendment or otherwise in or be enacted by, the House of Representatives or the Senate of the Congress of the United States of America, or a decision by a Court of the United States of America shall be rendered, or a stop order, ruling, release, regulation, official statement or no-action letter by or on behalf of the Securities and Exchange Commission or any other governmental agency having jurisdiction of the subject matter of the Series 1996 Bonds shall have been proposed, issued or made (which is beyond the control of the Senior Manager or the County to prevent or avoid) to the effect that the issuance, offering or sale of the Series 1996 Bonds, including all the underlying obligations as contemplated by this Purchase Contract or by the Official Statement, or any document relating to the issuance, offering or sale of the Series 1996 Bonds is or would be in violation of any of the federal securities laws at Closing, including the Securities Act of 1933, as amended and then in effect, the Securities Exchange Act of 1934, as amended and then in effect, or the Trust Indenture Act of 1939, as amended and then in effect, or with the purpose or effect of otherwise prohibiting the offering and sale of obligations of the general character of the Series 1996 Bonds, or the Series 1996 Bonds, as contemplated by this Purchase Contract; or

(f)    there shall have occurred, after the signing of this Purchase Contract, either a financial crisis or a default with respect to the debt obligations of the County, or proceedings under the federal bankruptcy laws shall have been instituted by the County, in either case the effect of which, in the reasonable judgment of the Senior Manager, is such as to affect (i) the market price or the marketability of the Series 1996 Bonds, or (ii) the ability of the Underwriters to enforce contracts for the sale of the Series 1996 Bonds; or

(g)    a general banking moratorium shall have been declared by the United States of America, New York or Florida authorities, which in the reasonable opinion of the Senior Manager, materially and adversely affects the market for the Series 1996 Bonds or the sale, at the contemplated offering prices, by the Underwriters of the Series 1996 Bonds to be purchased by them; or

(h)    any national securities exchange, or any governmental authority, shall impose, as to the Series 1996 Bonds or obligations of the general character of the Series 1996 Bonds, any material restrictions not now in force, or increase materially those now in force, with respect to the extension of credit by, or the charge to the net capital requirements of the Underwriters, or the establishment of material restrictions upon trading of securities, including limited or minimum prices, by any governmental authority or by any national securities exchange; or

15

    (i)    legal action shall have been filed against the County from which an adverse ruling would adversely affect the transactions contemplated hereby or by the Official Statement or the validity of the Series 1996 Bonds, the Ordinance, this Purchase Contract, or the Escrow Deposit Agreement; provided, however, that as to any such litigation, the County may request and the Senior Manager may accept an opinion by Co-Bond Counsel, or of other counsel acceptable to the Senior Manager, that in such counsel's opinion the issues raised by any such litigation or proceeding are without substance or that the contentions of any plaintiff are without merit; or

    (j)    the rating of any of the Series 1996 Bonds shall have been downgraded below "AAA" by S&P, or "Aaa" by Moody's, after the date of this Purchase Contract, the effect of which, in the opinion of the Senior Manager, is to affect materially and adversely the market prices of the Series 1996 Bonds or trading in any securities of the County shall have been suspended on any national securities exchange; or any proceeding shall be pending or threatened by the Securities and Exchange Commission against the County; or a general suspension of trading on the New York Stock Exchange or the American Stock exchange or other national securities exchange; or

    (k)    any information shall have become known which, in the Senior Manager's reasonable opinion, makes untrue, incorrect or misleading in any material respect any statement or information contained in the Official Statement, as that information has been supplemented or amended by other information, as of the date furnished or supplied to the Underwriters and until the end of the Disclosure Period, or causes the Official Statement, as so supplemented or amended, to contain an untrue, incorrect or misleading statement of a material fact or to omit to state a material fact required or necessary to be stated therein in order to make the statements made therein, in light of the circumstances under which they were made, not misleading and upon the receipt of notice of same by the County, the County fails to promptly amend or supplement the Official Statement in a manner which is reasonably acceptable in form and content to the Senior Manager.

8.    <u>Termination of Purchase Contract by County</u>.

    (a)    The County may terminate this Purchase Contract, without liability therefore, by written notification to the Senior Manager should Banque Paribas and/or any of its syndicate banks fail for any reason to execute the Termination Agreement for the Prior Bonds to be dated as of September 10, 1996, among Montenay-Dade, Ltd., Montenay Power Corporation, Banque Paribas, and any of its syndicate banks.

9.   Expenses.

    (a)    The County agrees to pay all expenses incident to the performance of its obligations, including, but not limited to, (i) the cost of the preparation, printing or other reproduction (for distribution prior to, on, or after the date of acceptance of this Purchase Contract) of copies of the Official Statement and Preliminary Official Statement, (ii) charges made by rating agencies for the rating of the Series 1996 Bonds, (iii) the fees and charges of the Escrow Agent and the Trustee, (iv) the fees and expenses of Co-Bond Counsel, the Financial Advisor, and of any other experts or consultants retained by the County, (v) the cost of any insurance commitment or other credit enhancements, (vi) the cost of any consent letters delivered by the County's accountants or consultants, and (vii) any other cost incidental to the issuance of the Series 1996 Bonds.

    (b)    The Underwriters shall pay all expenses incident to their obligation to purchase the Series 1996 Bonds, including, but not limited to, (i) the cost of delivering the Series 1996 Bonds from New York, New York, to their purchasers, (ii) the fees and disbursements of Co-Counsel to the Underwriters, and (iii) all other expenses incurred by them or any of them in connection with their offering and distribution of the Series 1996 Bonds including the preparation, printing and separate distribution, if any, of the Blue Sky memoranda and legal investment surveys.

    (c)    In the event either the County or the Underwriters shall have paid obligations of the other as set forth in this Section, appropriate reimbursements and adjustments shall be made.

10.   Truth in Bonding Statement.

    The County is proposing to issue not more than $182,695,000 of the Dade County, Florida Resource Recovery Facility Refunding Revenue Bonds, Series 1996, (the "Series 1996 Bonds") for the purpose of providing funds together with other available funds, if any, (i) to refund all of the $55,000,000 Dade County, Florida Adjustable Tender Solid Waste Industrial Revenue Bonds, Series 1988, dated as of February 22, 1988, presently outstanding in the aggregate principal amount of $49,115,000 (the "Series 1988 Bonds"), the $18,000,000 Dade County, Florida Adjustable Tender Solid Waste Industrial Revenue Bonds, Series 1989 dated as of May 23, 1989 , presently outstanding in the aggregate principal amount of $8,555,000 (the "Series 1989 Bonds") and the $190,000,000 Dade County, Florida Adjustable Tender Solid Waste Industrial Revenue Bonds, Series 1990A dated as of December 27, 1990, presently outstanding in the aggregate principal amount of $129,955,000 (the "Series 1990A Bonds" and, collectively with the Series 1988 Bonds and the Series 1989 Bonds, the "Prior Bonds"), and (ii) to pay the costs of issuance relating to the Series 1996 Bonds, including the premium for the municipal bond insurance policy and the Reserve Fund Surety Bond.

The debt or obligation created by the Series 1996 Bonds is expected to be repaid over a period of seventeen (17) years from October 1, 1996. At a true interest cost (TIC) of 5.5755%, the total interest paid over the life of the debt or obligation will be $89,156,807.71.

The source of repayment or security for this proposal to issue the Series 1996 Bonds is exclusively limited to certain funds known as the Trust Estate. Because (a) such Trust Estate funds may not be used by the County for any purpose other than the stated purposes in the Ordinance and the Trust Indenture, (b) the ad valorem taxing power of the County is not pledged or involved in these Series 1996 Bonds, (c) the Series 1996 Bonds including interest do not constitute a debt of the County within the meaning of any constitutional or statutory provision, and (d) the faith and credit of the County are not pledged to the payment of the principal of or the interest on the Series 1996 Bonds, authorizing this debt or obligation will result in no diminution of any moneys being available to the County to finance other services of the County each year for the 17 year period for the Series 1996 Bonds.

11. <u>Public Entity Crimes</u>  The Underwriters represent that each of them, including its employees, officers, directors, executives, partners, shareholders, or agents have not been charged with or indicted for a public entity crime pursuant to Section 287.133, Florida Statutes.

12. <u>Miscellaneous</u>.

    (a)    All notices, demands and formal actions hereunder shall be in writing and mailed, telegraphed, or delivered to:

The Underwriters:

    Grigsby Brandford & Co., Inc.
    101 California Street, Suite 2000
    San Francisco, California 94111
    Attention: Lorraine

The County:

    Metropolitan Dade County
    Stephen P. Clark Center
    111 N.W. First Street, Suite 2550
    Miami, Florida 33128-1996
    Attention: Finance Director

(or such other addresses as may be designed in writing to the other party).

    (b)    This Purchase Contract will inure to the benefit of and be binding upon the parties

and their successors and assigns, and will not confer any rights upon any other person. The terms "successors" and "assigns" shall not include any purchaser of any of the Series 1996 Bonds from the Underwriters merely because of such purchase.

(c)     All the representations, warranties, covenants and agreements of the County in this Purchase Contract shall remain operative and in full force and effect as if made on the date of this Purchase Contract and the Closing Date, regardless of (i) any investigation made by or on behalf of any of the Underwriters, or (ii) delivery of and any payment for the Series 1996 Bonds.

(d)     The agreements contained in Sections 3 and 9 hereof shall survive any termination of this Purchase Contract.

(e)     Section headings have been inserted in this Purchase Contract as a matter of convenience for reference only, and it is agreed that such section headings are not a part of this Purchase Contract and will not be used in the interpretation of any provisions of this Purchase Contract.

(f)     If any provision of this Purchase Contract shall be held or deemed to be, or shall in fact be, invalid, inoperative or unenforceable as applied in any particular case in any jurisdiction or jurisdictions, or in all jurisdictions because it conflicts with any provisions of any constitution, statute, or rule of public policy, or for any other reasons, such circumstances shall not have the effect of rendering the provision in question invalid, inoperative or unenforceable in any other case or circumstances, or of rendering any other provision or provisions of this Purchase Contract invalid, inoperative or unenforceable to any extent whatever.

(g)     This Purchase Contract may be executed in several counterparts, each of which shall be regarded as an original and all of which shall constitute one and the same document.

(h)     This Purchase Contract shall be governed by and construed in accordance with the laws of the State of Florida.

(i)     This Purchase Contract shall become effective upon the execution by the appropriate County officials and shall be valid and enforceable at the time of such acceptance.

19

GRIGSBY BRANDFORD & CO., INC.

By: _____

Accepted as of the date
first above written:

METROPOLITAN DADE COUNTY, FLORIDA

By: _____
\____ County Manager

Approved as to form:

By: _____
Assistant County Attorney

SCHEDULE I

BOND TERMS

$182,695,000
Dade County, Florida
Resource Recovery Facility Refunding Revenue Bonds,
Series 1996

| Maturity (October 1) | Principal Amount | Interest Rate | Yield |
|---|---|---|---|
| 1997 | $10,300,000 | 4.00% | 4.00% |
| 1998 | 10,735,000 | 4.30 | 4.30 |
| 1999 | 10,740,000 | 6.00 | 4.55 |
| 2000 | 10,745,000 | 4.60 | 4.70 |
| 2001 | 10,745,000 | 4.70 | 4.85 |
| 2002 | 10,750,000 | 4.85 | 4.95 |
| 2003 | 10,755,000 | 5.00 | 5.10 |
| 2004 | 10,760,000 | 5.10 | 5.20 |
| 2005 | 10,765,000 | 5.20 | 5.30 |
| 2006 | 10,775,000 | 6.00 | 5.40 |
| 2007 | 10,780,000 | 5.30 | 5.50 |
| 2008 | 10,785,000 | 5.35 | 5.60 |
| 2009 | 10,795,000 | 5.50 | 5.70 |
| 2010 | 10,800,000 | 5.50 | 5.75 |

$32,465,000 5.50% Term Bond maturing October 1, 2013 - 5.85% Yield

(plus accrued interest from September 1, 1996)

**Redemption**

*Optional Redemption.* The Series 1996 Bonds maturing on or before October 1, 2006, are not subject to redemption prior to maturity. The Series 1996 Bonds maturing on or after October 1, 2007, are subject to redemption prior to maturity, at the option of the County, on or after October 1, 2006, as a whole or in part at any time by lot, at the following redemption prices (expressed as a percentage of the principal amount to be redeemed), plus accrued interest to the date fixed for redemption:

| Redemption Period (Both Dates Inclusive) | Redemption Price |
|---|---|
| October 1, 2006 thru September 30, 2007 | 102% |
| October 1, 2007 thru September 30, 2008 | 101% |
| October 1, 2008 and thereafter | 100% |

*Extraordinary Optional Redemption.* At any time upon the exercise by the Company of its option to prepay payments due under the Loan Agreement, the Series 1996 Bonds will be redeemed in whole or in

21

part at the principal amount plus accrued interest to the redemption date (but without premium) in the event that the Company certifies to the Trustee that:

(A) Any federal, state, or local body exercising governmental or judicial authority has taken any action which results in the imposition of unreasonable burdens or excessive liabilities with respect to the Facility rendering impracticable or uneconomical the operation of the Facility by the Company; or

(B) Any portion of the Facility has been taken by any governmental authority pursuant to the power of eminent domain or condemnation, or an encumbrance on the Facility or site cannot be cleared, in each case, which has a material adverse effect on the fair market value, usefulness, or operating efficiency of the Facility; or

(C) Any portion of the Facility has been damaged or destroyed to such an extent that it is not practicable or desirable to rebuild, repair, or restore the Facility.

*Mandatory Redemption.* The Series 1996 Bonds maturing on October 1, 2013 are subject to mandatory redemption prior to maturity in part by lot in such manner as may be designated by the Trustee at the principal amount of such Series 1996 Bonds to be redeemed plus accrued interest to the date of redemptiopn, without premium, on each October 1 set forth below for mandatory sinking fund installments in the following years and in the following amounts:

| Year | Principal Amount |
|------|------------------|
| 2011 | $10,815,000 |
| 2012 | 10,820,000 |
| 2013* | 10,830,000 |

---

* Final Maturity

22

SCHEDULE II

DISCLOSURE LETTER

Board of County Commissioners of
 Dade County, Florida
111 Northwest First Street
Miami, Florida  33128-1995

$182,695,000
Dade County, Florida
Resource Recovery Facility Refunding Revenue Bonds,
Series 1996

Ladies and Gentlemen:

Pursuant to Section 218.385, Florida Statutes, and in reference to the issuance of the Dade County, Florida Resource Recovery Facility Refunding Revenue Bonds, Series 1996 (the "Series 1996 Bonds"), Grigsby Brandford & Co., Inc. (the "Senior Manager"), acting on behalf of itself and Smith Barney, Inc., Howard Gary & Company, and AIBC Investment Services Corporation, (collectively with the Senior Manager, the "Underwriters") as named in the Bond Purchase Contract (the " Purchase Contract"), dated August 29, 1996, by and among the Underwriters and Dade County, Florida (the "County"), hereby makes the following disclosures to the County.

The Underwriters are acting as investment bankers to the County for the public offering of the Series 1996 Bonds, executed and delivered in the aggregate principal amount of $182,695,000.  The total fee to be paid to the Underwriters pursuant to the Bond Purchase Contract is $1,454,252.20.

13.   Expenses estimated to be incurred by the Underwriters in connection with the issuance of the Series 1996 Bonds:

| | |
|---|---|
| Underwriters Counsel Fees and Expenses | $133,367.00 |
| Courier and Delivery | 5,481.00 |
| | |
| Day Loan | 29,231.00 |
| PSA Fees | 5,481.00 |
| DTC | 500.00 |
| CUSIP/Dalcomp | 3,654.00 |
| Travel | 56,636.00 |

23

Communications/Misc.                                     14,283.00

TOTAL                                                  $248,633.00

14.     Names, addresses and estimated amounts of compensation of any person who is not regularly employed by, or not a partner or officer of, an underwriter, bank, banker or financial consultant or advisor and who enters into an understanding with either the County or the Underwriters, directly, expressly or impliedly, to act solely as an intermediary between the County and the Underwriters for the purpose of influencing any transaction in the purchase of the Series 1996 Bonds:

NONE

15.     The amount of underwriting spread expected to be realized:

Risk                        $ 0.00/1000
Average Takedown              5.60/1000
Expenses                      1.36/1000
Management fee                1.00/1000

Total                        $7.96/1000

16.     Any other fee, bonus and other compensation estimated to be paid by the underwriters in connection with the Series 1996 Bonds to any person not regularly employed or retained by the Underwriters:

NONE

17.     The name and address of the Underwriters connected with the Series 1996 Bonds:

See attached list

Very truly yours,

Grigsby Brandford & Co., Inc.

As Managing Underwriter acting on behalf of the Underwriters, including itself.

24

$182,695,000
DADE COUNTY, FLORIDA
RESOURCE RECOVERY FACILITY
REFUNDING REVENUE BONDS
SERIES 1996

UNDERWRITERS

**Grigsby Brandford & Co., Inc.**
101 California Street
Suite 2000
San Francisco, California 94111

**Howard Gary & Company**
3050 Biscayne Boulevard
Suite 603
Miami, Florida 33137

**Smith Barney, Inc.**
390 Greenwich Street
New York, New York 10013

**AIBC Investment Services Corporation**
World Trade Center
80 S.W. 8th Street, Suite 2120
Miami, Florida 33130

EXHIBIT A

OFFICIAL STATEMENT

# EXHIBIT 3

| | |
|---|---|
| Issuer | Metropolitan Dade County, Florida |
| Securities | Dade County, Florida Resource Recovery Facility Refunding Revenue Bonds Series 1996 |
| Estimated Principal Amount | $187,625,000 |
| Name of Purchaser | HOWARD GARY & COMPANY |
| Your Original Participation | $28,143,750 |
| Representative for the Managers | Grigsby Brandford & Co., Inc |

## AGREEMENT AMONG UNDERWRITERS
## INSTRUCTIONS, TERMS AND ACCEPTANCE

August 27, 1996

We, as Representative for the Managers, are forming a Group of Underwriters, including ourselves and the other Managers, to submit a proposal for the purchase of the Securities described above and to distribute the Securities by a public offering pursuant to the Agreement Among Underwriters. The Agreement Among Underwriters will consist of these Instructions, Terms and Acceptance and the Standard Terms and Conditions (PSA Standard 6/15/91), incorporated by reference herein, as the Standard Terms and Conditions may be modified or supplemented in Exhibit A hereto.

The Group will consist of those Underwriters listed in Exhibit B attached hereto who accept participation pursuant to Section 16 hereof and who do not withdraw pursuant to Section 5 hereof. Capitalized terms not defined herein are used as defined in the Standard Terms and Conditions.

You are invited to participate in the Group with the Original Participation specified above, which will be subject to adjustment as provided in the Agreement Among Underwriters.

Enclosed are the Preliminary Official Statement, the proposed form of Purchase Contract, the Preliminary Blue Sky Survey and a Letter of Representation

## 1. Offering Information.

The following information applies to the proposed offering.

Expected Offering Date: August 28, 1996

Expected Purchase Contract Execution Date: August 29, 1996

Expected Closing Date: September 5, 1996

Payment of Funds at Closing Federal funds

Representative's Syndicate Address  101 California Street, Suite 2600, San Francisco, California 94111, Att. Steven Nielsen

(telephone (415) 392-4800  telecopy (415) 398-5548)

Official Statement Availability Address:     Packard Press
                                            One Penn Center at Suburban Station
                                            1617 JFK Boulevard, Suite 430
                                            Philadelphia, PA 19103
                                            Tel (215) 563-9000  Fax (215) 563-3810

## 2. Operative Terms.

As used in the Agreement Among Underwriters:

"Notification to the Representative" means written, telephonic or telecopy notification to the Representative at the Representative's Syndicate Address

"Official Statement" means the Final Official Statement, as it may be amended or supplemented, relating to the Securities, to be delivered to the Underwriters by the Issuer pursuant to the Purchase Contract.

"Payment Delivery Address" means   Grigsby Brandford & Co., Inc.
                                     101 California Street, Suite 2000
                                     San Francisco, California 94111

"Preliminary Official Statement" means the Preliminary Official Statement, dated August 20  , 1996, relating to the Securities

"Prevailing Time" means California Time

"Wire Notice" means the transmission of information to the Group by the Representative by Dalcomp/DalNet, Minifacts or as otherwise specified by the Representative. If an Underwriter is not a subscriber to that wire service, that Underwriter must advise the Representative, by a Notification to the Representative, of an alternative means of notification, satisfactory to the Representative   Thereafter, notice by that means shall constitute Wire Notice to that Underwriter.

## 3. Preliminary Official Statement.

You may obtain a reasonable number of additional copies of the Preliminary Official Statement by placing you order at the Official Statement Availability Address. We call your attention to SEC Rule 15c2-12 requiring that the Preliminary Official Statement be sent to potential customers in certain circumstances.

The Issuer has advised us that the Preliminary Official Statement is "deemed final" for purposes of Rule 15c2-12 Unless you immediately notify us to the contrary, we will rely upon your representation in the Agreement Among Underwriters that you have no knowledge of any false or misleading statement in or material omission from the Preliminary Official Statement.

## 4. Official Statement.

Your order for Official Statements should be placed with the Official Statement Availability Address not later than 12:00 noon, Prevailing Time, on the business day following the date of execution of the Purchase Contract

We call your attention to the requirements of SEC Rule 15c2-12 and Municipal Securities Rulemaking Board Rule G-32 requiring that the Official Statement and certain other information be sent to potential customers and customers

## 5. Notification of Proposed Terms of Purchase and Withdrawal.

The Representative will advise each Underwriter by  Wire Notice of the initial offering prices and other proposed terms of purchase for the Securities   Priority of orders will be as set forth in Section 6 of the Agreement Among Underwriters  Standard Terms and Conditions, unless otherwise specified by the Representative by Wire Notice. Underwriters who do not wish to participate in the offering must notify the Representative by a Notification to the Representative not later than 4:00 p.m., Prevailing Time, on the business day preceding the date of execution of the Purchase Contract   Any telephonic notice must be promptly confirmed in writing by telecopy or delivery of the Withdrawal from Agreement Among Underwriters attached as Exhibit D.

2

## 6. Advertising.

The Representative reserves the right to advertise the Securities in such publications and over the names of such Underwriters as the Representative may determine. Any Underwriter who chooses to be omitted from any such advertisement must give a Notification to the Representative on or prior to the date of the execution of the Purchase Contract Advertising will be an expense of the Group. No Underwriter is authorized to advertise the Securities in any publication without the express approval of the Representative until the day following publication of the official advertisement, or if no official advertisement is published, until the Representative advises the members of the Group that syndicate restrictions on trading the Securities have been removed.

## 7. Compliance with MSRB Rules.

We call your attention to the rules of the Municipal Securities Rulemaking Board applicable to the offer and sale of the Securities, and in particular to Rule G-11 establishing certain requirements for sales during the underwriting period and Rule G-21 relating to advertisements. We will file or cause to be filed, pursuant to Rule G-36, copies of the Official Statement with the Municipal Securities Rulemaking Board.

## 8. Release

Each Underwriter and the Representative hereby release each Underwriter and the Representative and each Underwriter's and the Representative's successors, assigns and former and current parents and affiliates from all actions, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever, in law or equity which each Underwriter and the Representative and each Underwriter's and the Representative's successors, assigns and former and current parents and affiliates, ever had, now or hereafter can, shall or may have, for, upon, or by reason of any matter related to or derived from the obligations hereunder or associated herewith (other than any action or claim relating to the performance of any obligation of any Underwriter or the Representative explicitly contained herein) from the beginning of the world through the date of delivery of the Bonds. This Agreement constitutes the entire agreement between each Underwriter and the Representative.

## 9. Acceptance.

You must advise the Representative of your participation in the Group by a Notification to the Representative received not later than 4:00 p.m., Prevailing Time, on the business day preceding the Expected Offering Date. Any telephonic notice must be promptly confirmed in writing by telecopy or delivery of the Acceptance of Agreement Among Underwriters attached as Exhibit C.

Very truly yours,

GRIGSBY BRANDFORD & CO., INC

By /S/ _____
Steven Nielsen, Sr. Vice President

EXHIBIT B
TO
AGREEMENT AMONG UNDERWRITERS
(INSTRUCTIONS, TERMS AND ACCEPTANCE)

METROPOLITAN DADE COUNTY, FLORIDA

$187,625,000*

DADE COUNTY, FLORIDA
RESOURCE RECOVERY FACILITY REFUNDING REVENUE BONDS
SERIES 1996

The Group of Underwriters formed to purchase and distribute the above-referenced Securities shall consist of the following, upon acceptance of their respective participation

| Representative | Original Participation In the Securities (in dollars or percent) |
|---|---|
| Grigsby Brandford & Co., Inc | 55% |
| **Managers** | |
| AIBC Investment Services Corporation | 15% |
| Howard Gary & Company | 15% |
| Smith Barney, Inc. | 15% |
| **Other Underwriters** | |
| None | |
| | 100% |

If a Selling Group is formed the Representative will notify the Underwriters by Wire Notice.

---

*Preliminary, subject to change

# EXHIBIT 4



JAMES C. BURKE
COMMISSIONER

*Board of County Commissioners*
METROPOLITAN DADE COUNTY-FLORIDA
DISTRICT 2
STEPHEN P. CLARK CENTER
111 N. W. FIRST STREET
MIAMI, FLORIDA 33128-1963
(305) 375-4833

August 5, 1996

Mr. Howard Gary
President & CEO
Howard Gary & Company
3050 Biscayne Boulevard
Suite 603
Miami, FL 33137

Dear Mr. Gary:

In response to our discussion regarding your participation in the
Montenay $225,000,000, Series 1996 bond issue, please be informed
that as Chairman of the Metropolitan Dade County Finance
Committee, it is my understanding from Mr. Juan Portuondo of
Montenay and Mr. Grigsby of Grigsby Brandford & Company that your
firm's participation includes the underwriting and the
accompanying swap.

Our meeting with Mr. Calvin Grigsby, President and Chairman of
Grigsby Brandford & Company, who is senior managing this
transaction, to discuss this matter verified your participation
as previously mentioned. Specifically, Mr. Grigsby agreed that
your participation in the underwriting would be 25% and should
generate your firm $160,00. With regard to the accompanying swap,
Mr. Grigsby agreed that your firm and his firm would split
equally the revenues from the swap after the deduction of $500,00
for expenses.

As a locally headquartered minority owned firm, your
participation is in compliance with the county commission's
policy and is important to the development of local business .

If you have any further questions, please feel free to contact
me.

Sincerely,

James Burke
Commissioner, District 2

# EXHIBIT 5

# THE BOND BUYER

## THE DAILY NEWSPAPER OF MUNICIPAL FINANCE

Vol. 317 No. 29978 | Tuesday, September 10, 1996 | New York, NY

## DERIVATIVES NEWS AND TRENDS

## Dade County, Fla., Enters Into a Fixed-to-Floating Interest Rate Swap

*By Joanne Morrison*

Washington – Dade County, Fla., entered into a fixed-to-floating interest rate swap with GBR Financial Products in conjunction with the county's $182.695 million of resource recovery facility refunding bonds priced late last month.

GBR Financial Product structured and served as counterparty for the swap, which extends through the final maturity of the bonds, 2013. GBR says the swap is possibly one of the largest and longest transactions of its kind ever executed by a municipal issuer.

"The fixed-to-floating interest rate swap was always an integral part of the county's financing plan," said Don Rice, president and chief executive officer of GBR Financial, adding that the county saves 100 basis points annually by entering into the transaction rather than issuing traditional variable-rate debt.

"In addition to much lower costs through the removal of letter of credit and remarketing fees, the county also removed several burdensome revenue constraints which should provide added financing flexibility to the county's overall debt portfolio," Rice said.

Rice said synthetic variable-rate debt has "distinct advantages" over conventional floaters because there are no LOC or remarketing fees and no increase fees as a result of credit downgrades.

"We believe more municipal entities will look to replace their old costly variable rate with this cheaper and far more efficient structure," Rice said.

"I think it is a good deal for the county, it saves a lot of money and gives us a lot of flexibility in the future," said Dade County commission, James Burke, in a statement released by GBR.

"GBR's innovative structure allowed us to do what we needed and at a much lower cost than a conventional financing," Burke said.



The interest rate swap is structured so that the county will receive fixed-rate payments from GBR that offset the fixed rate it is paying out on its bonds.

In exchange, the county will then pay GBR a floating rate based on the Public Securities Association Municipal Swap Index. The structure produces interest costs more than 100 basis points lower than the county's current cost of funds.

"In all, the swap should generate about $15 million in present value savings, which is more than 8% of par," Rice said.

A unique feature of the swap was the firm's development of its so-called actual annual effective interest cost swap, which takes into account the increase in the average coupon over the life of the bonds. The fixed rate that the county receives will be equal to the fixed rate on the outstanding bonds and will change annually as that rate changes.

"By increasing the fixed swap coupon as the lower coupon bonds are amortized, we were able to achieve a structure than more closely resembles conventional variable-rate debt," said Michael Murray, vice president and senior trader at GBR.

Under a traditional fixed-to-floating swap, the fixed rate an issuer receives remains the same over the life of the swap. But in the actual annual effective interest cost swap, the fixed-swap rate rises so that it always equals the average coupon of the outstanding bonds.

Under this structure, the issuer can gauge in advance what the rate will be.

'**We believe more municipal entities will look to replace their old costly variable rate with this cheaper and far more efficient structure,' says Don Rice of GBR Financial.**

Rice cited a $35 million deal for the **Texas Veterans Land Board**, closed in May 1994, as another example of a successful fixed-to- floating rate swap transaction. It was the state's first such deal, he said.

The purpose of Dade County's bonds issue and underlying interest rate swap transaction last month was to refinance the county's Series 1988, 1989, and 1990A variable-rate bonds that originally funded the county's waste-to-energy resources recovery facility.

That facility is operated by Montenay-Dade Ltd., a joint venture between the county and Montenay Power Corp.

**Grigsby Brandford & Co.,** which is a part owner of GBR Financial, ran the books and headed a syndicate for the negotiated bond offering that includes Smith Barney Inc. as co-senior manager. Howard Gary & Co. and AIBC Investment Services Corp. are also aboard.

The bonds, with yields ranging from 4% in 1997 to 5.75% in 2010, are insured by AMBAC and have triple-A ratings from Standard & Poor's and Moody's.

A few weeks ago, GBR implemented a similar conversion to variable-rate debt for the city of **Fort Worth, Tex.,** against a portion of the city's already outstanding fixed-rate water and sewer revenue bonds.

Fort Worth officials said the program would allow the city to continue to benefit from the lower interest rates available in the short-term debt market that have been attained through the Water and Sewer Commercial Paper Program, without incurring additional principal obligations.

Reprinted with permission from *The Bond Buyer*

# EXHIBIT 6



SEC⸍                 05044174              ⸍ISSION

OMB APPROVAL
OMB Number:      3235-0123
Expires·       October 31, 2004
Estimated average burden
hours per response..... 12.00

# ANNUAL AUDITED REPORT
## FORM X-17A-5
## PART III

SEC FILE NUMBER
8- 29236

### FACING PAGE
**Information Required of Brokers and Dealers Pursuant to Section 17 of the Securities Exchange Act of 1934 and Rule 17a-5 Thereunder**

REPORT FOR THE PERIOD BEGINNING ___October 1, 2004___ AND ENDING ___September 30, 2005___
                              MM/DD/YY                                  MM/DD/YY

## A. REGISTRANT IDENTIFICATION

NAME OF BROKER-DEALER:
  Grigsby & Associates, Inc.
ADDRESS OF PRINCIPAL PLACE OF BUSINESS: (Do not use P.O. Box No.)

| OFFICIAL USE ONLY |
|---|
| FIRM I.D. NO. |

311 California Street      Suite 320

                                    (No· and Street)

San Francisco           California         94104
   (City)                       (State)·              (Zip Code)

NAME AND TELEPHONE NUMBER OF PERSON TO CONTACT IN REGARD TO THIS REPORT
  William Chin                        (415) 392-4800
                                                       (Area Code – Telephone Number)

## B. ACCOUNTANT IDENTIFICATION

INDEPENDENT PUBLIC ACCOUNTANT whose opinion is contained in this Report*
  Breard & Associates Inc., Certified Public Accountants

                                (Name – if individual, state last, first, middle name)

9010 Corbin Avenue  Suite 7    Northridge       CA      91324
   (Address)                      (City)                 (State)

CHECK ONE:

  ☒ Certified Public Accountant
  ☐ Public Accountant
  ☐ Accountant not resident in United States or any of its possessions.

PROCESSED
JAN 2 5 2006
THOMSON
FINANCIAL

| FOR OFFICIAL USE ONLY |
|---|
|  |

*Claims for exemption from the requirement that the annual report be covered by the opinion of an independent public accountant must be supported by a statement of facts and circumstances relied on as the basis for the exemption. See Section 240.17a-5(e)(2)

Potential persons who are to respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

## OATH OR AFFIRMATION

I, Calvin B. Grigsby _____, swear (or affirm) that, to the best of my knowledge and belief the accompanying financial statement and supporting schedules pertaining to the firm of Grigsby & Associates, Inc. _____, as of September 30 _____, 20 05, are true and correct. I further swear (or affirm) that neither the company nor any partner, proprietor, principal officer or director has any proprietary interest in any account classified solely as that of a customer, except as follows:

_____

_____

State of _California_
County of _San Francisco_
Subscribed and sworn (or affirmed) to
before me this 4th day of Nov, 2005

_Darnella Broaden_
Notary Public

Signature _Cal B Grigsby_

Title _PRESIDENT_

DARNELLA BROADEN
Commission # 1375539
Notary Public - California
San Francisco County
My Comm. Expires Oct 13, 2006

This report ** contains (check all applicable boxes):
- ☒ (a) Facing Page.
- ☒ (b) Statement of Financial Condition.
- ☒ (c) Statement of Income (Loss).
- ☒ (d) Statement of Changes in Cash Flows
- ☒ (e) Statement of Changes in Stockholders' Equity or Partners' or Sole Proprietors' Capital.
- ☒ (f) Statement of Changes in Liabilities Subordinated to Claims of Creditors.
- ☒ (g) Computation of Net Capital.
- ☒ (h) Computation for Determination of Reserve Requirements Pursuant to Rule 15c3-3.
- ☒ (i) Information Relating to the Possession or Control Requirements Under Rule 15c3-3.
- ☐ (j) A Reconciliation, including appropriate explanation of the Computation of Net Capital Under Rule 15c3-3 and the Computation for Determination of the Reserve Requirements Under Exhibit A of Rule 15c3-3.
- ☐ (k) A Reconciliation between the audited and unaudited Statements of Financial Condition with respect to methods of consolidation.
- ☒ (l) An Oath or Affirmation.
- ☐ (m) A copy of the SIPC Supplemental Report.
- ☐ (n) A report describing any material inadequacies found to exist or found to have existed since the date of the previous audit.

**For conditions of confidential treatment of certain portions of this filing, see section 240.17a-5(e)(3).*

# B REARD & A SSOCIATES, I NC.

## Certified Public Accountants

<u>Independent Auditor's Report</u>

Board of Directors
Grigsby & Associates, Inc.

We have audited the accompanying statement of financial condition of Grigsby & Associates, Inc. as of September 30, 2005, and the related statements of operations, changes in stockholder's equity, and cash flows for the year then ended that you are filing pursuant to rule 17a-5 under the Securities Exchange Act of 1934. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatements. An audit includes examining on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Pension Dynamics Securities Corporation as of September 30, 2005, and the results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

Our examination was made for the purpose of forming an opinion on the basic financial statements taken as a whole. The information contained on Schedules I-III are presented for purposes of additional analysis and is not required as part of the basic financial statements, but as supplementary information required by rule 17a-5 of the Securities and Exchange Commission. Such information has been subject to the auditing procedures applied in the examination of the basic financial statements and, in my opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole and in conformity with the rules of the Securities and Exchange Commission.

*Breard & associates, Inc.*
Breard & Associates, Inc.
Certified Public Accountants

Northridge, California
October 27, 2005

*We Focus & Care℠*

9010 Corbin Avenue, Suite 7
Northridge, California  91324
(818) 886-0940 • Fax (818) 886-1924
www.baicpa.com

Grigsby & Associates, Inc. and Subsidiary
Consolidated Statement of Financial Condition
September 30, 2005

### Assets

| | |
|---|---:|
| Cash and cash equivalents | $ 445,037 |
| Deposits with clearing organization | 200,000 |
| Marketable securities, at market | 144,898 |
| Securities, not readily marketable | 4,200 |
| Receivable from related party | 857,654 |
| Receivable-other | 1,400,000 |
| Equipment & furniture, net | 12,472 |
| Deposits | 19,572 |
| Other assets | 7,890 |
| Investments in unconsolidated affiliates | — |
| **Total assets** | **$ 3,091,723** |

### Liabilities & Stockholder's Equity

**Liabilities**

| | |
|---|---:|
| Accounts payable and accrued expenses | $ 23,761 |
| Income tax payable | 82,043 |
| **Total liabilities** | 105,804 |

**Stockholder's equity**

| | |
|---|---:|
| Common stock, no par value, 100,000 shares authorized, 1,000 shares issued and outstanding | 30,000 |
| Additional paid-in capital | 3,838,522 |
| Accumulated deficit | (882,603) |
| **Total stockholder's equity** | 2,985,919 |
| **Total liabilities & stockholder's equity** | **$ 3,091,723** |

*The accompanying notes are an integral part of these financial statements.*

-1-

Grigsby & Associates, Inc. and Subsidiary
Consolidated Statement of Income
For the Year Ended September 30, 2005

**Revenues**

| | | |
|---|---|---:|
| Commissions | $ | 236,821 |
| Underwriting fees | | 22,445 |
| Interest income and dividends | | 17,953 |
| Interest income, non-taxable | | 450 |
| Unrealized gains (losses) | | 97,457 |
| Realized gains (losses) | | (34,614) |
| Other income | | 1,757,268 |
| | | |
| **Total revenues** | | 2,097,780 |

**Expenses**

| | |
|---|---:|
| Employee compensation and benefits | 242,608 |
| Underwriting | 96,509 |
| Communications | 32,171 |
| Interest | 8,417 |
| Occupancy and equipment rental | 114,612 |
| Taxes, licenses, & fees, other than income taxes | 20,447 |
| Other operating expenses | 461,776 |
| | |
| **Total expenses** | 976,540 |
| | |
| Net income (loss) before income taxes | 1,121,240 |
| | |
| **Total income tax provision** | 90,543 |
| | |
| **Net income (loss)** | $ 1,030,697 |

*The accompanying notes are an integral part of these financial statements.*

Grigsby & Associates, Inc. and Subsidiary
Consolidated Statement of Changes in Stockholder's Equity
For the Year Ended September 30, 2005

| | Common Stock | Additional Paid-in Capital | Accumulated Deficit | Total |
|---|---|---|---|---|
| Balance, September 30, 2004 | $ 30,000 | $ 3,638,522 | $(1,913,300) | $1,755,222 |
| Additional paid-in capital | – | 200,000 | – | 200,000 |
| Net income (loss) | – | – | 1,030,697 | 1,030,697 |
| Balance, September 30, 2005 | $ 30,000 | $3,838,522 | $ (882,603) | $2,985,919 |

*The accompanying notes are an integral part of these financial statements.*

-3-

Grigsby & Associates, Inc. and Subsidiary
Consolidated Statement of Changes in Cash Flows
For the year ended September 30, 2005

**Cash flows from operating activities:**

| | | |
|---|---:|---:|
| Net income (loss) | | $ 1,030,697 |
| Adjustments to reconcile net income (loss) to net cash | | |
| provided by (used in) operating activities: | | |
| Depreciation | $ 2,779 | |
| Valuation of marketable securities to market | (97,785) | |
| (Gain) loss on sale of marketable securities | 8,809 | |
| (Increase) decrease in: | | |
|     Receivable from clearing firm | (200,000) | |
|     Receivable, other than trade | (1,359,802) | |
|     Deposits | (13,912) | |
|     Other assets | 30,125 | |
| (Decrease) increase in: | | |
|     Accounts payable and accrued expenses | (19,267) | |
|     Income taxes payable | 74,367 | |
|     Total adjustments | | (1,574,686) |
| Net cash and cash equivalents provided by (used in) operating activities | | (543,989) |

**Cash flows from investing activities:**

| | | |
|---|---:|---:|
| Proceeds from sale of marketable securities | 300,000 | |
| Purchase of equipment | (15,251) | |
| Net cash and cash equivalents provided by (used in) investing activities | | 284,749 |

**Cash flows from financing activities:**

| | | |
|---|---:|---:|
| Collection of related party loan | 321,081 | |
| Proceeds from issuance of additional paid–in capital | 200,000 | |
| Net cash and cash equivalents provided by (used in) financing activities | | 521,081 |

| | |
|---|---:|
| Net decrease in cash and cash equivalents | 261,841 |
| Cash and cash equivalents at beginning of year | 183,196 |
| Cash and cash equivalents at end of year | $ 445,037 |

**Supplemental disclosure of cash flow information:**
Cash paid during the year for the period ended September 30, 2005

| | | |
|---|---:|---:|
|     Interest | $ | — |
|     Income taxes | $ | 8,500 |

*The accompanying notes are an integral part of these financial statements.*

-4-

Grigsby & Associates, Inc. and Subsidiary
Consolidated Notes to Financial Statements
September 30, 2005

Note 1:   GENERAL AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Basis of Consolidation*

The consolidated financial statements include the accounts of Grigsby Brandford Capital Partners (the Subsidiary), a wholly-owned subsidiary. All significant inter-company accounts and transactions have been eliminated in consolidation.

*General*

Grigsby & Associates, Inc. and Subsidiary (formerly Grigsby Brandford & Co., Inc.) was incorporated in 1981, and registered as a broker-dealer under the Securities and Exchange Act of 1934 in April, 1983. Grigsby & Associates, Inc. and Subsidiary (the "Company") is a fully disclosed broker/dealer whereby it does not hold customer funds or securities. The Company is a member of the National Association of Securities Dealers, Inc. ("NASD"), the Municipal Rule Making Board ("MSRB"), and the Securities Investor Protection Corporation ("SIPC").

*Summary of Significant Accounting Principles*

The presentation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

*Income Taxes*

Income taxes are provided for the tax effects of transactions reported on the financial statements and consist of taxes currently due or refundable plus deferred taxes. Deferred taxes are recognized for differences between the basis of assets and liabilities for financial statement and income tax purposes. The differences relate primarily to investments in partnerships and closely held corporations (use of different methods of accounting for financial statement and income tax purposes), depreciable assets (use of different depreciation methods and lives for financial statement and income tax purposes), and contributions (limitations on amount of deduction based upon income for income tax purposes and for financial statement purposes).

*Statement of Cash Flows*

For purposes of the statements of cash flows, the Company considers all highly liquid debt instruments purchased with a maturity of three months or less to be cash equivalents.

Grigsby & Associates, Inc. and Subsidiary
Consolidated Notes to Financial Statements
September 30, 2005

Note 1:   GENERAL AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES
(Continued)

*Related Party Transactions*

The receivable from related party is unsecured and non-interest bearing. If interest would have
been charged at the current U.S. bank rates, approximately 4%, the interest income not included
in these financial statements of $40,728 is material to the financial statements when taken as a
whole.

The sole shareholder and president of the Company is also the sole stockholder and president of
Fiscal Funding Co., Inc.. The Company shares office space with Fiscal Funding. Fiscal Funding
has paid half of the lease expenses associated with the Company's office rent. These statements
do not reflect any adjustment for these amounts.

*Securities Owned*

Investments in marketable securities at market value transactions are shown at market value. The
change in unrealized gains and losses on investments in marketable securities at market value is
reflected in the statements of operations. Securities transactions are recorded on a trade date
basis.

Mutual funds and annuities income are recognized when earned.

*Investments in Unconsolidated Affiliates*

The investment in unconsolidated affiliates in which the Company maintains a 50% interest, is
accounted for under the equity method. The Company's interest is carried at cost adjusted for its
proportionate share of distributed and undistributed earnings or losses.

Rent expense for the year ended September 30, 2005, was $104,687, and is included in
occupancy and equipment rental in the statement of income.

Note 2:   INVESTMENTS IN UNCONSOLIDATED AFFILIATES

The Company owns a 50% interest in two closely-held corporations (G.B. Derivative Products
Corporation and GBDP Corporation). These two corporations own general partnership interests
in three partnerships (1% - GB Derivative Products., L.P., 1% - GBDP Holdings, L.P., and 1% -
GBDP, L.P.). The Company also owns a limited partnership interest in two of these partnerships
(49.5% - GB Derivative Products Co., L.P. and 49.5% - GBDP Holdings, L.P.). GBDP

Grigsby & Associates, Inc. and Subsidiary
Consolidated Notes to Financial Statements
September 30, 2005

Note 2:   INVESTMENTS IN UNCONSOLIDATED AFFILIATES
(Continued)

Holdings, L.P. in addition, owns a 99% limited partnership interest in GBDP, L.P.. The unconsolidated affiliates are collectively referred to as GBR Financial Products Companies (GBR).

The affiliated companies were formed to engage in interest and currency swap transactions through GBDP, L.P.. These transactions involve obligating itself to pay a stream of payments at a given rate while simultaneously entering into a hedging transaction to receive a stream of payments at a rate in excess of that of the payment stream. Revenues are recorded as the net payment stream. Because of the degree of uncertainty involving these transactions, the Company accounts for its equity investment in these entities on the cash receipts and disbursements method of accounting.

In accordance with the limited partnership agreement, the Company made a capital contribution of $545,000 to GBDP Holdings, L.P.. In accordance with the agreement, the Company is liable only to the extent of its capital contribution. The allocation of the partnership loss is allocated first to the Company, equal to the excess of its aggregate capital contributions of the other limited partner. At September 30, 2005, the Company was the sole contributor to the partnership.

The Company's share of partners' (deficit) and equity earnings of approximately ($25,000), at September 30, 2005 has not been recorded.

Subsequent to September 30, 1996, the Company has been unsuccessful in obtaining any information from GBR, regarding its 50% financial interest. The Company was seeking legal demand for access to the books and records of GBR. (See Note 8)

The Company's investment in GBR is carried at zero value. There has been no income or expenses on its investment in GBR on the statement of operations for the year ended September 30, 2005, nor has the Company received any distributions from GBR during the year ended September 30, 2005.

Note 3:   DEPOSITS WITH CLEARING ORGANIZATION

The Company has deposited $200,000 with Huntleigh Securities Corporation as security for its transactions with them. Interest is paid monthly on the deposit at the average overnight repurchase agreement rate.

)                                                    )

Grigsby & Associates, Inc. and Subsidiary
Consolidated Notes to Financial Statements
September 30, 2005

Note 4:   MARKETABLE SECURITIES

The Company's securities investments are held principally for the purpose of selling in the near term and are classified as trading securities.  Trading securities are recorded at fair value on the balance sheet in current assets, with the change in fair value during the period in earnings. The market value of these investments at September 30, 2005 was $144,898.

Note 5: SECURITIES, NOT READILY MARKETABLE

Securities, not readily marketable consist of 1,200 warrants in the NASDAQ Stock Market, Inc., these securities were offered primarily to NASD members and purchased through a Private Placement Memorandum.  The warrants were exercisable in four tranches over four years.  The third tranche became exercisable on June 28, 2004 at $14 and expired on June 27, 2005.  The Company has the remaining options to exercise in the following tranches;

|  |  | Exercisable on | Expires on | Exercise Price |
|---|---|---|---|---|
| Tranche 4 | 1,200 shares | June 28, 2005 | June 27, 2006 | $ 16.00 |

The Company is carrying these warrants at their amortized cost of $4,200.

Note 6: EQUIPMENT AND FURNITURE, NET

The equipment and furniture are recorded at cost as follows:

| | |
|---|---|
| Equipment and furniture | $   209,251 |
| Accumulated depreciation and amortization | (196,779) |
| Equipment and furniture, net | $    12,472 |

Depreciation expense for the year ended September 30, 2005, was $2,779.

Note 7:   PENSION PLAN

The Company maintains a defined contribution pension plan covering substantially all of the Company's employees.  The Company contributes an amount equal to 10% of participant's compensation subject to a maximum contribution of $15,000, per employee. For the year ended September 30, 2005, the Company contributed $29,033 to the plan, which is included in employee compensation and benefits in the statement of operations.

)                    )

Grigsby & Associates, Inc. and Subsidiary
Consolidated Notes to Financial Statements
September 30, 2005

Note 8:   INCOME TAXES

The current provision of $90,543 for income taxes consists of the California Franchise tax for
Grigsby & Associates, Inc.

The Company has available at September 30, 2005 unused operating loss carry-forwards, which
may be applied against future taxable income, resulting in a deferred tax asset of approximately
$417,347, that expire as follows:

| Amount of unused operating loss carry-forwards | Expiration during year ended September 30, |
|---|---|
| $    486,752 | 2018 |
| 920,226 | 2019 |
| 317,975 | 2020 |
| 516,527 | 2021 |
| 141,443 | 2022 |
| 399,388 | 2023 |
| $ 2,782,311 | |

A 100% valuation allowance has been established against this asset since management cannot
determine if it is more likely than not that the asset will be realized.

Note 9:   COMMITMENTS AND CONTINGENCIES

*Underwriting Commitments*

In the normal course of business, the Company enters into underwriting commitments.
Transactions relating to such underwriting commitments that were open at September 30, 2005
were subsequently settled and had no material effect on the financial statements as of that date.

*Litigation*

The Company and Calvin Grigsby filed a lawsuit in the federal district court in Manhattan
against J. Donald Rice Jr., Rice Derivative Holdings, L.P., Rice Derivative Holdings
Corporation, GBR Derivative Products Company, L.P., GBR Derivative Products Corporation
GBDP, L.P., GBDP Holdings, L.P., GBDP Corporation, GB Derivative Products Company, L.P.,
and GB Derivative Products Corporation (Collectively "Defendants"). The Company alleged
that they were owed monies by the defendants from the operation of a series of limited
partnerships involving the parties (see Note 2), which partnerships engaged in interest rate swap
transactions in connection with municipal bond financing.

)                                    )

Grigsby & Associates, Inc. and Subsidiary
Consolidated Notes to Financial Statements
September 30, 2005

Note 9:   COMMITMENTS AND CONTINGENCIES
(Continued)

The complaint set forth the following claims:(1) to compel inspection of the defendants' books
and records; (2) an accounting;(3) breach of fiduciary duty, (4) unjust enrichment and (5)
constructive trust. The complaint sought both equitable remedies and damages for breach of
fiduciary duty in an unspecified amount.

The Company entered into a settlement on August 22, 2005. The Company was awarded
$1,750,000 and has collected $350,268. The settlement agreement states that $182,966 will be
payable every three months from December 15, 2005 through September 15, 2007 at four percent
interest.

The settlement agreement also states that if an agreement terminating a Phase I swap can be
reached, the Company will effect a dissolution of GBDP Holdings, L.P., GB Derivative Products
Company, L.P., GBDP Corporation, and GB Derivative Products Corporation.

*Concentrations of Credit Risk*

The Company invests in marketable securities, the value of which is subject to market conditions
at any given time.

The Company's receivables are predominately from other broker/dealers.

The Company maintains cash balances at financial institutions. Accounts at each institution are
insured by the Federal Deposit Insurance Corporation up to $100,000. At September 30, 2005,
the Company's uninsured cash balances totaled $227,083.

*Operating Lease*

In February 2002, the Company entered into a five (5) year lease for its San Francisco office
space.

In January 2005, the Company entered into a three (3) year lease for its New York office space.
The New York office is a new branch.

Under these agreements total rent expense for the year ended September 30, 2005 was $100,545.

Grigsby & Associates, Inc. and Subsidiary
Consolidated Notes to Financial Statements
September 30, 2005

Note 9:   COMMITMENTS AND CONTINGENCIES
(Continued)

The future minimum lease expenses in the aggregate and for each of the five succeeding years are:

|  | September 30, |
|---|---|
| 2006 | $ 61,459 |
| 2007 | 45,813 |
| 2008 | 11,537 |
| 2009 | — |
| 2010 and thereafter | — |
| Total | $ 118,809 |

Note 10:   RECENTLY ISSUED ACCOUNTING STANDARDS

In January 2003, The Financial Accounting Standards Board ("FASB") issued FASB Interpretation No. 46, *"Consolidation of Variable Interest Entities"* ("FIN 46"). This interpretation of Accounting Research Bulletin No. 51, requires companies to consolidate the operations of all variable interest entities ("VIE's") for which they are the primary beneficiary. The term "primary beneficiary" is defined as the entity that will absorb a majority of expected losses, receive a majority of the expected residual returns, or both. This interpretation was later revised by the issuance of Interpretation No. 46R ("FIN 46R"). The revision was issued to address certain implementation issues that had arisen since the issuance of the original interpretation and to provide companies with the ability to defer the adoption of FIN 46 to periods after March 15, 2004. The implementation of FIN No. 46 and FIN 46R, had no material impact on the Company's financial statements.

On July 16, 2004, the FASB ratified the Emerging Issues Task Force ("EITF") consensus on Issue 02-14, *"Whether the Equity Method of Accounting Applies When an Investor Does Not Have an Investment in Voting Stock of an Investee but Exercises Significant Influence through Other Means"* ("EITF 02-14"). The consensus concludes that an investor should apply the equity method of accounting when it can exercise significant influence over an entity through a means other than holding voting rights. The consensus is effective for reporting periods beginning after September 15, 2004. The adoption of EITF 02-14 did not have a material impact on the Company's financial statements.

On December 16, 2004, FASB issued Statement of Financial Accounting Standards No. 123 (revised 2004), *"Share-Based Payment"* ("FASB 123R"), which addresses the accounting for employee stock options. FASB 123R requires that the cost of all employee stock options, as well

)                                                    )

Grigsby & Associates, Inc. and Subsidiary
Consolidated Notes to Financial Statements
September 30, 2005

Note 10:   RECENTLY ISSUED ACCOUNTING STANDARDS
(Continued)

as other equity-based compensation arrangements, be reflected in the financial statements based
on the estimated fair value of the awards.  Stock options are a valuable and important tool that
have been used by many companies as a means to motivate employees and to promote business
growth. The statement requires that the value of these arrangements be measured and recognized
in the financial statements.  FASB 123R becomes effective for reports filed after June 15, 2005.
Early adoption of FASB 123R had no material effect on the Company's financial statements.

Note 11:  NET CAPITAL

The Company is subject to the Securities and Exchange Commission Uniform Net Capital Rule
(SEC rule 15c3-1), which requires the maintenance of minimum net capital and requires that the
ratio of aggregate indebtedness to net capital, both as defined, shall not exceed 15 to 1.  Net
capital and aggregate indebtedness change day to day, but on September 30, 2005, the Company's
net capital of $623,522 exceeded the minimum net capital requirement by $523,522; and the
Company's ratio of aggregate indebtedness ($105,804) to net capital was 0.2:1, which is less than
the 15 to 1 maximum ratio allowed of a Broker/Dealer.

Note 12:   RECONCILIATION OF AUDITED NET CAPITAL TO UNAUDITED FOCUS

There is a $109,435 difference between the computation of net capital under net capital Sec. Rule
15c3-1 and the corresponding unaudited focus part IIA.

| | | | |
|---|---|---|---|
| Net capital per unaudited schedule | | $ | 732,957 |
| Adjustments: | | | |
| Accumulated deficit | $  1,216,429 | | |
| Non-allowable assets | (1,327,673) | | |
| Haircuts and undue concentration | 1,809 | | |
| Total adjustments | | | (109,435) |
| Net capital per audited statements | | $ | 623,522 |

)                                           )

Grigsby & Associates, Inc. and Subsidiary
Schedule I - Computation of Net Capital Requirements
Pursuant to Rule 15c3-1
As of September 30, 2005

Computation of net capital
| | | |
|---|---|---|
| Common stock | $ 30,000 | |
| Additional paid-in capital | 3,838,522 | |
| Accumulated deficit | (882,603) | |
| Total stockholder's equity | | $ 2,985,919 |
| Less: Non-allowable assets | | |
| Securities, not readily marketable | (4,200) | |
| Receivable from related parties | (857,654) | |
| Receivable-other | (1,400,000) | |
| Deposits | (19,572) | |
| Furniture & equipment, net | (12,472) | |
| Other assets | (15,590) | |
| Total adjustments | | (2,309,488) |
| Net capital before haircuts | | 676,431 |
| Haircuts on securities | | |
| Money market | (6,542) | |
| Municipal bonds | (613) | |
| Corporate stocks | (20,153) | |
| Other - Fidelity Bond deductible | (13,000) | |
| Total haircuts on securities | | (40,308) |
| | | |
| Undue concentration | | (12,601) |
| | | |
| Total haircuts and undue concentration | | (52,909) |
| | | |
| Net capital | | 623,522 |
| | | |
| Computation of net capital requirements | | |
| Minimum net capital requirements | | |
| 6 2/3 percent of net aggregate indebtedness | $ 7,054 | |
| Minimum dollar net capital required | $ 100,000 | |
| Net capital required (greater of above) | | (100,000) |
| | | |
| Excess net capital | | $ 523,522 |
| | | |
| Ratio of aggregate indebtedness to net capital | 0.2: 1 | |

There is a $109,435 difference in net capital computed above and that which was reported by the
Company in Part II of Form X-17A-5. See Note 12.

-------------------------------------------------------------------------------

*See independent auditor's report.*
-13-

Grigsby & Associates, Inc. and Subsidiary
Schedule II - Computation for Determination of Reserve
Requirements Pursuant to Rule 15c3-3
As of September 30, 2005

A computation of reserve requirement is not applicable to Grigsby & Associates, Inc. and Subsidiary as the Company qualifies for exemption under Rule 15c3-3 (k)(2)(ii).

*See independent auditor's report.*
-14-

)                              )

**Grigsby & Associates, Inc. and Subsidiary**
**Schedule III - Information Relating to Possession or Control**
**Requirements Under Rule 15c3-3**
**As of September 30, 2005**

Information relating to possession or control requirements is not applicable to Grigsby &
Associates, Inc. and Subsidiary as the Company qualifies for exemption under Rule 15c3-3
(k)(2)(ii).

*See independent auditor's report.*
-15-

Grigsby & Associates, Inc. and Subsidiary

Supplementary Accountant's Report

on Internal Accounting Control

Report Pursuant to 17a-5

for the Year Ended September 30, 2005

# BREARD & ASSOCIATES, INC.

### Certified  Public  Accountants

Board of Directors
Grigsby & Associates, Inc.

In planning and performing our audit of the financial statements and supplemental schedules of Pension Dynamics Securities Corporation ("the Company"), for the year ended September 30, 2005, We considered its internal control structure, for the purpose for safeguarding securities, in order to determine our auditing procedures for the purpose of expressing our opinion on the financial statements and not to provide assurance on the internal control structure.

Also, as required by rule 17a-5(g)(1) of the Securities and Exchange Commission ("SEC"), we have made a study of the practices and procedures followed by Pension Dynamics Securities Corporation including tests of such practices and procedures that we considered relevant to objectives stated in rule 17a-5(g), in making the periodic computations of aggregate indebtedness (or aggregate debits) and net capital under rule 17a-3(a)(11) and for determining compliance with the exemptive provisions of rule 15c3-3. Because the Company does not carry security accounts for customers or perform custodial functions relating to customer securities, we did not review the practices and procedures followed by the Company in any of the following:

1.   Making the quarterly securities examinations, counts, verifications and comparisons

2.   Recordation of differences required by rule 17a-13

3.   Complying with the requirements for prompt payment for securities under Section 8 of Federal Reserve Regulation T of the Board of Governors of the Federal Reserve System

The management of the Company is responsible for establishing and maintaining internal control structure and the practice and procedures referred to in the preceding paragraph in fulfilling this responsibility, estimates and judgements by management are required to assess the expected benefits and related costs of internal control structure policies and procedures and of the practices and procedures referred to in the proceeding paragraph and to assess whether those practices and procedures can be expected to achieve the SEC's above mentioned objectives. Two of the objectives of an internal control structure and the practices and procedures are to provide management with reasonable, but not absolute, assurance that assets for which the Company has responsibility are safeguarded against loss from unauthorized use or disposition and that transactions are executed in accordance with management's authorization and recorded properly to permit preparation of financial statements in conformity with generally accepted accounting principles. Rule 17-5(g) lists additional objectives of the practices and procedures listed in the preceding paragraph.

*We Focus & Care* ℠

9010 Corbin Avenue, Suite 7
Northridge, California  91324
(818) 886-0940 • Fax (818) 886-1924
www.baicpa.com

Because of inherent limitations in any internal control structure or the practices and procedures referred to above, errors or irregularities may occur and not be detected. Also, projection of any evaluation of them to future periods is subject to the risk they may become inadequate because of changes in conditions or that the effectiveness of their design and operation may deteriorate.

Our consideration of the internal control structure would not necessarily disclose all matters in the internal control that might be material weaknesses under standards established by the American Institute of Certified Public Accountants. A material weakness is a condition in which design or operation of the specific internal control structure elements does not reduce to a relatively low level the risk that errors or irregularities in amounts that would be material in relation to the financial statements being audited may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions. However, we noted no matters involving the internal control structure, including procedures for safeguarding securities, that we considered to be material weakness as defined above.

We understand that practices and procedures that accomplish the objectives referred to in the second paragraph of this report are considered by the SEC to be adequate for its purpose in accordance with the Securities Exchange Act of 1934 and related regulations, and that practices and procedures that do not accomplish such objectives in all material respects indicate material inadequacy for such purposes. Based on this understanding and on our study, we believe that the Company's practices and procedures were adequate at September 30, 2005 to meet the SEC's objectives.

This report is intended solely for the use of management, the Securities and Exchange Commission, and other regulatory agencies which rely on rule 17a-5(g) under the Securities Exchange Act of 1934 and should not be used for any other purpose.

Breard & Associates, Inc.
Certified Public Accountants

Northridge, California
October 27, 2005

# EXHIBIT 7



SEC 05044174 MISSION

OMB APPROVAL
OMB Number: 3235-0123
Expires: October 31, 2004
Estimated average burden
hours per response.....12.00

# ANNUAL AUDITED REPORT
## FORM X-17A-5
## PART III

SEC FILE NUMBER
8- 29236

### FACING PAGE
**Information Required of Brokers and Dealers Pursuant to Section 17 of the
Securities Exchange Act of 1934 and Rule 17a-5 Thereunder**

REPORT FOR THE PERIOD BEGINNING ___October 1, 2004___ AND ENDING ___September 30, 2005___
           MM/DD/YY            MM/DD/YY

## A. REGISTRANT IDENTIFICATION

NAME OF BROKER-DEALER:
 Grigsby & Associates, Inc.

OFFICIAL USE ONLY

ADDRESS OF PRINCIPAL PLACE OF BUSINESS: (Do not use P.O. Box No.)

FIRM I.D. NO.

311 California Street   Suite 320
           (No. and Street)

San Francisco    California    94104
 (City)       (State)     (Zip Code)

NAME AND TELEPHONE NUMBER OF PERSON TO CONTACT IN REGARD TO THIS REPORT
William Chin          (415) 392-4800
              (Area Code – Telephone Number)

## B. ACCOUNTANT IDENTIFICATION

INDEPENDENT PUBLIC ACCOUNTANT whose opinion is contained in this Report*

Breard & Associates Inc., Certified Public Accountants
       (Name – if individual, state last, first, middle name)

9010 Corbin Avenue  Suite 7  Northridge   CA   91324
 (Address)      (City)    (State)

CHECK ONE:

 ☒ Certified Public Accountant

 ☐ Public Accountant

 ☐ Accountant not resident in United States or any of its possessions.

PROCESSED
JAN 2 5 2006
THOMSON
FINANCIAL

---

**FOR OFFICIAL USE ONLY**

---

*Claims for exemption from the requirement that the annual report be covered by the opinion of an independent public accountant
must be supported by a statement of facts and circumstances relied on as the basis for the exemption. See Section 240.17a-5(e)(2)

SEC 1410 (06-02)  **Potential persons who are to respond to the collection of
information contained in this form are not required to respond
unless the form displays a currently valid OMB control number.**

**OATH OR AFFIRMATION**

I, Calvin B. Grigsby _____ , swear (or affirm) that, to the best of

my knowledge and belief the accompanying financial statement and supporting schedules pertaining to the firm of
Grigsby & Associates, Inc.

_____ , as

of _September 30_ , _20 : 05_ , are true and correct.  I further swear (or affirm) that

neither the company nor any partner, proprietor, principal officer or director has any proprietary interest in any account

classified solely as that of a customer, except as follows:

_____

_____

_____

State of _California_

County of _San Francisco_

Subscribed and sworn (or affirmed) to
before me this _4th_ day of _Nov_ , _2005_

_Darnella Broaden_
Notary Public

Signature

_PRESIDENT_
Title

DARNELLA BROADEN
Commission # 1375539
Notary Public - California
San Francisco County
My Comm. Expires Oct 13, 2006

This report ** contains (check all applicable boxes):

- ☒ (a)  Facing Page.
- ☒ (b)  Statement of Financial Condition.
- ☒ (c)  Statement of Income (Loss)
- ☒ (d)  Statement of Changes in Cash Flows
- ☒ (e)  Statement of Changes in Stockholders' Equity or Partners' or Sole Proprietors' Capital.
- ☒ (f)  Statement of Changes in Liabilities Subordinated to Claims of Creditors.
- ☒ (g)  Computation of Net Capital.
- ☒ (h)  Computation for Determination of Reserve Requirements Pursuant to Rule 15c3-3.
- ☒ (i)  Information Relating to the Possession or Control Requirements Under Rule 15c3-3.
- ☐ (j)  A Reconciliation, including appropriate explanation of the Computation of Net Capital Under Rule 15c3-3 and the Computation for Determination of the Reserve Requirements Under Exhibit A of Rule 15c3-3.
- ☐ (k)  A Reconciliation between the audited and unaudited Statements of Financial Condition with respect to methods of consolidation.
- ☒ (l)  An Oath or Affirmation.
- ☐ (m)  A copy of the SIPC Supplemental Report.
- ☐ (n)  A report describing any material inadequacies found to exist or found to have existed since the date of the previous audit.

**For conditions of confidential treatment of certain portions of this filing, see section 240.17a-5(e)(3).*

# B EARD & A SSOCIATES, NC.

## Certified Public Accountants

### Independent Auditor's Report

Board of Directors
Grigsby & Associates, Inc.

We have audited the accompanying statement of financial condition of Grigsby & Associates, Inc. as of September 30, 2005, and the related statements of operations, changes in stockholder's equity, and cash flows for the year then ended that you are filing pursuant to rule 17a-5 under the Securities Exchange Act of 1934. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatements. An audit includes examining on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Pension Dynamics Securities Corporation as of September 30, 2005, and the results of their operations and their cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America.

Our examination was made for the purpose of forming an opinion on the basic financial statements taken as a whole. The information contained on Schedules I-III are presented for purposes of additional analysis and is not required as part of the basic financial statements, but as supplementary information required by rule 17a-5 of the Securities and Exchange Commission. Such information has been subject to the auditing procedures applied in the examination of the basic financial statements and, in my opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole and in conformity with the rules of the Securities and Exchange Commission.

*Breard & Associates, Inc.*

Breard & Associates, Inc.
Certified Public Accountants

Northridge, California
October 27, 2005

*We Focus & Care℠*

9010 Corbin Avenue, Suite 7
Northridge, California 91324
(818) 886-0940 • Fax (818) 886-1924
www.baicpa.com

**Grigsby & Associates, Inc. and Subsidiary**
**Consolidated Statement of Financial Condition**
**September 30, 2005**

### Assets

| | |
|---|---:|
| Cash and cash equivalents | $ 445,037 |
| Deposits with clearing organization | 200,000 |
| Marketable securities, at market | 144,898 |
| Securities, not readily marketable | 4,200 |
| Receivable from related party | 857,654 |
| Receivable-other | 1,400,000 |
| Equipment & furniture, net | 12,472 |
| Deposits | 19,572 |
| Other assets | 7,890 |
| Investments in unconsolidated affiliates | — |
| **Total assets** | **$ 3,091,723** |

### Liabilities & Stockholder's Equity

**Liabilities**

| | |
|---|---:|
| Accounts payable and accrued expenses | $ 23,761 |
| Income tax payable | 82,043 |
| **Total liabilities** | 105,804 |

**Stockholder's equity**

| | |
|---|---:|
| Common stock, no par value, 100,000 shares authorized, 1,000 shares issued and outstanding | 30,000 |
| Additional paid-in capital | 3,838,522 |
| Accumulated deficit | (882,603) |
| **Total stockholder's equity** | **2,985,919** |
| **Total liabilities & stockholder's equity** | **$ 3,091,723** |

*The accompanying notes are an integral part of these financial statements.*

### Grigsby & Associates, Inc. and Subsidiary
### Consolidated Statement of Income
### For the Year Ended September 30, 2005

**Revenues**

| | | |
|---|---|---:|
| Commissions | $ | 236,821 |
| Underwriting fees | | 22,445 |
| Interest income and dividends | | 17,953 |
| Interest income, non-taxable | | 450 |
| Unrealized gains (losses) | | 97,457 |
| Realized gains (losses) | | (34,614) |
| Other income | | 1,757,268 |
| **Total revenues** | | 2,097,780 |

**Expenses**

| | |
|---|---:|
| Employee compensation and benefits | 242,608 |
| Underwriting | 96,509 |
| Communications | 32,171 |
| Interest | 8,417 |
| Occupancy and equipment rental | 114,612 |
| Taxes, licenses, & fees, other than income taxes | 20,447 |
| Other operating expenses | 461,776 |
| **Total expenses** | 976,540 |
| Net income (loss) before income taxes | 1,121,240 |
| **Total income tax provision** | 90,543 |
| **Net income (loss)** | $ 1,030,697 |

*The accompanying notes are an integral part of these financial statements.*

**Grigsby & Associates, Inc. and Subsidiary**
**Consolidated Statement of Changes in Stockholder's Equity**
**For the Year Ended September 30, 2005**

| | Common Stock | Additional Paid-in Capital | Accumulated Deficit | Total |
|---|---|---|---|---|
| Balance, September 30, 2004 | $ 30,000 | $ 3,638,522 | $(1,913,300) | $1,755,222 |
| Additional paid-in capital | – | 200,000 | – | 200,000 |
| Net income (loss) | – | – | 1,030,697 | 1,030,697 |
| Balance, September 30, 2005 | $ 30,000 | $3,838,522 | $ (882,603) | $2,985,919 |

*The accompanying notes are an integral part of these financial statements.*

-3-

**Grigsby & Associates, Inc. and Subsidia.y**
**Consolidated Statement of Changes in Cash Flows**
**For the year ended September 30, 2005**

**Cash flows from operating activities:**

| | | |
|---|---:|---:|
| Net income (loss) | | $ 1,030,697 |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | |
| Depreciation | $ 2,779 | |
| Valuation of marketable securities to market | (97,785) | |
| (Gain) loss on sale of marketable securities | 8,809 | |
| (Increase) decrease in: | | |
|     Receivable from clearing firm | (200,000) | |
|     Receivable, other than trade | (1,359,802) | |
|     Deposits | (13,912) | |
|     Other assets | 30,125 | |
| (Decrease) increase in: | | |
|     Accounts payable and accrued expenses | (19,267) | |
|     Income taxes payable | 74,367 | |
|     Total adjustments | | (1,574,686) |
| Net cash and cash equivalents provided by (used in) operating activities | | (543,989) |

**Cash flows from investing activities:**

| | | |
|---|---:|---:|
| Proceeds from sale of marketable securities | 300,000 | |
| Purchase of equipment | (15,251) | |
| Net cash and cash equivalents provided by (used in) investing activities | | 284,749 |

**Cash flows from financing activities:**

| | | |
|---|---:|---:|
| Collection of related party loan | 321,081 | |
| Proceeds from issuance of additional paid-in capital | 200,000 | |
| Net cash and cash equivalents provided by (used in) financing activities | | 521,081 |

| | | |
|---|---:|---:|
| Net decrease in cash and cash equivalents | | 261,841 |
| Cash and cash equivalents at beginning of year | | 183,196 |
| Cash and cash equivalents at end of year | | $ 445,037 |

**Supplemental disclosure of cash flow information:**
Cash paid during the year for the period ended September 30, 2005

| | | |
|---|---:|---:|
|     Interest | $ — | |
|     Income taxes | $ 8,500 | |

*The accompanying notes are an integral part of these financial statements.*
-4-

Grigsby & Associates, Inc. and Subsidiary
Consolidated Notes to Financial Statements
September 30, 2005

Note 1:   **GENERAL AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*Basis of Consolidation*

The consolidated financial statements include the accounts of Grigsby Brandford Capital Partners
(the Subsidiary), a wholly-owned subsidiary.  All significant inter-company accounts and
transactions have been eliminated in consolidation.

*General*

Grigsby & Associates, Inc. and Subsidiary (formerly Grigsby Brandford & Co., Inc.) was
incorporated in 1981, and registered as a broker-dealer under the Securities and Exchange Act of
1934 in April, 1983.  Grigsby & Associates, Inc. and Subsidiary (the "Company") is a fully
disclosed broker/dealer whereby it does not hold customer funds or securities.  The Company is a
member of the National Association of Securities Dealers, Inc. ("NASD"), the Municipal Rule
Making Board ("MSRB"), and the Securities Investor Protection Corporation ("SIPC").

*Summary of Significant Accounting Principles*

The presentation of financial statements in conformity with accounting principles generally
accepted in the United States of America requires management to make estimates and
assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent
assets and liabilities at the date of the financial statements and the reported amounts of revenue
and expenses during the reporting period.  Actual results could differ from those estimates.

*Income Taxes*

Income taxes are provided for the tax effects of transactions reported on the financial statements
and consist of taxes currently due or refundable plus deferred taxes.  Deferred taxes are
recognized for differences between the basis of assets and liabilities for financial statement and
income tax purposes.  The differences relate primarily to investments in partnerships and closely
held corporations (use of different methods of accounting for financial statement and income tax
purposes), depreciable assets (use of different depreciation methods and lives for financial
statement and income tax purposes), and contributions (limitations on amount of deduction based
upon income for income tax purposes and for financial statement purposes).

*Statement of Cash Flows*

For purposes of the statements of cash flows, the Company considers all highly liquid debt
instruments purchased with a maturity of three months or less to be cash equivalents.

Grigsby & Associates, Inc. and Subsidiary
Consolidated Notes to Financial Statements
September 30, 2005

### Note 1:   GENERAL AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

*Related Party Transactions*

The receivable from related party is unsecured and non-interest bearing.  If interest would have been charged at the current U.S. bank rates, approximately 4%, the interest income not included in these financial statements of $40,728 is material to the financial statements when taken as a whole.

The sole shareholder and president of the Company is also the sole stockholder and president of Fiscal Funding Co., Inc..  The Company shares office space with Fiscal Funding.  Fiscal Funding has paid half of the lease expenses associated with the Company's office rent.  These statements do not reflect any adjustment for these amounts.

*Securities Owned*

Investments in marketable securities at market value transactions are shown at market value.  The change in unrealized gains and losses on investments in marketable securities at market value  is reflected in the statements of operations.  Securities transactions are recorded on a trade date basis.

Mutual funds and annuities income are recognized when earned.

*Investments in Unconsolidated Affiliates*

The investment in unconsolidated affiliates in which the Company maintains a 50% interest, is accounted for under the equity method.  The Company's interest is carried at cost adjusted for its proportionate share of distributed and undistributed earnings or losses.

Rent expense for the year ended September 30, 2005, was $104,687, and is included in occupancy and equipment rental in the statement of income.

### Note 2:   INVESTMENTS IN UNCONSOLIDATED AFFILIATES

The Company owns a 50% interest in two closely-held corporations (G.B.  Derivative Products Corporation and GBDP Corporation).  These two corporations own general partnership interests in three partnerships (1% - GB Derivative Products., L.P., 1% - GBDP Holdings, L.P., and 1% - GBDP, L.P.).  The Company also owns a limited partnership interest in two of these partnerships (49.5% - GB Derivative Products Co., L.P. and 49.5% - GBDP Holdings, L.P.).  GBDP

Grigsby & Associates, Inc. and Subsidiary
Consolidated Notes to Financial Statements
September 30, 2005

Note 2:   INVESTMENTS IN UNCONSOLIDATED AFFILIATES
(Continued)

Holdings, L.P. in addition, owns a 99% limited partnership interest in GBDP, L.P.. The
unconsolidated affiliates are collectively referred to as GBR Financial Products Companies
(GBR).

The affiliated companies were formed to engage in interest and currency swap transactions
through GBDP, L.P. These transactions involve obligating itself to pay a stream of payments at
a given rate while simultaneously entering into a hedging transaction to receive a stream of
payments at a rate in excess of that of the payment stream. Revenues are recorded as the net
payment stream. Because of the degree of uncertainty involving these transactions, the Company
accounts for its equity investment in these entities on the cash receipts and disbursements method
of accounting.

In accordance with the limited partnership agreement, the Company made a capital contribution
of $545,000 to GBDP Holdings, L.P.. In accordance with the agreement, the Company is liable
only to the extent of its capital contribution. The allocation of the partnership loss is allocated
first to the Company, equal to the excess of its aggregate capital contributions of the other limited
partner. At September 30, 2005, the Company was the sole contributor to the partnership.

The Company's share of partners' (deficit) and equity earnings of approximately ($25,000), at
September 30, 2005 has not been recorded.

Subsequent to September 30, 1996, the Company has been unsuccessful in obtaining any
information from GBR, regarding its 50% financial interest. The Company was seeking legal
demand for access to the books and records of GBR. (See Note 8)

The Company's investment in GBR is carried at zero value. There has been no income or
expenses on its investment in GBR on the statement of operations for the year ended September
30, 2005, nor has the Company received any distributions from GBR during the year ended
September 30, 2005.

Note 3:   DEPOSITS WITH CLEARING ORGANIZATION

The Company has deposited $200,000 with Huntleigh Securities Corporation as security for its
transactions with them. Interest is paid monthly on the deposit at the average overnight
repurchase agreement rate.

-7-

Grigsby & Associates, Inc. and Subsidia. y
Consolidated Notes to Financial Statements
September 30, 2005

### Note 4:   MARKETABLE SECURITIES

The Company's securities investments are held principally for the purpose of selling in the near term and are classified as trading securities.  Trading securities are recorded at fair value on the balance sheet in current assets, with the change in fair value during the period in earnings. The market value of these investments at September 30, 2005 was $144,898.

### Note 5: SECURITIES, NOT READILY MARKETABLE

Securities, not readily marketable consist of 1,200 warrants in the NASDAQ Stock Market, Inc., these securities were offered primarily to NASD members and purchased through a Private Placement Memorandum. The warrants were exercisable in four tranches over four years.  The third tranche became exercisable on June 28, 2004 at $14 and expired on June 27, 2005.  The Company has the remaining options to exercise in the following tranches;

|  |  | Exercisable on | Expires on | Exercise Price |
|---|---|---|---|---|
| Tranche 4 | 1,200 shares | June 28, 2005 | June 27, 2006 | $ 16.00 |

The Company is carrying these warrants at their amortized cost of $4,200.

### Note 6: EQUIPMENT AND FURNITURE, NET

The equipment and furniture are recorded at cost as follows:

| | |
|---|---|
| Equipment and furniture | $   209,251 |
| Accumulated depreciation and amortization | (196,779) |
| Equipment and furniture, net | $    12,472 |

Depreciation expense for the year ended September 30, 2005, was $2,779.

### Note 7:   PENSION PLAN

The Company maintains a defined contribution pension plan covering substantially all of the Company's employees.  The Company contributes an amount equal to 10% of participant's compensation subject to a maximum contribution of $15,000, per employee. For the year ended September 30, 2005, the Company contributed $29,033 to the plan, which is included in employee compensation and benefits in the statement of operations.

-8-

Grigsby & Associates, Inc. and Subsidiary
Consolidated Notes to Financial Statements
September 30, 2005

Note 8:   INCOME TAXES

The current provision of $90,543 for income taxes consists of the California Franchise tax for
Grigsby & Associates, Inc.

The Company has available at September 30, 2005 unused operating loss carry-forwards, which
may be applied against future taxable income, resulting in a deferred tax asset of approximately
$417,347, that expire as follows:

| Amount of unused operating loss carry-forwards | Expiration during year ended September 30, |
|---|---|
| $    486,752 | 2018 |
| 920,226 | 2019 |
| 317,975 | 2020 |
| 516,527 | 2021 |
| 141,443 | 2022 |
| 399,388 | 2023 |
| $ 2,782,311 | |

A 100% valuation allowance has been established against this asset since management cannot
determine if it is more likely than not that the asset will be realized.

Note 9:   COMMITMENTS AND CONTINGENCIES

*Underwriting Commitments*

In the normal course of business, the Company enters into underwriting commitments.
Transactions relating to such underwriting commitments that were open at September 30, 2005
were subsequently settled and had no material effect on the financial statements as of that date.

*Litigation*

The Company and Calvin Grigsby filed a lawsuit in the federal district court in Manhattan
against J. Donald Rice Jr., Rice Derivative Holdings, L.P., Rice Derivative Holdings
Corporation, GBR Derivative Products Company, L.P., GBR Derivative Products Corporation
GBDP, L.P., GBDP Holdings, L.P., GBDP Corporation, GB Derivative Products Company, L.P.,
and GB Derivative Products Corporation (Collectively "Defendants"). The Company alleged
that they were owed monies by the defendants from the operation of a series of limited
partnerships involving the parties (see Note 2), which partnerships engaged in interest rate swap
transactions in connection with municipal bond financing.

# EXHIBIT 8

NASD Dispute Resolution
www.nasd.com

Western Region

300 South Grand Avenue ● Suite 900 ● Los Angeles, CA ● 90071-3135 ● 213-613-2680 ● Fax 213-613-2677



September 21, 2006

Curtis Carlson, Esq.
One Southeast Third Ave.
Suite 1200
Miami, FL  33131

Subject:     NASD Dispute Resolution Arbitration Number 06-04209
             M Securities Investment, Inc. v. Grisby & Associates, Inc., and Calvin B. Grisby

Dear Mr. Carlson:

The attached invoice includes a Surcharge that is owed in the subject case. Please remit your check in the enclosed envelope.

Pursuant to Rule 10333(a) of the NASD Code of Arbitration Procedure ("Code"):

1.     Each member that is named ... in a Claim, Counterclaim, Crossclaim or Third-Party Claim, shall be assessed a non-refundable surcharge....when the Director perfects services of the claim naming the member or any party to the proceeding.

2.     For each associated person who is named, the surcharge shall be assessed against the member or members that employed the associated person at the time of the events which gave rise to the dispute, claim or controversy....

3.     The surcharge shall not be chargeable to any other party under Rules 10332(c) and 10205(c) of the Code.

The Surcharge must be remitted to NASD Dispute Resolution upon receipt of this invoice.

**THIS WILL BE YOUR ONLY NOTICE.  If payment in full is not received within 60 days of this notice, the delinquent unpaid arbitration fees and costs will be deducted from the Central Registration Depository (CRD) account of M Securities Investment, Inc.. Further, if there are insufficient funds on deposit to cover unpaid fees and M Securities Investment, Inc. has not made other payment arrangements, NASD Dispute Resolution will pursue suspension from or cancellation of registration after a 15-day written notice, in accordance with Article VI, Section 3 of the NASD By-Laws.**

**IMPORTANT NOTICE TO COUNSEL representing a member firm: This is the ONLY statement that is sent out. Your client does _not_ receive a duplicate copy of this statement. Please forward this notice immediately to your client, so that your client can pay the invoice timely.**

Very truly yours,

Western Processing Center

WesternProcessingCenter@nasd.com
(213)613-2680    Fax:(301)527-4766

WPC:IGY:LC70C
idr:02/06

RECIPIENTS:

Curtis Carlson, Esq., M Securities Investment, Inc.
One Southeast Third Ave., Suite 1200, Miami, FL  33131

STATEMENT OF ACCOUNT

NASD Dispute Resolution
300 South Grand Avenue, Suite 900
Los Angeles, CA 90071

As of: 09/21/2006

INVOICE COPY: Please Return with Payment

TO: Curtis Carlson, Esq.
    One Southeast Third Ave.
    Suite 1200
    Miami, FL 33131

FOR: M Securities Investment, Inc. (M)
    , FL

Invoice#: 06-04209-6-SF

Case Number: 06-04209
    Name: M Securities Investment, Inc. v. Grisby & Associates, Inc.,
          and Calvin B. Grisby

| Date | Multiple Party | Description | Fees Owed | Credits | Check No. | Check Date |
|------|------|------|------|------|------|------|
| 09/19/2006 | | Check No: 5371 | | $3,200.00 | | |
| 09/21/2006 | | Hearing Session Deposit - Initial Claim | $1,200.00 | | | |
| 09/21/2006 | | Filing Fee - Initial Claim | $2,000.00 | | | |
| 09/21/2006 | | Section 45 Member Surcharge | $2,800.00 | | | |

Mediation Fee Total:                    $.00
Arbitration Fee Total:                $6,000.00
Total Fees:                           $6,000.00
Credits To Date:                                 $3,200.00
Credits By Others:                               $.00
Less Credits To Others:                          $.00
Less Refunds:                                    $.00

Balance Due:                          $2,800.00

Please Make Check Payable to:

NASD Dispute Resolution
Dept LA 21460
Pasadena, CA 91185-1460

IGY: RF02A

# EXHIBIT 9

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 00-3278-CIV-LENARD/TURNOFF

**M SECURITIES and INVESTMENTS,
INC., a Florida corporation, d/b/a
HOWARD GARY & COMPANY,**

      Plaintiff,

vs.

**NAPOLEAN BRANDFORD, et al.,**

      Defendant.

_____/

FILED by _____ D.C.

AUG 1 0 2001

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## ORDER TO SHOW CAUSE

**THIS CAUSE** is before the Court <u>sua sponte</u>. Plaintiff filed the instant Complaint on September 1, 2000. The Court finds that Plaintiff failed to execute timely service of process on Defendants Calvin G. Grigsby, James Burke, and Grigsby & Associates, Inc., pursuant to Federal Rule of Civil Procedure 4(m), which provides in pertinent part:

> If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service fro an appropriate period.

At no time has Plaintiff moved for an extension of time within which to serve these Defendants or attempted to show good cause as to why Plaintiff has failed to execute timely

service on them. Based on the Court's review of the record, it is therefore

**ORDERED AND ADJUDGED** that, pursuant to Federal Rule of Civil Procedure 4(m), Plaintiff M Securities & Investments, Inc. shall have up to and including August 30, 2001 within which to show good cause why Plaintiff's claims against Defendants Calvin G. Grigsby, James Burke, and Grigsby & Associates, Inc. should not be dismissed for lack of service.

**DONE AND ORDERED** in Chambers in Miami, Florida, this $\cancel{10}^{th}$ day of August, 2001.

JOAN A. LENARD
UNITED STATES DISTRICT JUDGE

cc:  U.S. Magistrate Judge William C. Turnoff

Richard M. Leslie, Esq.
Shutts & Bowen, LLP
201 S. Biscayne Blvd.
Miami, FL 33131

Richard J. Burton, Esq.
Richard J. Burton & Associates
18305 Biscayne Blvd., Ste. 300
N. Miami Beach, FL 33160

Jeanette M. Lombardi, Esq.
Porter, Wright, Morris & Arthur, LLP
5801 Pelican Bay Blvd, Ste. 300
Naples, FL 34108

James Nespole, Esq.
Fulbright & Jaworski
666 Fifth Ave.
New York, NY 10103

Lawrence S. Gordon, Esq.
Astigarraga, Davis & Mullins
201 S. Biscayne Blvd.
Ste. 2070 Miami Center
Miami, FL 33131

**00-3278-CIV-LENARD/TURNOFF**

2

# EXHIBIT 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-3278-CIV-LENARD/TURNOFF

M SECURITIES and INVESTMENTS,
INC., a Florida corporation, d/b/a
HOWARD GARY & COMPANY,

      Plaintiff,

vs.

NAPOLEAN BRANDFORD, et al.,

      Defendant.

_____/

FILED by _____ D.C.

SEP 2 8 2001

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

### ORDER OF DISMISSAL OF DEFENDANTS CALVIN C. GRIGSBY, JAMES BURKE, AND GRIGSBY & ASSOCIATES, INC.

THIS CAUSE is before the Court sua sponte. On August 10, 2001, the Court ordered that Plaintiff M Securities & Investments, Inc. show cause why this action should not be dismissed as to Defendants Calvin G. Grigsby, James Burke, and Grigsby & Associates, Inc., pursuant to Federal Rule of Civil Procedure 4(m), for lack of timely service of process. (D.E. 136.) Plaintiff has not complied with this order. Based on the Court's review of the record, it is therefore

**ORDERED AND ADJUDGED** that:

1. This matter is dismissed without prejudice as to Defendants Calvin G. Grigsby, James Burke, and Grigsby & Associates, Inc.

2. All pending motions with regard to Defendants Calvin G. Grigsby, James Burke, and Grigsby & Associates, Inc., are **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers in Miami, Florida, this _2-8_ day of

September, 2001.


Joan A. Lenard

JOAN A. LENARD
UNITED STATES DISTRICT JUDGE

cc:     U.S. Magistrate Judge William C. Turnoff

        Richard M. Leslie, Esq.
        Shutts & Bowen, LLP
        1500 Miami Center
        201 S. Biscayne Blvd.
        Miami, FL 33131

        Richard J. Burton, Esq.
        Richard J. Burton & Associates
        18305 Biscayne Blvd., Ste. 300
        N. Miami Beach, FL 33160

        Jeanette M. Lombardi, Esq.
        Porter, Wright, Morris & Arthur, LLP
        5801 Pelican Bay Blvd. Ste. 300
        Naples, FL 34108

        James Nespole, Esq.
        Fulbirght & Jaworski
        666 Fifth Ave.
        New York, NY 10103

        Lawrence S. Gordon, Esq.
        Astigarraga, Davis & Mullins
        201 S. Biscayne Blvd.
        Ste. 2070 Miami Center
        Miami, FL 33131

        00-3278-CIV-LENARD/TURNOFF

Since the initiation of this Court's
FAXBACK program, the parties are
no longer required to submit envelopes
with their motions & proposed orders.
Orders should include a full service list.

2

# EXHIBIT 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA



Case No. : 00-1951-CIV-LENARD
Magistrate Judge Turnoff

M SECURITIES AND INVESTMENTS,
INC., a Florida Corporation, d/b/a
HOWARD GARY & COMPANY,
                    Plaintiff,

vs.                                    **AMENDED COMPLAINT**

MIAMI-DADE COUNTY,FLORIDA,
 MICHAEL ABRAMS, individually
 and DAIN RAUSCHER, Incorporated. f/k/a
RAUSCHER PIERCE, REFNES, INC.,
jointly, Individually and severally.

        Defendants.
_____/

        Plaintiff, M. Securities and Investments, Inc, a Florida Corporation, d/b/a
HOWARD GARY & COMPANY & Company (hereinafter " HOWARD GARY &
COMPANY or PLAINTIFF"), sues Defendant, Miami- Dade County, Florida f/k/a
Metropolitan Dade County (hereinafter "Dade") MICHAEL ABRAMS (hereinafter.
ABRAMS), individually, and as agent for DAIN RAUSCHER, Incorporated. f/k/a
RAUSCHER PIERCE, REFNES, INC. and DAIN RAUSCHER, Incoporated f/k/a
RAUSCHER PIERCE, REFNES, INC., (hereinafter RAUSCHER) and alleges as
follows:

### PARTIES

1. Plaintiff, M. Securities and Investments, Inc., d/b/a HOWARD GARY &
   COMPANY is a Florida Corporation with its principle place of business located
   in Miami-Dade County, Florida, formerly known as Metropolitan Dade County.

2. HOWARD GARY & COMPANY is a registered securities broker-dealer,
   registered with the Security and Exchange Commission. HOWARD GARY &
   COMPANY is a member of the National Association of Securities Dealers, Inc.,
   (NASD) and the Municipal Securities Rule making Board.

3. HOWARD GARY & COMPANY has been active as an underwriter of
   municipal bonds in Miami-Dade County and throughout the United States.

4. HOWARD GARY & COMPANY has, as its majority ownership, individuals who are African-American citizens of the United States of America.

5. Defendant, DADE is a County of the State of Florida. At the relevant time period, it was governed by an Executive Mayor and a thirteen member Board of County Commissioners (hereinafter "Board").

6. Defendant Michael Abrams is a resident of Miami- Dade County, Florida and is otherwise sui juris. At all times relevant, Abrams was the managing agent for the Miami office of Defendant RAUSCHER which was the *FINANCIAL ADVISOR* for certain agencies of Defendant DADE, in the oversight of the issuing of Municipal bonds, for those agencies.

## JURISDICTION

7. This Court has jurisdiction over this matter as it arises under the Constitution of the United States, Article 1, §9, Clause 3 and the Statues of the United States, specifically, 28 USC §d1331, §1332, §1343 et. seq., and 42 U.S.C. §1981 and §1983 . Further, the amount in controversy exceeds $75,000.00, and there are numerous pendant State claims.

## GENERAL ALLEGATIONS

8. Pursuant to the procedures and requirements contained in the then relevant Dade Code, Sections 2-10.6, 94-158 and 95-37, HOWARD GARY & COMPANY had been named as a member of two authorized underwriting teams permitted, and contracted to participate as an underwriter in general obligation and revenue bonds issued by Dade on a rotating basis. In so naming HOWARD GARY & COMPANY to the team, Dade entered into a contract with HOWARD GARY & COMPANY.

9. In or about September 1996, pursuant to the then relevant Dade County Code, and its duly adopted Ordinances, HOWARD GARY & Company's underwriting team, including Howard GARY & COMPANY individually, were selected by the County Manager's Finance Committee to serve as underwriters of certain bond issues. In fact, HOWARD GARY & COMPANY was included in the Preliminary Offering Circular(s) for the subject bond issues.

10. The awarding of the underwriting contract is a public contract governed by Dade County Code Sections 2-10.6, 94-158 and 95-37.

11. Commencing September, 1996, after HOWARD GARY & COMPANY was erroneously named as a purported perpetrator of certain "alleged" wrongdoing, by the media, Defendant, RAUSHER, by and through its representative and managing agent for the DADE County area, Defendant ABRAMS recommended to Defendant DADE to unlawfully exclude PLAINTIFF from ongoing Bond underwriting transactions for which HOWARD GARY & COMPANY had

performed work, and for which HOWARD GARY & COMPANY had a
contractual obligation to perform, on behalf of DADE. RAUSCHER and
ABRAMS, as Financial Advisor endorsed the continuing exclusions of
HOWARD GARY & COMPANY from the bond underwriting, of DADE,
thereafter.

12. Without any due process, DADE followed Defendant, RAUSHER, and
Defendant ABRAMS recommendation, and unlawfully excluded HOWARD
GARY & COMPANY from participation, in those "deals", causing HOWARD
GARY & COMPANY to suffer substantial damages.

13. Thereafter, DADE attempted to exclude HOWARD GARY & COMPANY from
all pending, and proposed Bond underwritings, in which HOWARD GARY &
COMPANY would have been a participant.

14. The F.B.I. and the United States Attorney became aware that HOWARD GARY
& COMPANY was being improperly damaged and denied the right to conduct
business, and even recommended that HOWARD GARY & COMPANY be
granted assistance, in the form of a stipend by the United States Department of
Justice. (Exhibit A)

15. DADE, was then notified both orally, by F.B.I. agents, and subsequently by an
Assistant United States Attorney, that HOWARD GARY & COMPANY was not
a subject, or target of any federal investigation. On or about October 30. 1996,
Dade had specific knowledge of the fact that HOWARD GARY & COMPANY
was not a target of any FBI investigation. ( Exhibit "B").

16. As a result of the letter and opinions of the office of the Dade County Attorney's
office, HOWARD GARY & COMPANY was permitted to participate in an
additional bond underwriting.

17. In the sale of those bonds, even during the "firestorm" of negative press
publicity, generated by the financial problems of the City of Miami, and the Port
of Miami, for which HOWARD GARY & COMPANY was wrongfully
implicated, in the media (*TRIAL BY PRESS*), those bonds sold with no adverse
impact on their price, nor their market acceptance, [the only two valid criteria
for excluding HOWARD GARY & COMPANY's participation in the deals].

18. The City of Miami's financial problems were largely exacerbated and concealed
by Defendant ABRAMS and Defendant RAUSCHER, who was the lead
underwriter on a 1995 Bond issue, of the City of Miami, which ABRAMS and
RAUSCHER *KNEW* was to create deficit financing and exacerbate the City of
Miami's precarious financial condition. (Exhibit C—{sent via fax from
RAUSCHER headquarters in Sarasota, Florida to ABRAMS, in RAUSCHER's
Miami office, and then sent via fax to Manohar Suranna, the then Director of
both Budget and Finance, for the City of Miami, and to the then City Manager,

2

Ceasar Odio}).  Exhibit C was only obtained during the trial in the legal proceeding, S.E.C. v City of Miami, et al, within the last 3 months.

19. HOWARD GARY & COMPANY, without any ability to determine the above described private dealings, between RAUSCHER and ABRAMS and the officials, of the City of Miami had consistently advised the City of Miami, as its Co-Financial Advisor that pursuant to its legal obligations in their opinion, the City of Miami, in an effort to be financially prudent, should review and reduce its true expenses, since, HOWARD GARY & COMPANY had formally warned the City, as early as 1989, that were the City of Miami not change its spending habits, vis-à-vis its revenue that by 1996 it would have a $65,000,000.00 deficit. (Exhibit D).

20. Virtually none of those details were actually portrayed in the press "flaying" of HOWARD GARY & COMPANY, nor was HOWARD GARY & COMPANY permitted to respond to these unlawful removals from the bond underwriting syndicates in a manner consistent with due process of law.

21. Thereafter, on or about December 12, 1996 and December 13, 1996, the Manager's Finance (Budget) Committee of the BOARD met to finalize the details of the bond issue. Upon information and belief, at that meeting the possibility of removing HOWARD GARY & COMPANY from the underwriting team was discussed.

22. The possible removal of HOWARD GARY & COMPANY from the underwriting team was based upon allegations that the continued inclusion of HOWARD GARY & COMPANY would create a negative financial impact to DADE as a result of publicity associated with HOWARD GARY & COMPANY's cooperation with the Federal Bureau of Investigation in one of its ongoing investigations.

23. At that time, the Committee knew or should have known that pursuant to county ordinance, it was required that there be eleven (11)-underwriting firms rotated on the participation list. DADE could maintain the proper rotation only if HOWARD GARY & COMPANY were included on the participation list.

24. The Committee voted 4 to1 to retain HOWARD GARY & COMPANY on the participation list for underwriters, after a formal recommendation from the Office of the County Attorney.

25. The awarding of the underwriting contract is a public contract governed by DADE County Code Sections 210.6, 94-158 and 95-37.

26. On or about December 12, 1996 and December 13, 1996, the Manager's Finance (Budget) Committee of the BOARD met to finalize the details of the bond issue, Upon information and belief, at that meeting, a discussion was had as to whether

*A*

it were lawful to recommend the of removing HOWARD GARY & COMPANY from the underwriting team was discussed.

27. The possible removal of HOWARD GARY & COMPANY from the underwriting team was based upon allegations that the continued inclusion of HOWARD GARY & COMPANY would create a negative financial impact to DADE as a result of publicity associated with HOWARD GARY & COMPANY's purported cooperation with the Federal Bureau of Investigation in its ongoing investigations.

28. At that time, the Committee knew or should have known that pursuant to county ordinance, it was required that there be eleven (11)-underwriting firms rotated on the participation list, DADE could maintain the proper rotation only if HOWARD GARY & COMPANY were included on the participation list.

29. On or about December 17, 1996, the BOARD met in full session at a scheduled public meeting. It was at this meeting that the removal of HOWARD GARY & COMPANY from the underwriting team was again considered.

30. Members of the BOARD were, upon information and belief, motivated to remove HOWARD GARY & COMPANY as a result of the "shadow of cloud" which was allegedly associated with HOWARD GARY & COMPANY.

31. At the December 17, 1996 Board meeting, the BOARD voted to continue to include HOWARD GARY & COMPANY in the bond issue.

32. In the afternoon session of that same day, the BOARD, upon reconsideration, voted to improperly exclude HOWARD GARY & COMPANY from the bond issue.

33. At all times, material hereto, Smith Barney, a large, non-minority, securities firm, based in New York was under active legal process, by the Department of Justice and the Securities and Exchange commission for *defrauding* DADE in the issuance of its Municipal securities. During the investigation, by the Government, *they* were not removed from existing and future bond underwritings, by DADE. After they plead to the fraud and were fined millions of dollars, they were only *briefly* excluded from the list of approved bond underwriters for DADE.

34. At all times, material hereto, virtually all other non-minority bond underwriters, approved by DADE had been under active investigation for misconduct in the underwriting of municipal bonds and other public securities ["under a cloud"], or in the specific example of Merrill Lynch, among others, convicted of criminal behavior (Orange County, California). None of those majority firms were excluded from the profession of bond underwriting, by DADE.

ε

35. In removing HOWARD GARY & COMPANY from the bond issue, DADE violated its own ordinance requiring rotation of certified underwriters for issuance of general revenue bonds and that there be eleven (11) members on each underwriting team. HOWARD GARY & COMPANY was entitled, by virtue or its certification, to its position on the underwriting team.

36. The removal of HOWARD GARY & COMPANY from the underwriting team without just cause, was arbitrary and capricious and as a result of racial discrimination.

37. The BOARD had no discretion to act arbitrarily or capriciously in removing HOWARD GARY & COMPANY from the bond issue without just cause or due process. In effect, DADE convicted HOWARD GARY & COMPANY of wrongdoing when the firm had not been charged with any wrongdoing. Defendants RAUSCHER and ABRAMS benefited from sullying the name of HOWARD GARY & COMPANY.

38. In removing HOWARD GARY & COMPANY from the bond issue, DADE has thwarted the purpose of the rotation system and the public interest and welfare have not been protected.

39. Further, HOWARD GARY & COMPANY fully and admirably performed all of its obligations to the advantage, enjoyment and prosperity of DADE.

40. Pursuant to the terms of the subject contract, as well as the rules governing the Conduct of Municipal Securities Business, HOWARD GARY & COMPANY was obligated to perform its side of the contract. By improperly removing HOWARD GARY & COMPANY from the team, DADE subjected HOWARD GARY & COMPANY to potential liability for failure to complete a bond transaction.

41. The BOARD had no discretion to act arbitrarily or capriciously in removing HOWARD GARY & COMPANY from the bond issue without just cause or due process. In effect, DADE convicted HOWARD GARY & COMPANY of wrongdoing when the firm had not been charged with any wrongdoing. Further, there was clear evidence that the inclusion of HOWARD GARY & COMPANY on the underwriting team would have no negative economic impact on the bond issue.

42. Despite the work of HOWARD GARY & COMPANY, a minority contractor was removed from the underwriting rotation based on meritless allegations asserted against a principal in the media. No such action has been taken against non-minority participants even though many were under investigation, indictment and in some instance, confessed judgment or wrongdoing.

43. In or about the early part of 1997, and in subsequent years, thereafter, DADE passed an ordinance, which prohibits the County from doing any further

business with **HOWARD GARY & COMPANY**; this was a "de facto" debarment of **HOWARD GARY & COMPANY**. An Ordinance directed to a specific company is, by definition, *a bill of attainder.*

44. **HOWARD GARY & COMPANY's** exclusion violated many of its civil rights, both in terms of motive, and in terms of implementation, to wit; without due process of law, among other violations of its rights.

45. The removal of **HOWARD GARY & COMPANY** from the underwriting teams without just cause, was arbitrary and capricious and as a result of racial discrimination.

46. **HOWARD GARY & COMPANY** was suffered grave damages to its business and professional reputation in the community in which it had offered and performed services, and in terms of the huge lost income and profits.

47. Defendants **ABRAMS** and **RAUSCHER** are responsible for punitive damages for their conduct in damaging **HOWARD GARY & COMPANY.**

48. Such losses could have been reasonably anticipated as a result of **DADE** County's unlawful "debarment of Plaintiff.

49. All conditions precedent to the bringing and maintaining of this action have occurred or have been waived.

50. The Statute of Limitations, if applicable, would be stayed due to the recent disclosure of certain documents, which are the basis for portions of this suit.

51. As a result of the acts committed by the Defendants herein, **HOWARD GARY & COMPANY** has retained the services of the undersigned and is obligated to pay a reasonable attorney's fee.

## COUNT I—EQUAL PROTECTION VIOLATION UNDER FEDERAL CONSTITUTION

52. Plaintiff revears and realleges paragraphs 1 through 51 as though fully set forth herein.

53. Defendants have violated **HOWARD GARY & COMPANY's** equal rights under the laws of the United States.

54. Specifically, Defendants have denied **HOWARD GARY & COMPANY** the equal right to enter into and enforce contracts. Despite the fact that all elements for a valid contract being established, Defendant refused to perform the contract if **HOWARD GARY & COMPANY** remained a part of the team.

7

55. HOWARD GARY & COMPANY was denied the opportunity to give evidence which would have supported its contractual rights, in that the BOARD voted to cancel the contract only after HOWARD GARY & COMPANY was informed that such action would not take place.

56. HOWARD GARY & COMPANY, as a black minority business entity, was denied the full and equal protection of the all laws and proceedings as enjoyed by non-minority companies.

57. As alleged above, non-minority underwriters who were under a "cloud" or indictment or who had confessed judgment did not have their contracts cancelled.

58. HOWARD GARY & COMPANY has been damaged as a result of the actions of the Defendant in that it was prevented from complying with its obligations to deliver under the terms of the contract, and future contracts.

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants punitive damages, where assessable and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper.

## COUNT II
## EQUAL PROTECTION VIOLATION
## UNDER FLORIDA LAW

59. Plaintiff realleges and reavers paragraphs 1 through 51 as though fully set forth herein.

60.    Defendants have violated HOWARD GARY & COMPANY's equal rights under the Constitution and laws of the State of Florida.

61. Specifically, Defendants have denied HOWARD GARY & COMPANY the equal right to enter into and enforce contracts. Despite the fact that all elements for a valid contract being established, Defendant refused to perform the contract if HOWARD GARY & COMPANY remained a part of the teams.

62. HOWARD GARY & COMPANY was denied the opportunity to give evidence which would have supported his contractual rights, in that the BOARD voted to cancel the contract only after HOWARD GARY & COMPANY was informed that such action would not take place.

63. HOWARD GARY & COMPANY, as a black minority business entity, was denied the full and equal protection of the all laws and proceedings as enjoyed by non-minority citizens.

o

64. As alleged above, non-minority underwriters who were under a "cloud" or indictment or who had confessed judgment did not have their contracts cancelled.

65. HOWARD GARY & COMPANY has been damaged as a result of the actions of the Defendant in that it was prevented from complying with its obligations to deliver under the terms of the contract and future contracts.

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants punitive damages, where assessable and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper.

## COUNT III
## DUE PROCESS VIOLATION

66. Plaintiff realleges and reavers paragraphs 1 through 51 as though fully set forth herein.

67. Defendant DADE has in place a procedure by which an underwriter may be debarred. That procedure is specifically set forth in the County Code.

68. By passing an Ordinance, which prohibited HOWARD GARY & COMPANY from doing any further business with the County, Dade caused the "de facto" debarment of HOWARD GARY & COMPANY. This action was based solely upon the fact that HOWARD GARY & COMPANY is a black minority owned business.

69. HOWARD GARY & COMPANY's rights to due process were violated by Defendants actions in failing to follow its own procedures for debarment.

70. As a result, HOWARD GARY & COMPANY has been denied and deprived of a protected property right, to wit: doing business with the County. This violation amount to a deprivation under the Fourteenth Amendment to the United States Constitution and as guaranteed by the Constitution of the State of Florida.

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants punitive damages, where assessable and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper.

## COUNT IV
## VIOLATION OF 42 U.S.C. § 1983

n

71. Plaintiff realleges and reavers paragraphs 1 through 51 as though fully set forth herein.

72. HOWARD GARY & COMPANY possessed a property interest and a constitutionally protected right to enter into and enforce contracts. HOWARD GARY & COMPANY further possessed a right to be free from racial discrimination when doing business with the Defendants.

73. Defendants, while acting under color of State law, ordinance, regulation, custom and/or usage, subjected HOWARD GARY & COMPANY to or caused HOWARD GARY & COMPANY to be subjected to a deprivation of rights and privileges guaranteed by the Constitution of the United States and the State of Florida.

74. Pursuant to the provisions of 42 U.S.C. § 1983 for damages proximately caused, including but not limited to: actual and punitive damages in excess of the jurisdictional limits of this Court; compensatory damages for damage to HOWARD GARY & COMPANY's business reputation; and reasonable and necessary attorneys' fees pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants punitive damages, where assessable and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper.

## COUNT V
## VIOLATION OF 42 U.S.C. § 1981

75. Plaintiff realleges and reavers paragraphs 1 through 51 as though fully set forth herein.

76. HOWARD GARY & COMPANY possessed a property interest and a constitutionally protected right to enter into and enforce contracts. HOWARD GARY & COMPANY further possessed a right to be free from racial discrimination, as a black citizen owned business when doing business with the Defendants.

77. Defendant, DADE, while acting under color of State law, ordinance, regulation, custom and/or usage, subjected HOWARD GARY & COMPANY to or caused HOWARD GARY & COMPANY to be subjected to a deprivation of rights and privileges guaranteed by the Constitution of the United States and the State of Florida.

78. Pursuant to the provisions of 42 U.S.C. § 1981 for damages proximately caused, including but not limited to: actual and punitive damages in excess of the jurisdictional limits of this Court; compensatory damages for damage to

HOWARD GARY & COMPANY's business reputation; and reasonable and necessary attorneys' fees pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants punitive damages, where assessable and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper.

## COUNT VI
### CONSPIRACY TO VIOLATE PLAINTIFF'S
### CIVIL RIGHTS UNDER THE UNITED STATES CONSTITUTION

79. HOWARD GARY & COMPANY realleges and reavers paragraphs 1 through 51 as though fully set forth herein.

80. At all times relevant, Defendant ABRAMS was the agent for Defendant, RAUSCHER as Financial Advisor for Defendant DADE, in as to many of its bond underwritings, for many of its agencies.

81. Commencing on or about the summer of 1996, ABRAMS and RAUSCHER, while acting under color of state law, in their capacity as Financial Advisor to DADE, recommended that HOWARD GARY & COMPANY be removed from participation on future and then existing bond issues.

82. As a result of ABRAMS and RAUSCHER's improper actions, DADE and other County Agencies voted to exclude HOWARD GARY & COMPANY from future work on bond issues.

83. ABRAMS and RAUSCHER conspired with other officials to deprive HOWARD GARY & COMPANY of its constitutionally protected rights. Abrams was motivated to conspire with state officials because he was aware of HOWARD GARY & COMPANY's suspicions of improper conduct on behalf of ABRAMS and RAUSCHER as an underwriter for the City of Miami.

84. Abrams was a willful participant in a joint action with DADE officials and therefore may be found liable to HOWARD GARY & COMPANY for violations of 42 U.S.C. § 1981 and 42 U.S.C. § 1983.

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants punitive damages, where assessable and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper.

## COUNT VII
### UNITED STATES CONSTITUTION-BILL OF ATTAINDER

85. Plaintiff realleges and reavers paragraphs 1 through 51 as though fully set forth herein.

86. Defendant DADE in passing the ordinance prohibiting HOWARD GARY & COMPANY from working on further bond issues legislatively determined HOWARD GARY & COMPANY to be guilty of crimes for which it was never even charged.

87. The subject ordinance was specific in that it referred solely to HOWARD GARY & COMPANY, thus creating a Bill of Attainder.

88. Defendant by its Bill of Attainder wrongfully denied HOWARD GARY & COMPANY the fruits of its labor and inflicted upon HOWARD GARY & COMPANY the stigma of being wrongfully removed from bond work within the County.

89. The subject ordinance also worked to effectuate a "de facto" debarment of HOWARD GARY & COMPANY from public contracts. These actions were arbitrary and capricious.

90. HOWARD GARY & COMPANY was denied its full compensation for its participation in the issuance of its bond work and was further denied future it would have attained but for the illegal conduct on behalf of Defendant.

91. Defendant has violated Article 1, Section 9, clause 3 of the United States Constitution by passing and unlawful Bill of Attainder.

92. HOWARD GARY & COMPANY has been damaged as a result of Defendant's improper actions.

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants punitive damages, where assessable and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper.

## COUNT VIII
### FLORIDA CONSTITUTION-BILL OF ATTAINDER

93. HOWARD GARY & COMPANY realleges and reavers paragraphs 1 through 51 as though fully set forth herein.

94. Defendant DADE in passing the ordinance prohibiting HOWARD GARY & COMPANY from working on further bond issues legislatively determined HOWARD GARY & COMPANY to be guilty of crimes for which it was never even charged.

95. The subject ordinance was specific in that it referred solely to HOWARD GARY & COMPANY, thus creating a Bill of Attainder.

96. Defendant by its Bill of Attainder wrongfully denied HOWARD GARY & COMPANY the fruits of its labor and inflicted upon HOWARD GARY & COMPANY the stigma of being wrongfully removed from bond work within the County.

97. The subject ordinance also worked to effectuate a "de facto" debarment of HOWARD GARY & COMPANY from public contracts. These actions were arbitrary and capricious.

98. HOWARD GARY & COMPANY was denied its full compensation for its participation in the issuance of its bond work and was further denied future it would have attained but for the illegal conduct on behalf of Defendant.

99. Defendant has violated Article 1, Section 10, of the Constitution of the State of Florida by passing an unlawful Bill of Attainder.

100. HOWARD GARY & COMPANY has been damaged as a result of Defendant's improper actions.

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants punitive damages, where assessable and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper

## COUNT IX
## BREACH OF CONTRACT

101. Plaintiff realleges and reavers paragraphs 1 through 51 as though fully set forth herein.

102. HOWARD GARY & COMPANY possessed a property interest and a constitutionally protected right to enter into and enforce contracts.

103. Defendant, DADE, breached his contractual rights, thereby damaging the company.

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper.

<u>COUNT X</u>
<u>INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS</u>

104. Plaintiff realleges and reavers paragraphs 1 through 51 as though fully set forth herein.

105. HOWARD GARY & COMPANY had numerous ongoing relationships with customers, throughout the United States. ABRAMS and RAUSCHER were, at all times material, herein, business competitors of Plaintiff.

106. ABRAMS and RAUSCHER conduct constituted an unlawful interference with HOWARD GARY & COMPANY's advantageous business relationships with municipal issuing agencies, and customers for securities.

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants ABRAMS and RAUSCHER punitive damages, and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper.

<u>COUNT XI</u>
<u>COMMERCIAL DEFAMATION</u>

107. Plaintiff realleges and reavers paragraphs 1 through 51 as though fully set forth herein.

108. ABRAMS and RAUSCHER commercially defamed HOWARD GARY & COMPANY which resulted in HOWARD GARY & COMPANY being held to be unreliable as an underwriter of municipal securities and Financial Advisor to issuing agencies.

WHEREFORE, Plaintiff, HOWARD GARY & COMPANY, demands judgment against the Defendants ABRAMS and RAUSCHER for punitive damages, and for an amount in excess of $75,000.00 for actual damages, exclusive of interest, costs and attorneys fees and for any other relief this Court deems just and proper.

<u>DEMAND FOR TRIAL BY JURY</u>

The Plaintiff demands Trial By Jury for all issues so triable.

RICHARD J. BURTON & ASSOCIATES, P.A.
18305 Biscayne Boulevard, Suite 300
Miami, FL 33160
TEL: (305) 705-0888/FAX: 935-9542

BY:_____
Richard J. Burton, Esquire FBN 179337

14

FROM :        PHONE NO. :        May. 08 2000 09:39AM P4

12/31/1995

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE

**Date:** 11/19/1996

**To:** Miami

**From:** Miami
        PC-1
          **Contact:** SA Hubert A. Lane

**Approved By:** Clemens Michael S

**Drafted By:** Lane, Hubert A:bmf

**Case ID #:** 270D-MM-81589 (Pending)
         194B-MM-81345 (Pending)

**Title:** 270D-MM-8627-WC

**Synopsis:** Request for monthly expense payment of $6,200 for captioned source.

**Details:** Captioned Cooperating Witness (CW) acted successfully in a covert role in the "GREEN PALM" undercover operation (UCO). As a result of his successful cooperation, a separate investigation was opened under the title, "JAMES BURKE, METRO DADE COMMISSIONER, MIAMI, FL; CSLPO-LOCAL LEVEL; (OO:  MM)", 194B-MM-81345.  Essentially, CW made numerous consensual recordings of conversations with Commissioner BURKE, his aide, BILLY HARDEMON, and San Francisco bond dealer, CALVIN GRIGSBY. These consensual recordings documented a massive bribery scheme in which Grigsby agreed to pay Burke and Hardemon a total of $350,000 in return for their assistance in making Grigsby's firm the senior underwriter in the $160,000,000 refinancing of a Dade County waste recycling bond issue.  It is anticipated GRIGSBY, BURKE and HARDEMON will be indicted based primarily on evidence secured by CW.  Grigsby is a major bond dealer on a national scale, and it is anticipated this investigation will expand into other alleged areas of corruption in South Florida and other urban areas throughout the United States.  It is also noted CW consensually recorded a bribe payment to City Commissioner Miller Dawkins in the GREEN PALM UCO.  This evidence was of substantial importance in obtaining a guilty plea from Dawkins in that matter.

It is noted that since CW's role as an "informant" has been publicly affixed, his bond business, Howard V. Gary, and Associates, has virtually failed.  Due to the widespread publicity afforded the GREEN PALM investigation, and CW's role in that case, CW has been blacklisted by every municipality and

EXHIBIT

A

To:  Miami From:  Miami
Re:  194B-MM-81345, 11/19/1996

county government with which his firm had previously done
business.  In a meeting with CW and his attorney on 11/7/96, CW
laid out his financial condition requested assistance from the
FBI.  Inasmuch as CW's loss of income derives essentially from
his status as a cooperator, it is requested that a monthly
payment for expenses be made to CW to enable him to sustain
himself in South Florida until such time as his cooperation is no
longer needed.  CW is expected to testify extensively as a trial
witness and his availability is essential to the case.  CW will
have to devote extensive time to preparation for trial, including
the review and correction of each tape and transcript.

CW has presented documentation to Special Agents (SAs)
Hubert A. Lane and Gary N. Favitta indicating monthly personal
expenses of $10,840.00.  His income at the present time is zero.
A close analysis of his monthly expenses discloses a minimum
payment of $6,200 per month will be required to maintain CW at
this time.  These expenses are detailed as follows:

| | |
|---|---:|
| Mortgage and related expenses: | $ 2,700.00 |
| Automobile, health & life insurance: | 800.00 |
| Monthly utilities: | 650.00 |
| Car payments & gasoline/maintenance: | 900.00 |
| Child care: | 500.00 |
| Groceries: | 650.00 |
| TOTAL | $ 6,200.00 |

Assistant United States Attorney (AUSA) Bruce Udolf has
been briefed on the above, and fully supports this payment.

2



U.S. Department of Justice

*United States Attorney*
*Southern District of Florida*

99 N.E. 4 Street, Suite 800
Miami, Florida 33132-2111

October 30, 1996

Mr. Peter Raben, P.A.
1870 South Bayshore Dr.
Coconut Grove, FL 33133

Re: <u>Howard Gary & Co.</u>

Dear Mr. Raben:

This letter is written to respond to your written request, as counsel for Howard Gary & Co., for clarification of the status of the entity, Howard Gary & Co., in a grand jury investigation in this District. This letter confirms that the firm, Howard Gary & Co., is not now a subject or a target of the grand jury's investigation into political corruption in Miami or Metro-Dade County known as Operation Greenpalm.

SINCERELY,

WILLIAM A. KEEFER
UNITED STATES ATTORNEY

By: *Mary Butler*

Mary K. Butler
Assistant United States Attorney

EXHIBIT

B



# FINANCING ALTERNATIVE CONSIDERATIONS

## FOR THE CITY OF MIAMI

### JUNE 14, 1995





FOIA Confidential Treatment Requested. Contact Samuel
J. Winer. Foley & Lardner. 3000 K Street. NW. Suite
500. Washington. DC 20007 (202) 672-5300

RPRM 000992

FINANCING ALTERNATIVE CONSIDERATIONS
FOR THE CITY OF MIAMI

JUNE 14, 1995

We believe it is important to review the features of a number of financing alternatives being considered by the City of Miami.

The review is intended to determine whether each alternative achieves the expected impact on the City, both for the next budget year and for future budget years, as well. In addition, the reaction of capital market participants, specifically bond insurers and rating agencies, is fundamental to the viability of any financing option.

A summary of the financing options considered most recently are as follows:

Pension Payment Deferral - $25 million before October 1, 1995 and $35 million thereafter.

These financings would be considered operating budget deficit financings and would be received negatively by rating agencies, credit enhancers, and bond investors.

Their completion will raise credit concerns and likely carry a credit risk cost premium, either imbedded in the insurance premium or interest rate.

It is possible this borrowing could be construed as a general working capital borrowing and be subject to lower tax-exempt interest rates instead of taxable pension bond rates. This is a bond counsel research question.

The budget benefit is immediate in the first year, but is negative in all later years the bonds remain outstanding.

Pension Deposit for Gates Liability - Under $100 million, although $114 million satisfies the entire Gates liability.

This approach is a blend of achieving present value savings on bonds sold to finance the deposit compared with unfinanced deposits together with deferral of payment budget benefits.

This financing will likely be acceptable to credit enhancers and credit rating agencies because of the present value savings. However, they will be negative to the deferral component. But, on balance, the financing should be acceptable.

The budget relief is relatively small in comparison to the full deferral under the first alternative. Borrowed funds are deposited for the Gates liability and not directly used for budget relief.

Future years budgets are negatively impacted, but not as severely as the full deferral option.

503 F019 .fleopu

RPRI1 000993

FOIA Confidential Treatment Requested, Contact: Samuel J. Winer, Foley & Lardner, 3000 K Street, NW, Suite 500, Washington, DC 20007 (202) 672-5300

## Deficit Financing Notes

These notes are viewed negatively by the capital markets, but less so than long-term financing for correction of a current budget shortfall.

These notes have the benefit of a low cost of funds – both short and the short end of the tax-exempt yield curve.

The notes should be credit enhanced, probably by a bank letter of credit.

This instrument is a deferral of the budget problem from one year to the next. So, in essence, it buys one year's time.

## Convention Center Parking

This financing is conceptually similar to financing the Gates liability for the GESE pension fund.

The structure can create budget relief of approximately $3.5 million initially with modest negative impact the next several years.

The present value savings is an attraction of this financing.

## Employee Compensated Absence Borrowing - $43 million.

This financing should be viewed as creating a fund from which the past unused employee compensated absence benefits can be paid. If the proceeds are used directly for operating expenses, the City's liability will, in essence, be doubled and the financing would be a pure deficit financing having the previously described negative market reaction.

503F019.finopu

FOIA Confidential Treatment Requested. Contact Samuel J. Winer. Foley & Lardner. 3000 K Street. NW. Suite 500. Washington. DC 20007 (202) 672-5300

RPRM 000994

| | Financing Characteristics | | Use of Funds | | Tax Status | | Budget Impact | | Revenue Source |
|---|---|---|---|---|---|---|---|---|---|
| | Deficit Financing | Combination Deficit Financing With Present Value Savings | Restricted | Unrestricted | Taxable | Tax-Exempt | 95/96 | Beyond | |
| Pension Payment Deferral | X | | X | | X (2) | | Positive | Negative | Non ad valorem revenues |
| Pension Deposit for Model Year Gains Liability | | X | X | | X | | Positive | Negative | Non ad valorem revenues |
| Deficit Financing Notes | X | | | X | | X | Positive | Negative | Non ad valorem revenues |
| Construction Center | | X | | X | | X | Positive | Minimally Negative | Project revenues, public service tax, general budget covenant, MBIA insured |
| Employee Compensated Absence Borrowing | | ? | ■ | (1) | | X (3) | Not Qualified (4) | Not Qualified (4) | Probably non ad valorem revenues |

NOTES:

(1) Unless this amount is restricted to be used for employee benefits, it should be construed as deficit financing. The actual employee benefit liability would be doubled if proceeds are used for general budget expenditures.

(2) This may be tax-exempt if it is construed as a general governmental working capital borrowing and not a deposit for investment in the pension fund.

(3) May require legal tax research because use is not typical capital purpose.

(4) Assuming proceeds are restricted for use to fund already earned but unused employee compensated absences. The benefit will be the difference between the abatement and compensated and for from the fund established and the debt service on the bonds issued to establish the fund.

FOIA Confidential Treatment Requested. Contact: Samuel J. Winer. Foley & Lardner. 3000 K Street, NW, Suite 500. Washington, DC 20007 (202) 672-5300

RPRM 000995

| Credit Enhancement | Rating Agency Reaction | | Financing Terms | | | | | | |
| | Positive | Negative | Repayment Term | | Call Option | | | Interest Rate | |
| | | | Short-Term | Long-Term | Short | Typical 10-Year | Short-Term | Variable | Fixed Long-Term |
| **Pension Payment Deferral** — Required - deficit financing lowers to negative | | x | | x | | x | | Partial is optional | x |
| **Pension Deposits for Multi-Year Crisis Liability** — Required (bond insurance) | Will like savings | Negative regarding deferred component | | x | | x | | Partial is optional | x |
| **Deficit Financing Notes** — Required (Bank LOC) | x | | x | | X or none | | x | | |
| **Conversion Center** — Not required - carry forward MBIA is desirable | Will like savings | Negative regarding deferred component | | x | | x | | | x |
| **Employee Compensated Absence Borrowing** — Likely required | Probably neutral | | | x | | x | | x x | x |

FOIA Confidential Treatment Requested. Contact: Samuel J. Winer, Foley & Lardner, 3000 K Street, NW, Suite 500, Washington, DC 20007 (202) 672-5300

RPRM 000996

08/14/95   16:08   ☎613 957 1325          RAUSCHER PIERCE                    ✍001

```
                      **************************
                      ***   ACTIVITY REPORT   ***
                      **************************

        TRANSMISSION OK

        TX/RX NO.              2580
        CONNECTION TEL                 1 305 577 4838
        CONNECTION ID         RAUSCHER PIERCE
        START TIME            08/14 16:08
        USAGE TIME           03'00
        PAGES                  8
        RESULT               OK
```

RPRM 000997

FOIA Confidential Treatment Requested. Contact: Samuel
J. Winer. Foley & Lardner. 3000 K Street, NW, Suite
500, Washington. DC 20007 (202) 672-5300



Howard Gary & Company
Investment Bankers & Financial Advisors
3050 Biscayne Boulevard · Suite 603
Miami, Florida 33137-4163
(305) 571-1390 · Fax (305) 571-1393



RAYMOND JAMES
& ASSOCIATES INC.

880 Carillon Parkway
St Petersburg Florida 33716-1100
(813) 573-8189 · Fax (813) 573-8315
(800) 248-8863 · Ext 2883



EXHIBIT
Δx #1 I

September 30, 1994

**PRIVILEGED AND CONFIDENTIAL**

Carlos E. Garcia, CPA
Director
Department of Finance
City of Miami, Florida
300 Biscayne Boulevard Way, Suite 210
Miami, Florida 33131

Dear Mr. Garcia:

Since 1988, it has been our privilege to serve The City of Miami, Florida (the "City") as its Financial Advisors. As the City's Financial Advisors, we have certain fiduciary and ethical duties and responsibilities to the City. During this period of time, we have on numerous occasions expressed our concerns regarding the City's deteriorating fiscal condition.

The City's issuance of $18,000,000 Special Non-Ad Valorem Revenue Bonds to finance a self-insurance claims reserve fund for the payment of liability settlements or judgements against the City for the next two (2) fiscal years, in conjunction with the City's Fiscal Year 1994/1995 Budget are particular sources of concern. Other continuing concerns include the low level of unreserved general fund balances; the City's reliance on non-recurring revenue initiatives; asset sales; basic infrastructure maintenance needs; as well as the City's overall revenue inflexibility.

Based on our long and well established relationships with various Managers and Analysts at Moody's Investors Service, Inc. ("Moody's) and Standard & Poor's Corporation ("S&P"), we have ascertained that the City's general credit rating will experience a downgrade in the near future.

It should be noted that City Manager Odio, in conjunction with the City's the City's Department of Finance, as well as the Department of Management and Budget, under the leadership and guidance of yourself and Assistant City Manager Surana, respectively, have done an exemplary job of maintaining and avoiding major downgrades of the City's general credit

EXHIBIT
D

Members NASD, MSRB, SIPC

EXHIBIT
Parekh
11

HG S 00025

Carlos E. Garcia, CPA
Director
Department of Finance
City of Miami, Florida
September 30, 1994
Page Two of Two

rating during a significant restructuring of the South Florida economy; the effects of a national recession; and the single largest natural disaster in the history of the United States. This fact has been consistently recognized by both Moody's and S&P.

We look forward to meeting with you to discuss our concerns in-depth and to formulate a pro-active strategy to address these concerns with the City. As always, please do not hesitate to contact the undersigned at (305) 571-1380, should you have any questions.

Sincerely,

HOWARD GARY & COMPANY

Kishor M. Parekh
First Vice President

RAYMOND JAMES & ASSOCIATES, INC.

Wendell G. Gaertner
Vice President – Public Finance

HG S 00024

# EXHIBIT 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 00-1951-CIV-LENARD/TURNOFF

M   SECURITIES   AND
INVESTMENTS,   INC.,   a   Florida
corporation, d/b/a HOWARD GARY &
COMPANY,

      Plaintiff,

vs.

MIAMI-DADE COUNTY, FLORIDA;
MICHAEL ABRAMS, individually; and
DAIN RAUSCHER, INCORPORATED
f/k/a RAUSCHER PIERCE REFSNES,
INC., jointly, individually and severally,

      Defendants.



_____/

Case No. 00-3278-CIV-LENARD/TURNOFF .

M SECURITIES and INVESTMENTS,
INC., a Florida corporation, d/b/a
HOWARD GARY & COMPANY,

      Plaintiff,

vs.

NAPOLEAN BRANDFORD, et al.,

      Defendant.

_____/

ORDER CONSOLIDATING ACTIONS

THIS CAUSE is before the Court sua sponte. Upon review of the Complaints in these cases,

and pursuant to Federal Rule of Civil Procedure 42(a), the Court finds these cases involve common questions of law and fact. In the interest of judicial economy these cases shall be consolidated for both pretrial procedures and for trial. Accordingly, it is

**ORDERED AND ADJUDGED** that these cases shall be consolidated. The higher-numbered case, Case No. 00-3278, shall be administratively closed. It is further

**ORDERED AND ADJUDGED** that all non-case dispositive matters in the consolidated case, Case No. 00-1951, shall be referred to U.S. Magistrate Judge William C. Turnoff.

**DONE AND ORDERED** in Chambers at the United States District Courthouse in Miami, Florida, this 2 7 day of September, 2001.

JOAN A. LENARD
UNITED STATES DISTRICT JUDGE

cc:    U.S. Magistrate Judge William C. Turnoff

        Richard J. Burton, Esq.
        18305 Biscayne Blvd., Suite 300
        Miami, FL 33160

        Thomas A. Tucker Ronzetti, Esq.
        111 N.W. 1st Street, Suite 2810
        Miami, FL 33128

        Joseph D. Edmondson, Jr.
        Foley & Lardner
        3000 K St., N.W.
        Washington, D.C. 20007

        Richard S. Davis, Esq.,
        Foley & Lardner
        777 South Flagler Drive, Suite 200
        West Palm Beach, FL 33401

Since the initiation of this Court's FAXBACK program, the parties are no longer required to submit envelopes with their motions & proposed orders. Orders should include a full service list.

2

# EXHIBIT 13



123 S.Ct. 588                                                                                                           Page 1
537 U.S. 79, 123 S.Ct. 588, 154 L.Ed.2d 491, 71 USLW 4019, 02 Cal. Daily Op. Serv. 11,847, 2002 Daily Journal
D.A.R. 13,897, 16 Fla. L. Weekly Fed. S 20
**(Cite as: 537 U.S. 79, 123 S.Ct. 588)**

▷

<u>**Briefs and Other Related Documents**</u>

Supreme Court of the United States
Karen HOWSAM, Individually and as Trustee for the
E. Richard Howsam, Jr.,
Irrevocable Life Insurance Trust Dated May 14,
1982, Petitioner,
v.
DEAN WITTER REYNOLDS, INC.
No. 01-800.

Argued Oct. 9, 2002.
Decided Dec. 10, 2002.

Brokerage firm brought suit seeking to enjoin customer from arbitrating dispute with National Association of Securities Dealers (NASD). The United States District Court for the District of Colorado dismissed suit, but the Court of Appeals for the Tenth Circuit, <u>Ebel</u>, Circuit Judge, <u>261 F.3d 956</u>, reversed. After granting certiorari, the United States Supreme Court, Justice <u>Breyer</u>, held that: (1) interpretation of NASD rule imposing six-year time limit for arbitration was a matter presumptively for the arbitrator, not for the court, abrogating <u>J.E. Liss & Co. v. Levin, 201 F.3d 848, and</u> (2) parties' contract did not call for judicial determination of whether arbitration was time-barred.

Reversed.

Justice <u>Thomas</u> filed an opinion concurring in the judgment.

Justice <u>O'Connor</u> did not participate.

West Headnotes

**[1] Alternative Dispute Resolution** ☜~~200
25Tk200 <u>Most Cited Cases</u>
          (Formerly 33k23.14 Arbitration)
The question whether the parties have submitted a particular dispute to arbitration, i.e., the "question of arbitrability," is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise.

**[2] Alternative Dispute Resolution** ☜~~200
25Tk200 <u>Most Cited Cases</u>
          (Formerly 33k23.14 Arbitration)
A gateway dispute about whether the parties are bound by a given arbitration clause raises a "question of arbitrability" for a court to decide; similarly, a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court.

**[3] Alternative Dispute Resolution** ☜~~198
25Tk198 <u>Most Cited Cases</u>
          (Formerly 33k23.15 Arbitration)

**[3] Alternative Dispute Resolution** ☜~~202
25Tk202 <u>Most Cited Cases</u>
          (Formerly 33k23.15 Arbitration)
"Procedural" questions which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for an arbitrator, to decide; the presumption is that the arbitrator should decide allegations of waiver, delay, or a like defense to arbitrability.

**[4] Alternative Dispute Resolution** ☜~~412
25Tk412 <u>Most Cited Cases</u>
          (Formerly 33k91 Arbitration, 160k11(11.1))
Issue of whether arbitration of dispute between brokerage firm and its customer was time-barred under the National Association of Securities Dealers (NASD) Code of Arbitration Procedure was a gateway procedural dispute that did not present a "question of arbitrability," and thus interpretation of NASD time limit rule was a matter presumptively for the arbitrator, not for the court; NASD arbitrators were comparatively more expert about meaning of their own rule and better able to interpret and apply it; abrogating <u>J.E. Liss & Co. v. Levin, 201 F.3d 848.</u>

**[5] Alternative Dispute Resolution** ☜~~413
25Tk413 <u>Most Cited Cases</u>
          (Formerly 33k91 Arbitration, 160k11(11.1))
Contract between brokerage firm and its customer, which incorporated the National Association of Securities Dealers (NASD) Code of Arbitration Procedure, did not call for judicial determination of whether arbitration was time-barred under NASD arbitration time limit rule, although rule limited arbitration to "eligible" disputes, where rule's use of term "eligible" did not indicate parties' intent for time

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 S.Ct. 588                                                                                        Page 2
537 U.S. 79, 123 S.Ct. 588, 154 L.Ed.2d 491, 71 USLW 4019, 02 Cal. Daily Op. Serv. 11,847, 2002 Daily Journal
D.A.R. 13,897, 16 Fla. L. Weekly Fed. S 20
(Cite as: 537 U.S. 79, 123 S.Ct. 588)

limit issue to be resolved by court prior to arbitration, since parties to an arbitration contract would normally expect a forum-based decisionmaker to decide forum-specific procedural gateway matters. **589 Syllabus [FN*]

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co., 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.*

Per respondent Dean Witter Reynolds, Inc.'s standard client agreement, petitioner Howsam chose to arbitrate her dispute with the company before the National Association of Securities Dealers (NASD). NASD's Code of Arbitration Procedure § 10304 states that no dispute "shall be eligible for submission ... where six (6) years have elapsed from the occurrence or event giving rise to the ... dispute." Dean Witter filed this suit, asking the Federal District Court to declare the dispute ineligible for arbitration because it was more than six years old and seeking an injunction to prohibit Howsam from proceeding in arbitration. The court dismissed the action, stating that the NASD arbitrator should interpret and apply the NASD rule. In reversing, the Tenth Circuit found that the rule's application presented a question of the underlying dispute's "arbitrability"; and the presumption is that a court will ordinarily decide an arbitrability question.

*Held:* An NASD arbitrator should apply the time limit rule to the underlying dispute. Pp. 591-593.

(a) "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409.* The question whether parties have submitted a particular dispute to arbitration, *i.e.,* the *"question of arbitrability,"* is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." *AT & T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648.* The phrase "question of arbitrability" has a limited scope, applicable in the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter. But **590 the phrase is *not* applicable in other kinds of general circumstance where parties would likely expect that an arbitrator would decide the question--" 'procedural' questions

which grow out of the dispute and bear on its final disposition," *John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 557, 84 S.Ct. 909, 11 L.Ed.2d 898,* and "allegation [s] of waiver, delay, or a like *80 defense to arbitrability," *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp., 460 U.S. 1, 24- 25, 103 S.Ct. 927, 74 L.Ed.2d 765.* Following this precedent, the application of the NASD rule is not a "question of arbitrability" but an "aspec[t] of the [controversy] which called the grievance procedures into play." *John Wiley & Sons, Inc., supra,* at 559, 84 S.Ct. 909. NASD arbitrators, comparatively more expert about their own rule's meaning, are comparatively better able to interpret and to apply it. In the absence of any statement to the contrary in the arbitration agreement, it is reasonable to infer that the parties intended the agreement to reflect that understanding. And for the law to assume an expectation that aligns (1) decisionmaker with (2) comparative expertise will help better to secure the underlying controversy's fair and expeditious resolution. Pp. 591-593.

(b) Dean Witter's argument that, even without an antiarbitration presumption, the contracts call for judicial determination is unpersuasive. The word "eligible" in the NASD Code's time limit rule does not, as Dean Witter claims, indicate the parties' intent for the rule to be resolved by the court prior to arbitration. Parties to an arbitration contract would normally expect a forum-specific procedural gateway matters, and any temptation here to place special antiarbitration weight on the word "eligible" in § 10304 is counterbalanced by the NASD rule that "arbitrators shall be empowered to interpret and determine the applicability" of all code provisions, § 10324. P. 593.

261 F.3d 956, reversed.

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C.J., and STEVENS, SCALIA, KENNEDY, SOUTER, and GINSBURG, JJ., joined. THOMAS, J., filed an opinion concurring in the judgment, *post,* p. 593. O'CONNOR, J., took no part in the consideration or decision of the case.

Alan C. Friedberg, Denver, CO, for petitioners.

Matthew D. Roberts, for the United States as amicus curiae, by special leave of the Court supporting the petitioners.

Kenneth W. Starr, Arlington, VA, for respondent.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 S.Ct. 588                                                                                                    Page 3
537 U.S. 79, 123 S.Ct. 588, 154 L.Ed.2d 491, 71 USLW 4019, 02 Cal. Daily Op. Serv. 11,847, 2002 Daily Journal
D.A.R. 13,897, 16 Fla. L. Weekly Fed. S 20
(Cite as: 537 U.S. 79,  123 S.Ct. 588)

\*81 Justice BREYER delivered the opinion of the Court.

This case focuses upon an arbitration rule of the National Association of Securities Dealers (NASD). The rule states that no dispute "shall be eligible for submission to arbitration ... where six (6) years have elapsed from the occurrence or event giving rise to the ... dispute."  NASD Code of Arbitration Procedure § 10304 (1984) (NASD Code or Code). We must decide whether a court or an NASD arbitrator should apply the rule to the underlying controversy.  We conclude that the matter is for the arbitrator.

I

The underlying controversy arises out of investment advice that Dean Witter Reynolds, Inc. (Dean Witter), provided its client, Karen Howsam, when, some time between 1986 and 1994, it recommended that she buy and hold interests in four limited partnerships.  Howsam says that Dean Witter misrepresented the virtues of the partnerships. The resulting controversy \*\*591 falls within their standard Client Service Agreement's arbitration clause, which provides:

"[A]ll controversies ... concerning or arising from ... any account ..., any transaction ..., or ... the construction, performance or breach of ... any ... agreement between us ... shall be determined by arbitration before any self-regulatory organization or exchange of which Dean Witter is a member." App. 6- 7.
\*82 The agreement also provides that Howsam can select the arbitration forum.  And Howsam chose arbitration before the NASD.

To obtain NASD arbitration, Howsam signed the NASD's Uniform Submission Agreement.  That agreement specified that the "present matter in controversy" was submitted for arbitration "in accordance with" the NASD's "Code of Arbitration Procedure." *Id.,* at 24.  And that Code contains the provision at issue here, a provision stating that no dispute "shall be eligible for submission ... where six (6) years have elapsed from the occurrence or event giving rise to the ... dispute." NASD Code § 10304.

After the Uniform Submission Agreement was executed, Dean Witter filed this lawsuit in Federal District Court.  It asked the court to declare that the dispute was "ineligible for arbitration" because it was more than six years old.  App. 45.  And it sought an injunction that would prohibit Howsam from proceeding in arbitration.  The District Court dismissed the action on the ground that the NASD arbitrator, not the court, should interpret and apply the NASD rule.  The Court of Appeals for the Tenth Circuit, however, reversed. 261 F.3d 956 (2001).  In its view, application of the NASD rule presented a question of the underlying dispute's "arbitrability"; and the presumption is that a court, not an arbitrator, will ordinarily decide an "arbitrability" question. See, *e.g., First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).

The Courts of Appeals have reached different conclusions about whether a court or an arbitrator primarily should interpret and apply this particular NASD rule.  Compare, *e.g.,* 261 F.3d 956 (C.A.10 2001) (case below) (holding that the question is for the court); *J.E. Liss & Co. v. Levin,* 201 F.3d 848, 851 (C.A.7 2000) (same), with *PaineWebber Inc. v. Elahi,* 87 F.3d 589 (C.A.1 1996) (holding that NASD § 15, currently § 10304, is presumptively for the arbitrator); *Smith Barney Shearson, Inc. v. Boone,* 47 F.3d 750 (C.A.5 1995) (same).  We \*83 granted Howsam's petition for certiorari to resolve this disagreement.  And we now hold that the matter is for the arbitrator.

II

[1] This Court has determined that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); see also *First Options, supra,* at 942-943, 115 S.Ct. 1920.  Although the Court has also long recognized and enforced a "liberal federal policy favoring arbitration agreements," *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), it has made clear that there is an exception to this policy:  The question whether the parties have submitted a particular dispute to arbitration, *i.e.,* the *"question of arbitrability,"* is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise." *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (emphasis added); *First Options, supra,* at 944, 115 S.Ct. 1920.  We must decide here whether application of the NASD time limit provision falls into the scope of this last-mentioned interpretive rule.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 S.Ct. 588                                                                    Page 4
537 U.S. 79, 123 S.Ct. 588, 154 L.Ed.2d 491, 71 USLW 4019, 02 Cal. Daily Op. Serv. 11,847, 2002 Daily Journal
D.A.R. 13,897, 16 Fla. L. Weekly Fed. S 20
(Cite as: 537 U.S. 79, 123 S.Ct. 588)

**592 Linguistically speaking, one might call any potentially dispositive gateway question a "question of arbitrability," for its answer will determine whether the underlying controversy will proceed to arbitration on the merits. The Court's case law, however, makes clear that, for purposes of applying the interpretive rule, the phrase "question of arbitrability" has a far more limited scope. See 514 U.S., at 942, 115 S.Ct. 1920. The Court has found the phrase applicable in the kind of narrow circumstance where contracting parties would likely have expected a court to have decided the gateway matter, where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of *84 forcing parties to arbitrate a matter that they may well not have agreed to arbitrate.

[2] Thus, a gateway dispute about whether the parties are bound by a given arbitration clause raises a "question of arbitrability" for a court to decide. See id., at 943-946, 115 S.Ct. 1920 (holding that a court should decide whether the arbitration contract bound parties who did not sign the agreement); John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 546-547, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) (holding that a court should decide whether an arbitration agreement survived a corporate merger and bound the resulting corporation). Similarly, a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court. See, e.g., AT & T Technologies, supra, at 651-652, 106 S.Ct. 1415 (holding that a court should decide whether a labor-management layoff controversy falls within the arbitration clause of a collective-bargaining agreement); Atkinson v. Sinclair Refining Co., 370 U.S. 238, 241-243, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962) (holding that a court should decide whether a clause providing for arbitration of various "grievances" covers claims for damages for breach of a no-strike agreement).

[3] At the same time the Court has found the phrase "question of arbitrability" not applicable in other kinds of general circumstance where parties would likely expect that an arbitrator would decide the gateway matter. Thus " 'procedural' questions which grow out of the dispute and bear on its final disposition" are presumptively not for the judge, but for an arbitrator, to decide. John Wiley, supra, at 557, 84 S.Ct. 909 (holding that an arbitrator should decide whether the first two steps of a grievance procedure were completed, where these steps are

prerequisites to arbitration). So, too, the presumption is that the arbitrator should decide "allegation[s] of waiver, delay, or a like defense to arbitrability." Moses H. Cone Memorial Hospital, supra, at 24-25, 103 S.Ct. 927. Indeed, the Revised Uniform Arbitration Act of 2000 (RUAA), seeking to "incorporate *85 the holdings of the vast majority of state courts and the law that has developed under the [Federal Arbitration Act]," states that an "arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled." RUAA § 6(c), and comment 2, 7 U.L.A. 12-13 (Supp.2002). And the comments add that "in the absence of an agreement to the contrary, issues of substantive arbitrability ... are for a court to decide and issues of procedural arbitrability, i.e., whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide." Id., § 6, comment 2, 7 U.L.A., at 13 (emphasis added).

[4] Following this precedent, we find that the applicability of the NASD time limit rule is a matter presumptively for the arbitrator, not for the judge. The time limit rule closely resembles the gateway questions that this Court has found not to be "questions of arbitrability." E.g., **593Moses H. Cone Memorial Hospital, supra, at 24-25, 103 S.Ct. 927 (referring to "waiver, delay, or a like defense"). Such a dispute seems an "aspec[t] of the [controversy] which called the grievance procedures into play." John Wiley, supra, at 559, 84 S.Ct. 909.

Moreover, the NASD arbitrators, comparatively more expert about the meaning of their own rule, are comparatively better able to interpret and to apply it. In the absence of any statement to the contrary in the arbitration agreement, it is reasonable to infer that the parties intended the agreement to reflect that understanding. Cf. First Options, 514 U.S., at 944-945, 115 S.Ct. 1920. And for the law to assume an expectation that aligns (1) decisionmaker with (2) comparative expertise will help better to secure a fair and expeditious resolution of the underlying controversy--a goal of arbitration systems and judicial systems alike.

We consequently conclude that the NASD's time limit rule falls within the class of gateway procedural disputes that do not present what our cases have called "questions of arbitrability." *86 And the strong pro-court presumption as to the parties' likely intent does not apply.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 S.Ct. 588                                                                                                    Page 5

537 U.S. 79, 123 S.Ct. 588, 154 L.Ed.2d 491, 71 USLW 4019, 02 Cal. Daily Op. Serv. 11,847, 2002 Daily Journal
D.A.R. 13,897, 16 Fla. L. Weekly Fed. S 20
(Cite as: 537 U.S. 79, 123 S.Ct. 588)

### III

[5] Dean Witter argues that, in any event, *i.e.,* even without an antiarbitration presumption, we should interpret the contracts between the parties here as calling for judicial determination of the time limit matter. Howsam's execution of a Uniform Submission Agreement with the NASD in 1997 effectively incorporated the NASD Code into the parties' agreement. Dean Witter notes the Code's time limit rule uses the word "eligible." That word, in Dean Witter's view, indicates the parties' intent for the time limit rule to be resolved by the court prior to arbitration.

We do not see how that is so. For the reasons stated in Part II, *supra,* parties to an arbitration contract would normally expect a forum-based decisionmaker to decide forum-specific procedural gateway matters. And any temptation here to place special antiarbitration weight on the appearance of the word "eligible" in the NASD Code rule is counterbalanced by a different NASD rule; that rule states that "arbitrators shall be empowered to interpret and determine the applicability of all provisions under this Code." NASD Code § 10324.

Consequently, without the help of a special arbitration-disfavoring presumption, we cannot conclude that the parties intended to have a court, rather than an arbitrator, interpret and apply the NASD time limit rule. And as we held in Part II, *supra,* that presumption does not apply.

### IV

For these reasons, the judgment of the Tenth Circuit is

*Reversed.*

Justice O'CONNOR took no part in the consideration or decision of this case.

*87 Justice THOMAS, concurring in the judgment.

As our precedents make clear and as the Court notes, arbitration is a matter of contract. *Ante,* at 591. In *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989), we held that under the Federal Arbitration Act courts must enforce private agreements to arbitrate just as they would ordinary contracts: in accordance with their terms. Under *Volt,* when an arbitration agreement contains a choice-of-law provision, that provision must be

honored, and a court interpreting the agreement must follow the law of the jurisdiction selected by the parties. See *id.,* at 478-479, 109 S.Ct. 1248 (enforcing a choice-of-law provision that incorporated a state procedural rule concerning arbitration proceedings); see also **594*Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 67, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (THOMAS, J., dissenting) (concluding that the choice-of-law provision in question was indistinguishable from the one in *Volt* and, thus, should have been given effect). A straightforward application of these principles easily resolves the question presented in this case.

The agreement now before us provides that it "shall be construed and enforced in accordance with the laws of the State of New York." App. 6. Interpreting two agreements containing provisions virtually identical to the ones in dispute here, the New York Court of Appeals held that issues implicating § 15 (now § 10304) of the National Association of Securities Dealers Code of Arbitration Procedure are for arbitrators to decide. See *Smith Barney Shearson Inc. v. Sacharow,* 91 N.Y.2d 39, 666 N.Y.S.2d 990, 689 N.E.2d 884 (1997). Because the parties agreed to be bound by New York law and because *Volt* requires us to enforce their agreement, I would permit arbitrators to resolve the § 10304 issues that have arisen in this case, just as New York case law provides. The Court follows a different route to reach the same conclusion; accordingly, I concur only in the judgment.

537 U.S. 79, 123 S.Ct. 588, 154 L.Ed.2d 491, 71 USLW 4019, 02 Cal. Daily Op. Serv. 11,847, 2002 Daily Journal D.A.R. 13,897, 16 Fla. L. Weekly Fed. S 20

**Briefs and Other Related Documents (Back to top)**

• 2002 WL 31373879, 71 USLW 3279 (Oral Argument) Oral Argument (Oct. 09, 2002)

• 2002 WL 1974415 (Appellate Brief) REPLY BRIEF FOR THE PETITIONER (Aug. 22, 2002)

• 2002 WL 1728435 (Appellate Brief) Motion for Leave to File Brief Amicus Curiae and Brief Amicus Curiae for the Competitive Enterprise Institute in Support of Respondent (Jul. 22, 2002)

• 2002 WL 1728476 (Appellate Brief) BRIEF FOR THE SECURITIES INDUSTRY ASSOCIATION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

537 U.S. 79, 123 S.Ct. 588, 154 L.Ed.2d 491, 71 USLW 4019, 02 Cal. Daily Op. Serv. 11,847, 2002 Daily Journal
D.A.R. 13,897, 16 Fla. L. Weekly Fed. S 20
(Cite as: 537 U.S. 79, 123 S.Ct. 588)

AS AMICUS CURIAE IN SUPPORT OF RESPONDENT (Jul. 22, 2002)

• 2002 WL 1728503 (Appellate Brief) Brief for Respondent (Jul. 22, 2002)

• 2002 WL 1160586 (Appellate Brief) BRIEF FOR THE SECURITIES AND EXCHANGE COMMISSION AS AMICUS CURIAE SUPPORTING PETITIONER (May. 28, 2002)

• 2002 WL 1160596 (Appellate Brief) BRIEF OF AMICI CURIAE TRIAL LAWYERS FOR PUBLIC JUSTICE AND AARP IN SUPPORT OF NEITHER PARTY (May. 28, 2002)

• 2002 WL 1183196 (Appellate Brief) BRIEF FOR THE PETITIONER (May. 28, 2002)

• 2002 WL 32102964 (Joint Appendix) (May. 28, 2002)

• 2002 WL 32135868 (Appellate Petition, Motion and Filing) Brief of Amici Curiae Trial Lawyers for Public Justice And Aarp In Support of Neither Party (May. 28, 2002)Original Image of this Document (PDF)

• 2002 WL 32101169 (Appellate Petition, Motion and Filing) Brief in Opposition (Jan. 02, 2002)Original Image of this Document (PDF)

• 01-800 (Docket) (Dec. 03, 2001)

• 2001 WL 34091978 (Appellate Petition, Motion and Filing) Petition for Writ of Certiorari (Nov. 06, 2001)Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 14

# Notice to Members

**JANUARY 2005**

**SUGGESTED ROUTING**

Legal and Compliance

Senior Management

**KEY TOPICS**

Arbitration

Dispute Resolution

Eligibility of Arbitration Claims

GUIDANCE

# Arbitration Time Limits

NASD Amends Rule Governing Time Limits for Submission of Arbitration Claims; **Effective Date: May 1, 2005**

## Executive Summary

The Securities and Exchange Commission (SEC) has approved amendments to Rule 10304 of the NASD Code of Arbitration Procedure (Code) relating to time limits on the submission of claims in arbitration.[1] The amendments clarify that arbitrators, and not courts, will determine whether a claim is ineligible for arbitration under the rule; make clear that dismissal of a claim on eligibility grounds in arbitration does not preclude a claimant from pursuing the claim in court; provide that, by requesting dismissal of a claim under the rule, the requesting party is agreeing that the claimant may withdraw all related claims without prejudice and may pursue all of the claims in court; and state that the six-year time limit on the submission of claims does not apply to any claim that is directed to arbitration by a court of competent jurisdiction upon request of a member or associated person. Rule 10304, as amended, is included in this Notice as Attachment A.

The effective date of this rule change is **May 1, 2005**, for all claims filed with NASD on or after that date.

## Questions/Further Information

Questions regarding this *Notice* can be directed to Jean I. Feeney, Vice President and Chief Counsel, Dispute Resolution, at (202) 728-6959 or *jean.feeney@nasd.com;* or Laura Gansler, Assistant General Counsel, Regulatory Policy and Oversight, at (202) 728-8275 or *laura.gansler@nasd.com.*

# 05-10

## Background and Discussion

### Who Makes Eligibility Determinations

Rule 10304 provides that a claim is ineligible for arbitration under the Code if six or more years have elapsed from the occurrence or event giving rise to the claim. Currently, this rule does not state whether the eligibility of a claim is determined by arbitrators or by the courts; however, it is NASD's practice that arbitrators resolve questions concerning whether a particular claim falls within the six-year time limit. The issue of whether arbitrators or courts should determine the eligibility of a claim generated a significant amount of collateral litigation, and was eventually addressed by the United States Supreme Court in December 2002. In *Howsam v. Dean Witter Reynolds, Inc.,*[2] the Supreme Court determined that the issue of whether a claim is time-barred under Rule 10304 is a matter for arbitrators to decide. Therefore, to provide additional notice and guidance to parties on this issue, NASD is amending Rule 10304 to provide explicitly that the arbitrators make eligibility determinations.

### Effect of Arbitrator's Dismissal of Claim as Ineligible

NASD is amending Rule 10304 to clarify that the dismissal of a claim on eligibility grounds does not prohibit a party from pursuing the claim in court. This clarification is necessary because some courts, relying on the "election of remedies" doctrine, have held that claims dismissed as ineligible in arbitration may not be litigated in court. Therefore, Rule 10304 is being amended to state that, under NASD rules, the ineligibility of a claim under Rule 10304 is not intended to prevent a party from filing the claim in court.[3]

In order to protect parties from having to litigate related claims in two forums at the same time, NASD also is amending Rule 10304 to provide that, by requesting dismissal of a claim on eligibility grounds in the NASD forum, the respondent is agreeing that the claimant may withdraw all related claims without prejudice and may pursue all of the claims in court.[4] This provision will provide significant protection against involuntary splitting ("bifurcation") of claims, yet continue to allow arbitrators to decide questions of eligibility under Rule 10304.

**Applicability of Eligibility Rule to Claims Ordered to Arbitration by Court**

NASD is modifying Rule 10304 to provide that the six-year time limit on the submission of claims will not apply to any claim that is directed to arbitration by a court of competent jurisdiction upon request of a member or associated person. Currently, Rule 10304 does not apply to any claims ordered to arbitration by a court. Under the Supreme Court's decision in *Howsam* that eligibility is an issue for the arbitrators, not courts, to resolve, this provision would mean that the eligibility rule could not be applied by either the court or the arbitrators to any claims compelled to arbitration. Under the amendment, however, a member or associated person that compels a claim to arbitration may not then seek to dismiss the claim in arbitration on eligibility grounds. The SEC recently approved a corollary rule filing that amends Rule 3110(f) to require member firms seeking to compel arbitration of claims initiated in court to arbitrate all of the claims contained in the complaint if the customer so requests (regardless of whether such claims would otherwise be time-barred by the eligibility rule).[5]

NASD believes that, by clarifying the scope and application of Rule 10304, the rule amendments will streamline the administration of arbitrations as well as reduce the cost and delay caused by collateral litigation.

**Effective Date Provisions**

The rule amendments will become effective on **May 1, 2005**. The amendments will apply to claims filed with NASD Dispute Resolution on or after the effective date.

## Endnotes

1   Exchange Act Rel. No. 50714 (Nov. 22, 2004), 69 Fed. Reg. 69971 (Dec. 1, 2004) (File No. SR-NASD-2003-101).

2   537 U.S. 79 (2002).

3   The claims would still be subject to applicable statutes of limitations in court.

4   *See* note 3 above.

5   *Notice to Members 05-10; see* Exchange Act Rel. No. 50713 (Nov. 22, 2004), 69 Fed. Reg. 70293 (Dec. 3, 2004) (File No. SR-NASD-98-74).

©2005. NASD. All rights reserved. *Notices to Members* attempt to present information to readers in a format that is easily understandable. However, please be aware that, in case of any misunderstanding, the rule language prevails.

## ATTACHMENT A

New text is underlined; deletions are in brackets.

## 10304. Time Limitation Upon Submission

(a) No dispute, claim, or controversy shall be eligible for submission to arbitration under this Code where six (6) years have elapsed from the occurrence or event giving rise to the act or dispute, claim or controversy.  The panel will resolve any questions regarding the eligibility of a claim under this Rule.

(b) Dismissal of a claim under this Rule does not prohibit a party from pursuing the claim in court.  By requesting dismissal of a claim under this Rule, the requesting party agrees that if the panel dismisses a claim under the Rule, the party that filed the dismissed claim may withdraw any remaining related claims without prejudice and may pursue all of the claims in court.

(c) This Rule shall not extend applicable statutes of limitations[, nor shall it apply to any case which is directed to arbitration by a court of competent jurisdiction]; nor shall the six-year time limit on the submission of claims apply to any claim that is directed to arbitration by a court of competent jurisdiction upon request of a member or associated person.

# EXHIBIT 15

Westlaw.

206 A.D.2d 713

Page 1

206 A.D.2d 713, 614 N.Y.S.2d 638
(Cite as: 206 A.D.2d 713)

c

Supreme Court, Appellate Division, Third
Department, New York.
In the Matter of the ARBITRATION BETWEEN
PRUDENTIAL SECURITIES INC.,
Respondent-Appellant,
andAlfred C. PURELLO, Appellant-Respondent.
July 21, 1994.

The Supreme Court, Albany County, Conway, J.,
partially granted petitioner's application to stay
arbitration regarding claims stemming from
securities transactions, and appeal was taken. The
Supreme Court, Appellate Division, Peters, J., held
that statute of limitations issues would be addressed
by arbitrator.

Modified, and as modified, affirmed.

West Headnotes

[1] T ☞201

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(D) Performance, Breach, Enforcement,
and Contest
            25Tk197 Matters to Be Determined by
Court
                25Tk201 k. Conditions Precedent to
Arbitration; Procedural Arbitrability. Most Cited
Cases
    (Formerly 33k23.15 Arbitration)
While court is empowered to decide threshold
issues, including statute of limitations issues, scope
of this power should be applied narrowly and
substantive issues should be left to arbitrator.

[2] T ☞201

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(D) Performance, Breach, Enforcement,

and Contest
            25Tk197 Matters to Be Determined by
Court
                25Tk201 k. Conditions Precedent to
Arbitration; Procedural Arbitrability. Most Cited
Cases
    (Formerly 33k23.15 Arbitration)
While factual issues concerning statutes of
limitations could be tried by court, these issues were
intertwined with the ultimate substantive issues
stemming from securities transactions and thus,
limitation's issues would be left to arbitrator so as to
permit a more efficient resolution due to continuing
nature of claims and uncertainty concerning date of
occurrence or event giving rise to claims and given
that federal substantive law governed scope and
interpretation of agreement.

[3] T ☞113

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(A) Nature and Form of Proceeding
            25Tk113 k. Arbitration Favored; Public
Policy. Most Cited Cases
    (Formerly 33k7.1 Arbitration)

T ☞139

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk136 Construction
                25Tk139 k. Construction in Favor of
Arbitration. Most Cited Cases
    (Formerly 33k7.1 Arbitration)
Under Federal Arbitration Act (FAA), which
embodies emphatic national policy favoring
arbitration which is binding on all courts, state and
federal, questions of arbitrability must be addressed
with healthy regard for federal policy and any
doubts concerning scope of arbitrable issues should
be resolved in favor of arbitration. 9 U.S.C.A. § 1
et seq.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

206 A.D.2d 713

Page 2

206 A.D.2d 713, 614 N.Y.S.2d 638
(Cite as: 206 A.D.2d 713)

**\*\*638** Ainsworth, Sullivan, Tracy, Knauf, Warner & Ruslander (Timothy J. O'Connor, of counsel), Albany, for appellant-respondent.
Hancock & Estabrook (Patrick M. Connors, of counsel), Albany, for respondent-appellant.

Before MERCURE, J.P., and WHITE, CASEY, WEISS and PETERS, JJ.
\*713 PETERS, Justice.
Cross appeals from an order of the Supreme Court (Conway, J.), entered July 15, 1993 in Albany County, which partially granted petitioner's application pursuant to CPLR 7503 to stay arbitration between the parties.

Petitioner moved for an order pursuant to CPLR 7503 permanently staying the arbitration commenced by respondent before the National Association of Securities Dealers Inc. (hereinafter NASD) on the ground that the claims fail to satisfy the substantive eligibility requirement of section 15 of the NASD Code of Arbitration Procedure (hereinafter the Code). Respondent argued, *inter alia*, that the Federal Arbitration Act (hereinafter FAA) (*see*, 9 USC § 1 *et seq.*) is applicable and warrants arbitration of all claims. The statement of claim \*714 alleged eight causes of action: (1) breach of contract, (2) breach of fiduciary duty, (3) respondeat superior, (4) common-law fraud and fraudulent concealment, (5) violations of Securities Exchange Act of 1934, (6) liability under the Employee Retirement Income Security Act of 1974, (7) negligent misrepresentation, and (8) securities brokerage malpractice.

Supreme Court held that arbitration of the second, third, fifth, sixth and eighth causes of action were barred by the eligibility requirements detailed in section 15 of the Code. Supreme Court held, however, that arbitration of the first, fourth, and seventh causes of action properly fell within the embrace of the "commerce" realm of the FAA requiring that questions concerning the timeliness of these claims be decided by the arbitrator.

**\*\*639** It should be noted at the outset that the parties do not dispute that an agreement to arbitrate exists or that the Code binds them. Moreover, no question has been raised as to whether the claims at

issue are subject to arbitration. Hence, in solely addressing the eligibility requirement set forth in section 15 of the Code, we note that the section provides as follows:
No dispute, claim or controversy shall be eligible for submission to arbitration under this Code where six (6) years have elapsed from the occurrence or event giving rise to the act or dispute, claim or controversy. This section shall not extend applicable statute of limitations \* \* \*.

Upon our review we find that Supreme Court erred in failing to leave the ultimate resolution of the issue of timeliness concerning the second, third, fifth, sixth and eighth causes of action to the arbitrator.

[1][2] It is well settled that "[w]hile the court is empowered to decide threshold issues, including Statute of Limitations issues \* \* \* the scope of this power should be applied narrowly and substantive issues should be left to the arbitrator" (*Matter of Corbo v. Les Chateau Assocs.*, 127 A.D.2d 657, 657-658, 511 N.Y.S.2d 883 [citations omitted] ). Here, as in *Matter of Corbo v. Les Chateau Assocs.* ( *supra* ), we find that "[w]hile factual issues concerning the Statutes of Limitations may be tried by the court \* \* \* in the instant case, these issues are intertwined with the ultimate substantive issues" (*id.*, at 658, 511 N.Y.S.2d 883 [citations omitted] ). Due to the continuing nature of these claims and the uncertainty concerning the date of the occurrence or event giving rise to these claims, leaving these issues to the arbitrator will permit a more efficient resolution.

Our determination is consistent with the provisions of section 35 of the Code which provides that "[t]he arbitrator shall \*715 be empowered to interpret and determine the applicability of all provisions under this Code which interpretation shall be final and binding upon the parties". As noted by the United States District Court for the Southern District of New York in *Merrill Lynch, Pierce, Fenner & Smith v. Noonan*, 1992 WL 196741 (US Dist Ct, SDNY, Aug. 3, 1992, Kram, J.) when interpreting section 35 of the Code:
Since the NASD Code reserves the right to interpret all provisions under its Code, including Section 15,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

206 A.D.2d 713

206 A.D.2d 713, 614 N.Y.S.2d 638
(Cite as: 206 A.D.2d 713)

and since the Second Circuit has mandated that any limitations defense is in the province of the arbitrators, this Court compels arbitration before the NASD in New York City and defers to the arbitrator's judgment on the issue of the timeliness of respondents' claims (*id.*, at slip opn. p. 9).

[3] Further, we find the subject claims to have stemmed from securities transactions which are interstate commerce and, therefore, subject to the FAA (*see, Dean Witter Reynolds v. Byrd,* 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158). Under the FAA, which embodies an "emphatic" national policy favoring arbitration which is binding on all courts, state and Federal, " 'questions of arbitrability must be addressed with a healthy regard for the federal policy * * * [and] any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration' " (*Singer v. Jefferies & Co.,* 78 N.Y.2d 76, 81-82, 571 N.Y.S.2d 680, 575 N.E.2d 98, quoting *Cone Mem. Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765). Hence, with Federal substantive law now governing the scope and interpretation of this agreement, "regardless of what our own State's policies or case law might dictate" (*Fletcher v. Kidder, Peabody & Co.,* 81 N.Y.2d 623, 631, 601 N.Y.S.2d 686, 619 N.E.2d 998, *cert. denied* 510 U.S. 993, 114 S.Ct. 554, 126 L.Ed.2d 455), our decision to leave these limitations issues to the arbitrator is further buttressed (*see, Shearson Lehman Hutton v. Wagoner,* 944 F.2d 114, 121; *Conticommodity Servs. v. Philipp & Lion,* 613 F.2d 1222, 1224-1225).

In next addressing respondent's contention that Supreme Court lacks subject matter jurisdiction to decide the arbitrability of the sixth cause of action alleging a violation of the Employee Retirement Income Security Act of 1974, we find such contention to be without merit.

**640 ORDERED that the order is modified, on the law, without costs, by reversing so much thereof as granted petitioner's application to stay arbitration of the second, third, fifth, sixth and eighth causes of action; application denied regarding said causes of

action; and, as so modified, affirmed.

MERCURE, J.P., and WHITE, CASEY and WEISS , JJ., concur.
N.Y.A.D. 3 Dept.,1994.
Matter of Prudential Securities Inc. (Purello)
206 A.D.2d 713, 614 N.Y.S.2d 638

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 16

Westlaw.

Not Reported in N.Y.S.2d

Not Reported in N.Y.S.2d, 1995 WL 396568 (N.Y.Sup.), Fed. Sec. L. Rep. P 98,749

(Cite as: 1995 WL 396568 (N.Y.Sup.))

Page 1

**H**
NOT APPROVED BY REPORTER OF DECISIONS FOR REPORTING IN STATE REPORTS. NOT REPORTED IN N.Y.S.2d.

Supreme Court, New York,
IAS Part 47.
GOLDBERG, et al.
v.
Parker.

April 12, 1995.

Opinion

OMANSKY, Judge.

*1 Petitioners Gary M. Goldberg and Gary Goldberg & Company, Inc. ("Goldberg") move by Order to Show Cause for an Order:
1. Pursuant to CPLR 403, 7502 and 7503 dismissing and permanently staying the arbitration of all disputes, claims or controversies arising out of, relating to or with respect to investment purchases made by Respondent more than six years before the commencement of the arbitration before the National Association of Securities Dealers, Inc. ("NASD"), No. 94-02670, on the bases that such claims are ineligible for submission under, and are barred by, Section 15 of the NASD Code of Arbitration Procedure and New York Law;
2. Striking from Respondent's statement of claim all allegations concerning Respondent's state of health and precluding Respondent from making any such allegations, or adducing evidence in support of them, in the arbitration proceeding.

Respondent Patricia Parker has moved by Order to Show Cause to compel Goldberg to accept service of her Verified Answer in this proceeding. These two applications are consolidated for disposition.

Goldberg is a New York broker-dealer registered with NASD. Ms. Parker is an allegedly unsophisticated investor and disaffected Goldberg client who has commenced an arbitration proceeding against Goldberg before the NASD. Respondent alleges that she is a 53 year-old schoolteacher who has recently been diagnosed with and is being aggressively treated for breast cancer. She alleges

that at times relevant to her investment activities with Goldberg, she also suffered from ill health which affected her cognitive processes.

In broad terms, Ms. Parker alleges that she initially invested a small sum with Goldberg in or about 1983, advising Mr. Goldberg that she needed conservative investment vehicles. As she inherited sums from her father and received some portion of her mother's funds, Ms. Parker made additional investments with Goldberg. Respondent claims that in contravention of her wishes, Goldberg placed these funds in risky, unsuitable investments, mainly limited partnerships. In her Statement of Claims, she alleges that the distributions on virtually all of her limited partnership investments were materially reduced or ceased entirely in the period between 1989 and 1993, and that Goldberg misled her and obscured the truth about the nature and value of her investments. Ms. Parker is alleging losses in excess of $500,000 in Goldberg-recommended investments, claiming the loss of her retirement funds and the reduction of her mother to public dependency.

Turning first to respondent's cross-motion to compel acceptance of the Verified Answer, counsel for Ms. Parker states that he timely served a detailed memorandum of law and an affidavit executed by his client in response to the Petition, but neglected to serve any answer at all. He realized his oversight when initially serving an unverified Answer. Inasmuch as the Petition was verified, and the Answer was untimely, Goldberg's counsel rejected the proffered Answer. The following day, December 8, 1994, an attempt was made to serve a Verified Answer, which was also rebuffed. Accordingly, Respondent moved by Order to Show Cause to remedy her default.

*2 Counsel for respondent alleges that the default was inadvertent and his other papers evidence an intent to defend against the Petition. Upon the showing made, the application to compel acceptance of the Verified Answer is granted. *Antonious v. Muhammed, 188 AD2d 399, (1st Dept.1992)*. The Verified Answer is deemed served as of the date of submission of the two applications to the Court.

Ms. Parker commenced the arbitration proceeding before the NASD on or before July 8, 1994. There was apparently no customer agreement signed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.Y.S.2d                                                        Page 2
Not Reported in N.Y.S.2d, 1995 WL 396568 (N.Y.Sup.), Fed. Sec. L. Rep. P 98,749
(Cite as: 1995 WL 396568 (N.Y.Sup.))

between Parker and Goldberg, but Goldberg does not contest that he is bound to arbitrate under the NASD Code of Arbitration Procedure. Goldberg instituted this special proceeding in September 1994, invoking the jurisdiction of the New York court on the grounds that Parker is a New York City resident, making venue proper under CPLR 7502(a). He seeks to bar claims on investments purchased prior to August 1988 on the ground that they are time-barred.

At the outset, Parker urges us not to intervene, arguing that Section 35 of the NASD Code of Arbitration Procedure requires all issues to be submitted to arbitration. Section 35 reads:
  The arbitrators shall be empowered to interpret and determine the applicability of all provisions of this code which interpretation shall be final and binding upon the parties.
The law is clear, however, that "threshold" issues are properly for the court to determine, including whether the claim sought to be arbitrated is outside the scope of the arbitration. _Matter of County of Rockland,_ 51 NY2d 1, 7 (1980); _Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Manhard,_ --- N.Y.2d --- (NYLJ 2/2/95, p. 28, col. 5). The applicability of the eligibility rule falls within this category (see, e.g., _Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Manhard,_ 201 AD2d 347 (1st Dept.1994), rev'd on other grounds --- NY2d --- (NYLJ 2/2/95, p. 28, col. 5); _Merrill Lynch, Pierce, Fenner & Smith v. DeChaine,_ 194 AD2d 472 (1st Dept.1993); _Matter of Prudential Bache Sec. v. Archard,_ 179 AD2d 652 (2d Dept.1992), lv. denied 80 NY2d 754).

Turning to the merits, Goldberg bases his application upon Section 15 of the NASD Code of Arbitration Procedure:
  "No dispute, claim, or controversy shall be eligible for submission to arbitration under this Code where six (6) years have elapsed from the occurrence or event giving rise to the acts or dispute, claim or controversy. This section shall not extend applicable statute of limitations, nor shall it apply to any case which is directed to arbitration by a court of competent jurisdiction."
This provision is frequently referred to, and will be referred to here, as the "eligibility rule." Goldberg's claim is that the "occurrence or event" which triggers the six year eligibility period is the date of purchase of the investment, after which commencement of the arbitration is time-barred. The effect of this interpretation in fraud cases is to reward the unscrupulous broker-dealer and to penalize the unsophisticated investor who does not discover the fraud for more than six years after the investment was purchased.

*3 The First Department has recognized that Section 15 constitutes an absolute time bar for claims arising more than six years prior to their submission to arbitration (see, e.g., _Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Manhard,_ 201 AD2d 347 (1st Dept.1994), rev'd on other grounds --- NY2d --- (NYLJ 2/2/95, p. 28, col. 5); _Merrill Lynch, Pierce, Fenner & Smith v. DeChaine,_ 194 AD2d 472 (1st Dept.1993); _Matter of Prudential Bache Sec. v. Archard,_ 179 AD2d 652, lv. denied 80 NY2d 754.

However, the First Department has never expressly held that the only event which triggers the start of the six year eligibility period under Section 15 is the investment purchase date. While the statement in _Merrill Lynch, Pierce, Fenner & Smith v. DeChaine_ (194 AD2d 472 [1st Dept.1993] ) that the eligibility rule, because not a statute of limitations, cannot be tolled by allegations of fraud, assumes that there is a fixed starting point for the computation of the six year eligibility period, it is not a definitive holding that the "occurrence or event" language of Section 15 must necessarily be interpreted in all cases as the investment purchase date. Similarly, in _Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Manhard,_ 201 AD2d 347 (1st Dept.1994), rev'd --- NY2d --- (NYLJ 2/22/95, p. 28, col. 5), where the Appellate Division found that the IAS Court "properly stayed the arbitration of those claims which arose more than six years prior to their submission to arbitration," the court was not focusing on what occurrence or event gave rise to the claims. Indeed, the Court of Appeals noted, in reversing in part, that Manhard's counsel had conceded before the IAS court that all claims based upon transactions that occurred more than six years prior to the commencement of the arbitration were ineligible for arbitration (_Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Manhard,_ --- NY2d ----, _supra_ ), so that the Appellate Division's finding on the eligibility issue did not amount to more than a restatement of the rule. _Manhard,_ likewise, is not authority for the proposition that the only event which triggers the six year eligibility period of Section 15 is the investment purchase date.

Furthermore, the _DeChaine_ case cited _Edward D. Jones & Co. v. Sorrells,_ 957 F.2d 509 (7th Cir.1992), which adopted the position that the investment purchase date was the event which triggered the six year eligibility period. The Seventh Circuit relied in part on a statement of the NASD that "if the claim is six years old or more, the [NASD] and other self-regulatory organizations could not accept the matter

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.Y.S.2d                                                                                                       Page 3
Not Reported in N.Y.S.2d, 1995 WL 396568 (N.Y.Sup.), Fed. Sec. L. Rep. P 98,749
(Cite as: 1995 WL 396568 (N.Y.Sup.))

for arbitration." *Edward D. Jones & Co. v. Sorrells, 957 F.2d 509 (7th Cir.1992).*

It now appears that the NASD has begun to change its position so that, at least in fraud cases, the "occurrence or event" language in Section 15 is not automatically interpreted as the investment purchase date.

**\*4** Thus, in at least three cases, the current Director of Arbitration of the NASD, deciding threshold issues similar to those decided by the court, has ruled the "purchase date was not the event or occurrence that gave rise" to the dispute (Exhs. D, E, and F to Steckman Affidavit, sworn to December 7, 1994). In a letter dated October 28, 1991 the Director stated (Exh. D):

> It has been determined that the purchase date is not the event or occurrence that gave rise to this dispute.   Also, Section 15 does not refer specifically to the purchase date as the time that the six year limitation begins to run. Therefore it is equally appropriate that the discovery by the claimant be treated as the occurrence or event giving rise to the dispute.   Please note that this decision to deny this motion does not preclude viable bar under applicable Statute of Limitations.

Similarly, in appropriate cases the Second and Third Departments have declined to interpret Section 15 as merely involving a mathematical computation, counting six years from the date of purchase of the investment.   In *Corbo v. Les Chateau Assocs., 127 AD2d 657 (2d Dept.1987)*, where the customer's claims raised issues of fraud, the Second Department held that arbitration was properly compelled, notwithstanding the allegations that the proceeding to compel arbitration had been brought more than six years after the transactions involved in the petitioner's claim and more than four years after the petitioner should, with reasonable diligence, have discovered the fraud.   The court held that where it could not be said as a matter of law that the customer failed to exercise reasonable diligence in discovering the fraud, and where the factual issues underlying the limitations period were so intertwined with the ultimate substantive issues, it was not an abuse of discretion to leave all issues to the arbitrator (cf., *Matter of Prudential Bache Sec. v. Archard,* 179 AD2d [2d Dept.1992], lv. denied 80 NY2d 754).

In *Prudential Securities, Inc. v. Purello, 206 Ad2d 713 614 NYS2d 638 (3d Dept.1994)*, the Third Department held:

> Due to the continuing nature of these claims and

the uncertainty concerning the date of the occurrence or event giving rise to these claims, leaving these issues to the arbitrator will permit a more efficient resolution.

This case involves allegations of fraud and self-dealing by Goldberg, which make inappropriate the selection of the investment purchase date as the starting point for computing the six-year eligibility period, rather than the date of discovery of the fraud. For example, Parker alleges that in 1987, (and therefore outside the eligibility period in petitioner's view) she invested $25,000 in the Montebello Land Investors Limited Partnership, and $50,000 in the Montebello Park Investors Limited Partnership; that these entities were marketed exclusively by Goldberg in order to raise money to purchase and/or improve the land and building where Goldberg, Inc. was located.    She claims that Goldberg later agreed to return $25,000, the amount invested in the Montebello Land Investors Limited Partnership, on condition that it be rolled over into Gary Goldberg Planning Services, which, it is alleged, was another Goldberg-marketed entity used to finance one of Goldberg's businesses.    Parker claims that Goldberg told her that he was putting a letter in her file that guaranteed that she would not lose money, on the Gary Goldberg Planning Services, Inc. investment, but that in 1993 when Ms. Parker called to ask for a copy of that letter, Goldberg informed her that he could lose his license if he gave her a copy and therefore declined to send her a copy.

**\*5** These allegations lend credence to what Parker claims was a continuing pattern of misrepresentation on Goldberg's part, (see, *Prudential Securities, Inc. v. Purello, supra* ) beginning with the claim that Goldberg told her that he would invest her savings and inheritance conservatively in order to safeguard them for use as her pension, and then placing Parker in highly speculative, illiquid limited partnerships; that on one of the blank subscription agreements Goldberg sent her to sign for the limited partnerships, Parker noticed that an income well in excess of hers was necessary to participate, but when she questioned Goldberg, he told her not to worry;   that her monthly statements contained no information concerning her limited partnership investments;    that when Parker pressed Goldberg for information on the value of her limited partnership investments, Goldberg listed the limited partnerships at their acquisition costs.

In this case the factual issues underlying the computation of the eligibility periods are too closely intertwined with the substantive issues of fraud and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

self-dealing (*see, Corbo v. Les Chateau Assocs., supra* ) to permit the court to rule as a matter of law on which date or dates the events occurred giving rise to respondent's claim.

Rather than the court's holding a hearing on issues of fact, the more efficient resolution is to leave all issues to the arbitrator (*Id.*).    The NASD recognizes that when the court directs the eligibility issues to the arbitrator, the effect is to

make the Code's time limitation co-extensive with various state statutes of limitations and permit all securities-related disputes which are eligible for a judicial disposition to be resolved by arbitration.
Quoted in *Edward D. Jones v. Sorrells, 957 F.2d 509, 513 (7th Cir.1992)*

Petitioner has no cause to complain.    He confined the issue before this court to the application of Section 15's eligibility rule, and declined to ask the court to pass on any statute of limitation issue which is the court's main inquiry under CPLR § 7502(b).

Finally, the Court denies that branch of the application which seeks to preclude Respondent from making any mention of her physical condition in her statement of claim or in connection with the arbitration proceedings.    Such rules are within the province of the arbitrator(s).

Accordingly, petitioner's application for a permanent stay of arbitration is denied, the stay of the arbitration proceeding previously granted is vacated, and the petition is dismissed.

Settle order and judgment.

Not Reported in N.Y.S.2d, 1995 WL 396568 (N.Y.Sup.), Fed. Sec. L. Rep. P 98,749

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 17

Westlaw.

127 A.D.2d 657

Page 1

127 A.D.2d 657, 511 N.Y.S.2d 883

(Cite as: 127 A.D.2d 657)

C

In the Matter of Paschal A. Corbo,
Petitioner-Respondent,
v.
Les Chateau Associates et al., Appellants, et al.,
Respondent.

Supreme Court, Appellate Division, Second
Department, New York

February 9, 1987
OPINION OF THE COURT

Mollen, P. J., Thompson, Brown and Niehoff, JJ.,
concur.

In a proceeding to compel arbitration, the appeals
are from an order of the Supreme Court, Richmond
County (Felig, J.), dated July 16, 1986, which
granted the petition and denied a cross application
to permanently stay arbitration.

Ordered, that the order is affirmed, with costs.

The appellants argue that the proceeding to compel
arbitration, which was commenced in February
1985, was brought more than six years after the
transactions involved in the petitioner's claim and
more than four years after the petitioner should
have, with reasonable diligence, discovered the
alleged fraud (see, CPLR 213 [8]; 203 [f];
*Quadrozzi Concrete Corp. v. Mastroianni*, 56
AD2d 353). In July 1981 the Internal Revenue
Service informed the petitioner that it was
disallowing his deduction with respect to the
appellant partnership's activities for the year 1977
because the partnership had had no transactions,
assets or liabilities during that year. The appellants
argue that this was sufficient to put the petitioner on
notice and to charge him with knowledge of the
alleged fraud. The petitioner responds, *inter alia*,
that upon receiving this audit, his accountant spoke

to the appellants who assured him that they had kept
proper books and records and that based upon these
representations, the accountant filed a protest with
the Internal Revenue Service. The petitioner argues
that under the circumstances, he saw no need to
commence suit against the appellants. In 1984,
when the petitioner learned of further irregularities
and the Internal Revenue Service attached his bank
accounts, he promptly commenced this proceeding.
The petitioner also argues that appellants' actions
should equitably estop them from asserting the
Statute of Limitations *(see, Simcuski v. Saeli*, 44
NY2d 442, 449; *General Stencils v. Chiappa*, 18
NY2d 125).

Special Term decided, and we agree, that there was
insufficient evidence in the record to reach the
conclusion that, as a matter of law, the petitioner
failed to exercise reasonable diligence in
discovering the fraud in 1981. Special Term did not
abuse its discretion in this case in leaving ultimate
resolution of these issues to the arbitrator. While the
court is empowered to decide threshold issues,
including Statute of *658 Limitations issues (CPLR
7502 [b]; *Matter of Paver & Wildfoerster [Catholic
High School Assn.]*, 38 NY2d 669), the scope of
this power should be applied narrowly and
substantive issues should be left to the arbitrator (
CPLR 7501; *Matter of United Nations Dev. Corp.
v. Norkin Plumbing Co.*, 45 NY2d 358; *Matter of
Uddo [Taormina]*, 21 AD2d 402). While factual
issues concerning the Statute of Limitations may be
tried by the court (CPLR 7503 [b]; *Matter of United
Nations Dev. Corp. v. Norkin Plumbing Co.*, supra.,
at 363), in the instant case, these issues are
intertwined with the ultimate substantive issues.
Leaving these issues to the arbitrator will permit a
more efficient resolution consistent with the
objectives of CPLR article 75.

Copr. (c) 2005, Randy A. Daniels, Secretary of
State, State of New York.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 18

Westlaw.

2005 WL 1163248 (N.A.S.D.)                                                Page 1

2005 WL 1163248 (N.A.S.D.)

(Cite as: 2005 WL 1163248 (N.A.S.D.))


National Association of Securities Dealers, Inc.

*1 IN THE MATTER OF THE ARBITRATION BETWEEN
CLAIMANTS, KAREN HOWSAM, INDIVIDUALLY AND AS TRUSTEE FOR THE E. RICHARD HOWSAM,
JR. IRREVOCABLE LIFE INSURANCE TRUST DATED MAY 14, 1982 v.
RESPONDENTS, DEAN WITTER REYNOLDS, INC., ROBERT P. HOWARD, AND PAUL J. SILER
DOCKET NUMBER 97-01394 DENVER, COLORADO and
COUNTER-CLAIMANTS, DEAN WITTER REYNOLDS, INC., AND ROBERT P. HOWARD v.
COUNTER-RESPONDENTS, KAREN HOWSAM, INDIVIDUALLY AND AS TRUSTEE FOR THE E.
RICHARD HOWSAM, JR. IRREVOCABLE LIFE INSURANCE TRUST DATED MAY 14, 1982
Docket Number 97-01394
Date of Service (NASD use only): April 20, 2005

Signature Date: April 20, 2005

Signature Date: April 19, 2005


AWARD

Denver, Colorado

Nature of Dispute: Customers v. Member and Associated Persons and Member and
Associated

Person v. Customers

REPRESENTATION OF PARTIES: Karen Howsam, Individually and as Trustee for the E.
Richard Howsam, Jr. Irrevocable Life Insurance Trust dated May 14, 1982,
hereinafter referred to as "Claimants," were represented by Alan C. Friedberg,
Esq., of Pendleton, Friedberg, Wilson & Hennessey, P.C, Denver, Colorado.

Dean Witter Reynolds; Inc. ("DWR"), Robert P. Howard ("Howard"), and Paul J.
Siler ("Siler"), hereinafter referred to as "Respondents," were represented by
Lisa S. Kahn, Esq., of Davis Grahm & Stubbs, LLP, Denver, Colorado. Lisa Kahn gave
notice on or about October 16, 1997 that she had joined the law office of Holme
Roberts & Owen, LLP, Denver, Colorado. On or about July 21, 1999, Joseph C.
Coates, III, Esq., of Greenberg Traurig, PA, West Palm Beach, Florida, made an
appearance on behalf of Respondents and was lead counsel throughout the hearings.

CASE INFORMATION: The Statement of Claim was filed on or about March 7, 1997.
The Submission Agreement of Claimants were signed on or about April 16, 1997, by
Karen Howsam, Individually and on behalf of the E. Richard Howsam, Jr. Irrevocable
Life Insurance Trust dated May 14, 1982, and by David A. Chubb, Co-Trustee of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1163248 (N.A.S.D.)

**(Cite as: 2005 WL 1163248 (N.A.S.D.))**

E. Richard **Howsam**, Jr. Irrevocable Life Insurance Trust dated May 14, 1982.

An Amended Statement of Claim was filed on or about April 10, 1997.

A Joint Motion for Order Staying Arbitration was executed on behalf of all parties on or about July 18, 1997.

The Statement of Answer was filed jointly by Respondents, Dean Witter Reynolds, Inc. and Robert P. Howard, on or about August 13, 1999. No Submission Agreement was submitted for Respondents, Dean Witter Reynolds, Inc., or Robert P. Howard.

NASD Dispute Resolution was informed on or about June 11, 2003, that the U.S. District Court for the District of Colorado dismissed the case of Dean Witter v. **Howsam** (97-WM-1463).

Respondents, Dean Witter Reynolds, Inc. and Robert P. Howard, filed a Motion for Eligibility Determination and Counterclaim Seeking Arbitration Award on or about August 13, 1999. Respondents, Dean Witter Reynolds and Robert P. Howard filed a Memorandum In Support of their Motion to Dismiss for Lack of Eligibility on or about August 13, 1999. Claimants filed a Response to Respondents' Motion for Eligibility Determination and Counterclaim Seeking Arbitration Award on or about December 5, 2003. Respondents, Dean Witter Reynolds, Inc. and Robert P. Howard, filed a Reply to their Motion for Eligibility Determination and Counterclaim on or about December 23, 2003. Claimants' filed a Sur-Reply to Respondents' Motion for Eligibility Determination and Counterclaim on or about January 31, 2004.

*2 CASE SUMMARY: Claimants asserted causes of action including the following: breach of fiduciary duty, misrepresentations, unsuitability, failure to conduct due diligence, and concealment. The causes of action related to the purchase of limited partnerships, including: Dean Witter Realty Income Partnership III, L.P.; Century Properties Growth Fund XXII; Public Storage Properties XVII; and Dean Witter Realty Growth Properties, L.P. Claimants alleged that these investments were unsuitable and that Respondents failed to disclose the nature and/or amounts of commissions earned off such limited partnerships. Claimants alleged that Respondents failed to disclose the potential consequences of a proposed tax bill (HR3838) that would have replaced the nineteen-year depreciation and replaced it with a thirty-year depreciation. Claimants asserted that this tax bill would have taken away or diminished the potential tax benefits of real estate ownership. Claimants also alleged Respondents failed to disclose that the limited partnerships continued to purchase properties in the declining real estate market after the proposed tax bill, and Respondents failed to disclose the specific properties, which would be purchased by such limited partnerships.

Respondents denied the allegations set forth in the Statement of Claim and asserted affirmative defenses including the following: Claimants' claims arise from transactions seventeen years ago and are barred by the applicable statutes of limitation and/or repose; Claimants were fully advised in writing of the nature of the securities purchased in their account; the prospectus which Claimants received

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1163248 (N.A.S.D.)                                    Page 3

2005 WL 1163248 (N.A.S.D.)

**(Cite as: 2005 WL 1163248 (N.A.S.D.))**

each of their investments fully disclosed the risks and all other material information about the investment; the diminution of value of Claimants' investments, to the extent that there was any, was caused in whole or in part by changes in the laws and general decline in the investment markets, the economy and/or other events outside the control of Respondents; Claimant expressly ordered, approved, participated and ratified the acts and transactions that are complained of in the Statement of Claim. Claimants are accordingly barred from any recovery in this action under the doctrines of waiver, estoppel and ratification; Claimants' claims were proximately caused by their own decisions, conduct and/or negligence, not by the actions or inactions of Respondents; and Claimant is not entitled to recovery against Respondents in this action because Respondents acted at all times in good faith and exercised reasonable diligence.

 RELIEF REQUESTED: Claimants requested an award of compensatory damages in excess of $1,000,000, plus pre-judgment interest, attorneys' fees, costs and such other relief the panel deemed proper.

 Respondents requested that the claims asserted against them be denied in their entirety and that they be awarded their costs and attorneys' fees.

 In Respondents' counterclaim, they requested that the panel enter an award adjudicating the eligibility of Claimants' claim under Rule 10304 of the NASD Code of Arbitration Procedures, prior to addressing the merits of the dispute, the panel to declare all claims set forth in Claimant's Statement of Claim are ineligible for submission to NASD pursuant to Rule 10304 of the Code and grant such other relief as the panel deemed just and proper.

 *3 OTHER ISSUES CONSIDERED & DECIDED: On or about July 14, 1997, Claimants dismissed all claims asserted against Respondent, Paul J Siler. As a result the panel did not adjudicate any claims asserted against Respondent Paul J. Siler.

 On or about July 25, 1997, the United States District Court for the District of Colorado entered a Minute Order granting the parties' Joint Motion for Order Staying Arbitration dated July 21, 1997.

 On or about February 12, 2004, an in-person pre-hearing was held to address the outstanding Motions. After which, the panel entered an Order as follows:

 (1) Respondents' request for a Declaration that all claims set forth in Claimants' Statement of Claim against Dean Witter Reynolds, Inc. are ineligible for submission to the NASD pursuant to Rule 10304 of the NASD Code is denied;

 (2) Respondents' request for a Declaration that all claims set forth in Claimants' Statement of Claim against Robert P. Howard are ineligible for submission to the NASD pursuant to Rule 10304 of the NASD Code is granted;

 Respondent, Dean Witter Reynolds, Inc., did not file with NASD Dispute Resolution a properly executed Uniform Submission Agreement but is required to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1163248 (N.A.S.D.)                                          Page 4

2005 WL 1163248 (N.A.S.D.)

(Cite as: 2005 WL 1163248 (N.A.S.D.))

submit to arbitration pursuant to Rule 10301 of the NASD Code of Arbitration
Procedure (the "Code") and having answered the claim, appeared and testified
through counsel at the hearings is bound by the determination of the arbitraton
panel on all issues submitted.

The parties have agreed that the Award in this matter may be executed in
counterpart copies or that a handwritten, signed Award may be entered. In either
case, the parties have agreed to receive conformed copies of the award while the
originals remain on file with NASD Dispute Resolution ("NASD").

AWARD: After considering the pleadings, the testimony, and the evidence
presented at the hearing, the undersigned arbitrators have decided in full and
final resolution of the issues submitted for determination as follows:

1.) Respondent, Dean Witter Reynolds, Inc., is liable for and shall pay to Karen
Howsam, Individually and as Trustee for the E. Richard Howsam, Jr. Irrevocable
Life Insurance Trust dated May 14, 1982, the sum of One Million Three Hundred
Forty Two Thousand Two Hundred Sixty Seven Dollars and Sixty One Cents
($1,342,267.61) in compensatory damages, inclusive of pre-judgment interest;

2.) Respondent, Dean Witter Reynolds, Inc., is liable for and shall pay to Karen
Howsam, Individually and as Trustee for the E. Richard Howsam, Jr. Irrevocable
Life Insurance Trust dated May 14, 1982, post-judgment interest at the Colorado
statutory rate from the date of service of this award until this award is paid in
full;

3.) Respondent, Dean Witter Reynolds, Inc.'s counterclaims, unless granted in
the February 15, 2004 Order, are hereby denied and dismissed with prejudice;

4.) To the extent not specifically awarded or otherwise provided for above, all
other claims and requests for relief by any party hereto, are denied with
prejudice; and

*4 5.) Other than the Forum Fees noted below, the parties shall each bear all
other costs and expenses incurred by them in connection with this proceeding,
including but not limited to attorneys' fees.

FEES: Pursuant to the Code, the following fees are assessed:

Filing Fees: NASD Dispute Resolution will retain the non-refundable filing fee
for each claim:


Initial claim filing fee =  $ 250
Counterclaim filing fee =  $ 500


Member Fees: Member fees are assessed to each member firm that is a party in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1163248 (N.A.S.D.)                                              Page 5

2005 WL 1163248 (N.A.S.D.)

(Cite as: 2005 WL 1163248 (N.A.S.D.))

these proceedings or to the member firm that employed the associated persons at the time of the events giving rise to the dispute. In this matter, the member firm is Dean Witter Reynolds, Inc.

  Member surcharge = $ 500

  Adjournment Fees: Adjournments granted during these proceedings:


June 9-11, 2004
-------------------------------------------------------------------
Adjournment jointly requested by all parties Fee Assessed by the Panel  $ 1,000
=
(1/2 to Claimants, jointly and severally, and 1/2 to Respondent, Dean
  Witter Reynolds, Inc.)
March 1-4, 2005
-------------------------------------------------------------------
Adjournment requested by Respondent, Dean Witter Reynolds, Inc.
Fee Waived by the Panel =                                               $ 1,000


  Forum Fees and Assessments: The Arbitration Panel assesses forum fees for each hearing session conducted. A hearing session is any meeting between the parties and the arbitrators, including a pre-hearing conference with the arbitrators, that lasts four (4) hours or less. Fees associated with these proceedings are:


Four (4) Pre-hearing sessions with Panel x
  $ 1,000                                                               = $ 4,000

Pre-hearing conferences:              10/15/2003  1 session
                                      02/12/2004  2 sessions
                                      6/09/2004   1 session

Seven (7) Hearing sessions with Panel x
  $ 1,000                                                               = $ 7,000
Hearing Dates:                        03/21/2005  2 sessions
                                      03/22/2005  2 sessions
                                      03/23/2005  3 sessions

-----------------------------------------------------------------------
Total Forum Fees                                                        = $ 11,000


  The Arbitration Panel has assessed $ 5,500 of the forum fees solely to Karen
**Howsam.**

  The Arbitration Panel has assessed $ 5,500 of the forum fees to Dean Witter

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1163248 (N.A.S.D.)

2005 WL 1163248 (N.A.S.D.)

(Cite as: 2005 WL 1163248 (N.A.S.D.))

Page 6

Reynolds, Inc.

FEE SUMMARY: Claimants, Karen **Howsam**, Individually and as Trustee for the E. Richard **Howsam**, Jr. Irrevocable Life Insurance Trust dated May 14, 1982, are jointly and severally liable for:

```
Initial Filing Fee =              $ 250
---------------------------------------------
Adjournment Fees =                $ 500
Total Fees =                      $ 750
Less payments =                   $ 750
---------------------------------------------
Balance Due NASD Dispute Resolution = $   0
```

Claimant, Karen **Howsam**, is solely liable for:

```
Forum Fees =                      $ 5,500
---------------------------------------------
Total Fees =                      $ 5,500
Less payments =                   $   500
---------------------------------------------
Balance Due NASD Dispute Resolution = $ 5,000
```

Respondents, Dean Witter Reynolds, Inc. and Robert P. Howard, are jointly and severally liable for:

```
Counterclaim Filing Fee =         $ 500
---------------------------------------------
Total Fees =                      $ 500
Less payments =                   $ 500
---------------------------------------------
Balance Due NASD Dispute Resolution = $   0
```

*5 Respondent, Dean Witter Reynolds, Inc., is liable for:

```
Member Fees =                     $   500
---------------------------------------------
Forum Fees =                      $ 5,500
Adjournment Fees =                $   500
---------------------------------------------
Total Fees =                      $ 6,500
```

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 1163248 (N.A.S.D.)                                                    Page 7

2005 WL 1163248 (N.A.S.D.)

(Cite as: 2005 WL 1163248 (N.A.S.D.))


Less payments =                          $   850
------------------------------------------------
Balance Due NASD Dispute Resolution =   $ 5,650


   All balances are payable to NASD Dispute Resolution and are due upon receipt
pursuant to Rule 10330(g) of the Code of Arbitration

   ARBITRATION PANEL: Thaddeus J. Tecza, Ph.D-Public Arbitrator, Presiding Chair

   Vincent P. Fitzgerald, CPA-Public Arbitrator

   Cletus E. Byrne, Jr.-Non-Public Arbitrator

   Concurring Arbitrators:

Thaddeus J. Tecza, Ph.D

Public Arbitrator, Presiding Chair

Vincent P. Fitzgerald, CPA

Public Arbitrator

Cletus E. Byrne, Jr.

Non-Public Arbitrator

  2005 WL 1163248 (N.A.S.D.)

END OF DOCUMENT


© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Civil Action No. 05-cv-00911-PSF-BNB

KAREN HOWSAM, Individually, and as
Trustee for the E. Richard Howsam, Jr. Irrevocable Life Insurance Trust,
Dated May 14, 1982,

        Claimant,

v.

DEAN WITTER REYNOLDS, INC.,

        Respondent.

---

## ORDER ON MOTION TO CONFIRM ARBITRATION AWARD

---

This matter comes before the Court on Claimant's Motion to Confirm Arbitration Award (part of Dkt. # 1), which was originally brought in Denver County, Colorado District Court on May 13, 2005. It was timely removed by the respondent to this federal court based upon diversity of citizenship, with claimant a Colorado citizen and respondent a Delaware corporation having its principal place of business located in New York. The claimant seeks to confirm an arbitration award entered on April 20, 2005 (Exhibit C to Motion to Confirm, hereafter "Award"). Respondent cross-moves to vacate the arbitration award (Dkt. # 5). The motions have been fully briefed and are ripe for disposition.

**BACKGROUND**

The underlying dispute has a long history, including a United States Supreme Court ruling. *Howsam v. Dean Witter Reynolds, Inc.*, 579 U.S. 79 (2002). On April 20,

2005, a three-arbitrator panel awarded the claimant, Karen Howsam, individually and as trustee for the E. Richard Howsam, Jr. Irrevocable Life Insurance Trust dated May 14, 1982, the sum of $1,342,267.61 in compensatory damages. The removed action sought to confirm that award plus statutory interest.

After claimant's husband's death in 1986, she opened securities accounts with Respondent Dean Witter Reynolds, Inc., now known as Morgan Stanley DW, Inc. ("Dean Witter"). Investments included four limited partnerships purchased by claimant for about $550,000, of which claimant asserts Dean Witter commissions totaled approximately $46,000. Two of the partnerships were Dean Witter products. Another, Public Storage Properties 17 Limited Partnership, was underwritten by Dean Witter, and the fourth was Century Growth Properties 22 Limited Partnership. The partnerships were represented to claimant as long-term investments that would provide income and growth and value for five- to twelve-year periods.

From 1986 through March 1992, the Public Storage and Century Properties partnerships, having a total value of about $400,000, were not listed on the Dean Witter monthly account statements. A representative of respondent had assuaged claimant that he had been monitoring the partnerships and that all of them continued to be good and valuable investments. However, claimant asserted that the investments were unsuitable to her and her trust's needs. Claimant closed her accounts toward the end of 1994 after receiving correspondence indicating a erosion in the value of the partnerships since their acquisitions.

2

Case 1:06-cv-23035-MGC   Document 1-1   Entered on FLSD Docket 12/18/2006   Page 131 of
137
Case 1:05-cv-C   11-PSF   Document 22   Filed 12/21   105   Page 3 of 8

Claimant filed a claim with the National Association of Securities Dealers, Inc.

("NASD") in March 1997. The statement of claim alleged breaches of fiduciary duties

by Dean Witter, and two of its individual registered representatives, Robert Howard and

Paul Siler, including claims of unsuitability, bad advice, failure to monitor the

investments or keep claimant apprised of their value. In July 1997, claimant dismissed

her claims against Siler (Award at 3 of 7). In the same month, respondent countered

with a lawsuit in this district court, seeking to enjoin the arbitration on the basis the

claims were precluded by what is now NASD Code of Arbitration Procedure § 10304

(formerly § 15). That rule states that no dispute "shall be eligible for submission to

arbitration . . . where six (6) years have elapsed from the occurrence or event giving

rise to the act or dispute, claim or controversy . . . ." The lower courts grappled with

who, the arbitrators or the courts, decided as an initial matter the applicability of this

rule to the dispute. Ultimately, in a decision dated December 10, 2002, the United

States Supreme Court ruled that the issue of arbitrability presented in the case was

properly submittable in the first instance to the arbitrators for disposition rather than

to the courts. 537 U.S. at 85-86, *reversing Dean Witter Reynolds, Inc. v. Howsam*,

261 F.3d 956 (10th Cir. 2001).

In a ruling entered after an evidentiary pre-hearing held on February 12, 2004,

the arbitrators denied Dean Witter's request for a determination that the claims against

it were barred by § 10304, but granted the request of Respondent Howard for a

dismissal of the claims against him based on the rule. Award at 4 of 7. In its motion

to vacate the award, Dean Witter challenges this ruling and other aspects of the Award.

3

Case 1:06-cv-23035-MGC Document 1-1 Entered on FLSD Docket 12/18/2006 Page 132 of
137
Case 1:05-cv- '11-PSF Document 22 Filed 12/2 '005 Page 4 of 8

While the Award did not need to address with specificity every claim and defense

posed, and indeed it was not so comprehensive, it did reach the following conclusions:

1) Respondent, Dean Witter Reynolds, Inc. is liable for and shall pay to Karen Howsam, individually and as Trustee for the E. Richard Howsam, Jr. Irrevocable Life Insurance Trust dated May 14, 1982, the sum of One Million Three Hundred Forty Two Thousand Two Hundred Sixty Seven Dollars and Sixty One Cents ($1,342,267.61) in compensatory damages, inclusive of pre-judgment interest;

2) Respondent, Dean Witter Reynolds, Inc., is liable for and shall pay to Karen Howsam, Individually and as Trustee for the E. Richard Howsam, Jr. Irrevocable Life Insurance Trust dated May 14, 1982, post-judgment interest at the Colorado statutory rate from the date of service of this award until this award is paid in full;

3) Respondent, Dean Witter Reynolds, Inc.'s counterclaims, unless granted in the February 15, 2004 Order, are hereby denied and dismissed with prejudice;

4) To the extent not specifically awarded or otherwise provided for above, all other claims and requests for relief by any party hereto, are denied with prejudice; and

5) Other than the Forum Fees . . . below, the parties shall bear all other costs and expenses incurred by them in connection with this proceeding, including but not limited to attorneys' fees.

## APPLICABLE LAW

A district court's review of an arbitration award under the FAA is "strictly limited."

It is a "highly deferential" standard of review, which has been described as "among

the narrowest known to the law." *Bowen v. Amoco Pipeline Co.*, 254 F.3d 925, 932

(10th Cir. 2001) (quoting *ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1462 (10th

Cir. 1995)). This is because "[b]y agreeing to arbitrate, a party trades the procedures

and opportunity for review of the courtroom for the simplicity, informality, and expedition

4

of arbitration." *Brown v. Coleman Co., Inc.*, 220 F.3d 1180, 1182 (10th Cir. 2000), *cert. denied*, 531 U.S. 1192 (2001) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31 (1991)). A court may not, therefore, independently judge an arbitration award. *Ormsbee Dev. Co. v. Grace*, 668 F.2d 1140, 1147 (10th Cir.), *cert. denied*, *Grace v. Santa Fe Pac. Railroad Co.*,459 U.S. 838 (1982).

A court may vacate an arbitration award only in the limited circumstances provided in § 10 of the FAA, 9 U.S.C. § 10, or in accordance with a few judicially created exceptions. *Denver & Rio Grande Western Railroad Co. v. Union Pacific Railroad Co.*, 119 F.3d 847, 849 (10th Cir. 1997). Section 10(a) of the FAA contemplates vacating an arbitration award where it was procured by corruption, fraud, or undue means; where there was evident partiality or corruption by one or more arbitrators; where the arbitrators improperly refused to postpone the hearing or refused to receive relevant evidence or other such procedural irregularity; or, where the arbitrators exceeded their powers.

The nonstatutory bases for vacating an award are similarly circumscribed. In the Tenth Circuit a court can vacate an arbitration award where there was a manifest disregard of law, a violation of public policy or the denial of a fundamentally fair hearing. *Sheldon v. Vermonty*, 269 F.3d 1202, 1206 (10th Cir. 2001). Manifest disregard of the law means any "willful inattentiveness to the governing law," and something "more than error or misunderstanding with respect to the law." *ARW Exploration Corp.*, *supra*, 45 F.3d at 1463. "An arbitrator's erroneous interpretations or applications of law are not reversible." *Id.*

5

Case 1:06-cv-23035-MGC  Document 1-1  Entered on FLSD Docket 12/18/2006  Page 134 of
137
Case 1:05-cv-( 11-PSF  Document 22  Filed 12/2  )05  Page 6 of 8

**DISCUSSION**

Here, Dean Witter's main challenge is that the arbitrators exceeded their

authority in finding on February 12, 2004 that claimant's claims were not barred by the

NASD Code six-year arbitration provision, § 10304, as she waited 11 years, until 1997,

to bring her claims as to the investments made in 1986, and thereafter granting relief

on a claim untimely based on this rule. Worse, according to respondent, the arbitrators

knew they were exceeding their authority as can be seen by "incongruously" finding

against Dean Witter based on investments its agent recommended, yet dismissing all

claims against the agent individually under the six-year rule. Response to Motion to

Confirm at 2.

However, evidence presented at the February 12, 2004 pre-hearing supported

dismissal of the claims against the individual agent, as he was only in charge of

claimant's accounts for two or three months in 1986, had only one meeting with

claimant, and had left Dean Witter in 1988. (Partial Transcript of pre-hearing of

February 12, 2004, Exhibit E in Appendix to Respondent's Response filed June 10,

2005, at 24:6, 24:11-12, 156:3-4, 227:21). No showing was made that Dean Witter

should have been dismissed as well for the same reasons, or that there were not

other reasons for proceeding on the claims against that entity. Moreover, holding

a brokerage house liable for negligence without also holding an individual broker so

liable does not necessarily demonstrate a manifest disregard for the law. *Barkan v.*

*Lehman Bros., Inc.*, 2005 WL 1863672 *4 (S.D.N.Y., Aug. 4, 2005).

6

Case 1:06-cv-23035-MGC   Document 1-1   Entered on FLSD Docket 12/18/2006   Page 135 of
137
Case 1:05-cv-   '11-PSF   Document 22   Filed 12/2   '005   Page 7 of 8

There was also support for finding respondent's culpable acts or omissions spilling into the six-year period immediately preceding the assertion by claimant of her claims. The voluminous law cited by the parties does not reveal that § 10304 establishes an absolute rule of repose irrespective of ongoing wrongful acts or omissions of an arbitral respondent. *See e.g. Kidder Peabody & Co. v. Brandt*, 131 F.3d 1001, 1004 (11th Cir. 1997) (The "occurrence or event" giving rise to a claim under the NASD Code is the last occurrence or event necessary to make the claim viable, declining to interpret the predecessor to § 10304 "that would render some claims ineligible for arbitration before they came into existence.") In other words, the purchase date of an investment does not always trigger the running of the six-year period under § 10304. *Osler v. Ware*, 114 F.3d 91, 93 (6th Cir. 1997).

Given such legal support as the Supreme Court ruling in *Howsam, Kidder Peabody & Co. v. Brandt* and *Osler*, and the case law cited therein, it cannot be said that the arbitrators conclusions reflect "willful inattentiveness to the governing law," if there were any error at all. Dean Witter has made no showing of something "more than error or misunderstanding with respect to the law." *See ARW Exploration Corp., supra,* 45 F.3d at 1463. As such, the Tenth Circuit's interpretation of the Federal Arbitration Act that "an arbitrator's erroneous interpretations or applications of law are not reversible," *(id.)* assuming error even occurred, applies here. There are a host of possible scenarios supported by the evidence at the arbitration that point to no error at all, just a finding of longstanding improper conduct committed by a fiduciary as against an individual investor continuing within six years of claimant pursuing her claims.

7

Dean Witter has simply failed in establishing arbitrator error mandating setting aside the award.

Moreover, the fact that other portions of claimant's account did not poorly perform is no defense to the losses suffered by claimant determined by the arbitrators to be owing to respondent's improprieties as to other investments. Respondent's other arguments are similarly unavailing, including its attack on the arbitrator's damages methodology. *See Dominion Video Satellite, Inc. v. Echostar Satellite L.L.C.*, 2005 W.L. 3307384 *5-6 (10th Cir. Dec. 7, 2005) (summarizing judicial standards of review of arbitrator's damages awards, noting that courts will not interfere with an arbitration decision unless it can be said with positive assurance that the contract is not susceptible to the arbitrator's interpretation). Again, Dean Witter's efforts to show error are insufficient.

**CONCLUSION**

Claimant's Motion to Confirm Arbitration Award (part of Dkt. # 1) is GRANTED. Respondent's Cross-Motion for Order to Confirm Arbitration Award (Dkt. # 3) is DENIED.

The Clerk of the Court is directed to enter judgment for claimant, together with costs pursuant to Rule 54(d)(1), F.R.Civ.P.

DATED: December 21, 2005

BY THE COURT:

*s/ Phillip S. Figa*

_____

Phillip S. Figa
United States District Judge

8

**06-23035**

%JS 44  (Rev. 11/05)

# CIVIL COVER SHEET

CIV-COOKE

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

**I. (a) PLAINTIFFS** Grigsby & Associates, Inc. and Calvin B Grigsby

**DEFENDANTS** M Securities Investment, Howard Gary & Company, Howard V Gary and the National Association of Securities Dealers, Inc.

**(b)** County of Residence of First Listed Plaintiff  County of San Fran
(EXCEPT IN U.S. PLAINTIFF CASES)  Calif

County of Residence of First Listed Defendant  County of Dade
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Attorneys (If Known)

MAGISTRATE JUDGE
BROWN

**(d)** Check County Where Action Arose: DADE-DADE  ☑ MIAMI-DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

DADE 06cv23035/Cooke/Brown

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☑ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant
☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☑ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1  Original Proceeding
☐ 2  Removed from State Court
☐ 3  Re-filed- (see VI below)
☐ 4  Reinstated or Reopened
☐ 5  Transferred from another district (specify)
☐ 6  Multidistrict Litigation
☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S)
(See instructions second page):

a) Re-filed Case ☐ YES ☐ NO        b) Related Cases ☐ YES ☐ NO

JUDGE _____  DOCKET NUMBER _____

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):  15 U S C S 78aa

LENGTH OF TRIAL via  7  days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD  Calvin B Grigsby

DATE  12/12/06

FOR OFFICE USE ONLY

AMOUNT $ 350.00  RECEIPT # 951887

12/18/06